1
2
3
4
5

Pamela K. Fulmer (SBN 154736)
Dee A. Ware (SBN 154549)
Tactical Law Group LLP
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-3509
Facsimile: (415) 231-5272

Attorneys for Plaintiff RIVER SUPPLY, INC.

6
7

8        UNITED STATES DISTRICT COURT
9        NORTHERN DISTRICT OF CALIFORNIA

10
11
12

RIVER SUPPLY, INC., a Pennsylvania
Corporation;

13              Plaintiff,

14        vs.

15
16
17
18
19

ORACLE AMERICA, INC., a Delaware
corporation; NETSUITE, INC., a Delaware
Corporation; SPS COMMERCE, INC., a
Delaware corporation; VEND LIMITED, a
New Zealand corporation; LIGHTSPEED
COMMERCE INC., a Canadian Corporation;
APPFICIENCY INC., a Canadian corporation;
and Does 1 through 100,

20              Defendants.

**CASE NO: 3:23-cv-02981-LB**

**FIRST AMENDED COMPLAINT FOR:
FRAUD IN THE INDUCEMENT,
PROMISSORY FRAUD, NEGLIGENT
MISREPRESENTATION, BREACH OF
CONTRACT, BREACH OF WARRANTY,
BREACH OF THE IMPLIED COVENANT
OF GOOD FAITH AND FAIR DEALING,
THEFT UNDER PENAL CODE § 496,
UNFAIR BUSINESS PRACTICES UNDER
CAL. BUS. & PROF. CODE § 17200, AND
DECLARATORY RELIEF**

21
22
23
24
25

        Plaintiff River Supply, Inc. ("RSI" or "Plaintiff"), hereby complains against Defendants

Oracle America, Inc. ("OAI") and NetSuite, Inc. ("NetSuite") (collectively "Oracle"), SPS

Commerce, Inc. ("SPS"), Vend Limited ("Vend"), Lightspeed Commerce Inc., formerly known

as Lightspeed POS Inc., ("Lightspeed"), Appficiency Inc. ("AI"), and Does 1-100, inclusive

(collectively "Defendants"), as follows:

26                    **INTRODUCTION**

27
28

        1.      This case is about a widespread fraudulent scheme and unfair business practice

whereby Defendants OAI and its subsidiary NetSuite each year defraud countless American

---

companies, including Plaintiff, by representing falsely that they have developed an existing Software as a Service ("SaaS") subscription solution tailored for a specific industry, which with minor modifications they can customize for the customer so as to provide all of the functionality required by the customer at a fixed price.  Oracle targets small and medium size businesses such as Plaintiff with their NetSuite SuiteSuccess Cloud product (the "ERP Solution" or the "ERP Product"), knowing that they cannot provide all the functionality at the price promised.  But they do so anyway, offering steep discounts upfront to close the deal, all the while planning to inflate the original contract price through expensive change orders, as they work behind the scenes to create the solution that they claimed already existed.  Oracle lures their customers into signing complex and confusing agreements, several of which agreements are not adequately disclosed, and which the customer does not even know exist and therefore cannot be binding as there is no mutual assent, and no meeting of the minds.  These agreements are one-sided in Oracle's favor and often require payment up front for professional services fees but contain clauses that seek to limit or shield Oracle from liability in the event that it cannot deliver the solution that it claimed already existed.  Later when the customer has spent hundreds of thousands of dollars, and still has no working Enterprise Resource Planning ("ERP") Product, Oracle deploys "escalation teams", skilled at obfuscation and shifting the blame to the customer, all the while claiming that the customer is adding scope, which will require additional change orders.[1]  Often Oracle walks away from the implementation contract, pocketing the customer's money without implementing a workable ERP solution.

2.      At the end of the day RSI has paid Oracle and its recommended third-party business partners SPS, Vend, Lightspeed, and AI (collectively the "Oracle Partners" or "Business Partners") almost $170,000, for a solution that never worked, and on information and belief, which Oracle and its Business Partners knew at the time of contracting did not exist and that they could not develop for the price promised.  RSI seeks to rescind the agreements that it

---

[1]  In a lawsuit filed by a former Oracle/NetSuite employee Mr. Tayo Daramola, Mr. Daramola describes this scheme in detail in a 75-page complaint filed in the Northern District of California.  Attached hereto as Exhibit 1 is a true and correct copy of Mr. Daramola's amended complaint detailing Oracle's unlawful, unfair and fraudulent business practice and scheme.

was fraudulently induced to enter into, and seeks restitution and damages, including punitive

damages, to compensate it for the harm caused by Oracle's predatory, unlawful, and fraudulent

business practices, and to punish Oracle for its unlawful conduct.

**Oracle's Fraudulent NetSuite SuiteSuccess Scheme**

3.      Defendants Oracle and NetSuite tout their SuiteSuccess ERP Product in

marketing materials and on their website, making sweeping claims that have no basis in reality.

For example, according to Oracle's website, "NetSuite SuiteSuccess is a total solution designed

to manage all aspects of a business in a single system", which "gets you up and running

quickly".  Defendants claim that "KPIs, workflows, reports and value-driven dashboards meet

the day-to-day and strategic needs of all key roles within your company — from Day 1."  Here,

Oracle made these representations and others to induce RSI to enter into the contract.  These

representations turned out to be false. Now after signing the contract over 26 months ago,

Oracle has Plaintiff's money but has failed to deliver a functional ERP Product.  On information

and belief, Defendants Oracle and NetSuite have concocted this clever scheme to defraud

American companies including RSI, and to inflate their own profits.

4.      The unlawful scheme functions as follows.  First, Defendants sell their

SuiteSuccess cloud ERP Product to unsuspecting customers such as RSI as an already

developed solution that can quickly "go live" with only a few customizations and minor tweaks.

That is false.  On information and belief, in reality the solution often does not exist, is non-

functional or is still being developed.  But the product is sold as a completed solution, which

simply needs minor modifications to be implemented with the assistance of Oracle/NetSuite's

skilled professional services team, procured only by paying an additional fee.  Oracle then

offers deep discounts to sweeten the deal, all the time planning to make up the money lost

through discounting by later claiming that promised features were out of scope and were not

included in the contract price, thereby requiring the execution of expensive change orders,

which allow Oracle to make even more money.

5.      Oracle and the prospective customer engage in detailed discussions over multiple

days concerning the capabilities required by the customer, and the Oracle team assures the

customer that the NetSuite solution has those capabilities and can meet the customer's requirements and those features will be included in the Fixed Price Statement of Work.

6.      Once the customer is hooked and agrees to purchase NetSuite's SuiteSuccess ERP Solution, Oracle presents them with a complex set of contract documents via DocuSign, which contain hidden and confusing agreements that are not adequately called out by Oracle, and which contradict Oracle's previous representations and promises.  Many customers, including RSI, are completely unaware of Oracle's Subscription Services Agreement ("SSA"), which is contained in a disguised hyperlink, on the Estimate Form.  This agreement is not sent as an executable PDF, but rather is cleverly packaged and disguised so as to be completely missed by the typical Oracle small or medium sized business customer when executing the Estimate Form via a DocuSign link.  The SSA is presented to the Oracle customer through a hyperlink at the back of the simple Estimate Form.  However, the hyperlink is not in bold font or in a different color font so as to emphasize or draw attention to the link.  Rather just the opposite.  Oracle does not require the customer to click on or review the link to the SSA in order to execute the Estimate Form via DocuSign.  In fact, the prospective customer would not know the Estimate Form contained a hyperlink unless it hovered a cursor over the link.  In addition, clicking on the hyperlink does not result in the customer being taken directly to the SSA, but instead the customer lands on a page of the Oracle website where it is presented with a confusing menu of different types of agreements.  Even if the customer knew which of the many agreements it was looking for, it would take at least two additional clicks to get to that agreement.

7.      To compound the problem, the Fixed Price Statement of Work that is ultimately tendered contains Oracle's standard itemization of included services, which Oracle later claims do not include the functionality that it promised it could deliver during pre-contract discussions.  The Fixed Price Statement of Work also contains an integration clause, which purports to exclude from the agreement any previous discussions or understandings.  The prospective customer is not concerned because Oracle has represented that the terms included in the agreement accurately reflect all the features that the Oracle has promised during pre-contract discussions, which Oracle denies once the inevitable dispute arises.

8.      Oracle's presentation of the agreements for execution appears to be intentionally designed to mislead the Oracle customer into believing that the contracts are simple and transparent, when in fact they are not.  And because Oracle does not draw attention to the SSA or for that matter, the PS Terms for professional services that accompanies the Fixed Price Statement of Work ("Fixed Price SOW" or "SOW"), on information and belief many Oracle customers, including RSI are not even aware of either agreement while executing the Estimate Form or the Fixed Price SOW, or even during performance of the contract.  And the SSA, the Fixed Price SOW and the PS Terms are important contracts that a prospective customer would want to have fair notice of, as they contain such provisions as disclaimers of warranties, limitations of liability, contract term, termination, confidentiality, choice of law and other key provisions, including an integration clause.  Important clauses, which had the customer known of them, may have caused the customer to contract with another ERP provider.  For example, the SSA contains the following clause:

> ORACLE DOES NOT WARRANT THAT THE SERVICES WILL BE PERFORMED ERROR-FREE OR UNINTERRUPTED, THAT ORACLE WILL CORRECT ALL SERVICES ERRORS, OR THAT THE SERVICES WILL MEET CUSTOMER'S REQUIREMENTS OR EXPECTATIONS. ORACLE IS NOT RESPONSIBLE FOR ANY ISSUES RELATED TO THE PERFORMANCE, OPERATION OR SECURITY OF THE SERVICES THAT ARISE FROM CUSTOMER DATA OR THIRD PARTY APPLICATIONS OR SERVICES PROVIDED BY THIRD PARTIES.

Had RSI been aware of this clause prior to contract execution, which effectively seeks to absolve Oracle from any obligation to provide a working ERP solution, RSI would never have signed the contract.  RSI suspects that many other small and medium sized Oracle customers would not sign either had they had fair notice of these other agreements.

9.      The third part of the scheme involves Oracle selling an ERP solution to its customers that does not actually exist, and then trying to buy time to engineer the solution by accusing the customer of demanding features out of scope, which require a change order to provide.  On information and belief, Defendants Oracle and NetSuite offer large discounts pre-contract to get the customer in the door and to beat out the competition and win the contract, which they plan to make up through expensive change orders on the back end.  Oracle then

deploys "escalation teams" skilled at pointing the finger at the client or the third-party Oracle Partner, which Oracle recommended and brought to the table.  Next Oracle attempts to extract expensive change orders from the Oracle customer for the same functionality that Oracle had promised the client pre-contract.  And of course, in addition to the implementation fee and subscription services fees that Oracle often has already pocketed upfront, Oracle receives more payments for the expensive change orders, for a solution that does not work and has never gone live.  Often the Oracle customer pays the Oracle Partners a fee for providing functionality that it never uses because the solution never is put into production.  Later these Oracle Partners seek to renew their contracts for additional payments, even though the Oracle customer has received no functional ERP Solution.  RSI is familiar with this scheme, as it was one that Oracle and its Business Partners were deploying against RSI before Oracle essentially abandoned the contract, after failing to cure its many contractual breaches.  In addition to having first-hand experience with the scheme, RSI also learned of the fraudulent behavior due to the detailed complaint of a former Oracle employee, Mr. Daramola, who blew the whistle on the illegal practice and filed a lawsuit against Oracle and NetSuite in the Northern District of California.

10.     Finally, after 20 months of delays, performance failures and other excuses, RSI issued a notice of material breach and opportunity to cure to Oracle on November 14, 2022.  RSI even agreed to extend the cure period briefly to give Oracle additional time to effectuate the cure.  Instead, of curing its many breaches, Oracle deployed an escalation team against RSI, which sought to blame RSI for Oracle's failures and to extract an expensive change order, to get the functionality that Oracle had promised as far back as February of 2021.  At the time of this change order request, RSI had already paid Oracle and its Business Partners almost $170,000 in implementation and subscription fees, for a solution that never worked and never went live.  In addition to these damages, RSI was furthered damaged in the amount of at least $700,000 when it was forced to devote significant man hours and other internal and external resources to the failed project.  RSI also suffered additional damages in the form of lost revenue due to the failure to make the planned process improvements on sales, eCommerce and production in the amount of several millions of dollars.

11.     RSI brings this action seeking restitution of monies paid under the various contracts to Oracle and its Business Partners, as well as other damages suffered by RSI due to Defendants' illegal conduct, including but not limited to the cost of disruptions and unrealized efficiencies in bidding and quoting new jobs, managing inventory, as well as loss of resources, sales, revenue and profits due to the failed implementation; loss of process improvements; additional labor costs caused by the failed implementation; and additional costs and damages in an amount to be proven at trial.  RSI also seeks an injunction against Defendants under California Business & Professions Code Section 17200, which is necessary to prevent Defendants from defrauding and cheating other customers and to protect the American public. Finally, RSI seeks a declaration that the SSA and other hidden agreements such as the PS Terms, which RSI did not have fair notice of and did not agree to, are not binding for lack of mutual assent.  RSI also seeks a declaration that the agreements should either be completely rescinded due to Oracle's fraud in the inducement, or that certain provisions of those agreements are unenforceable against RSI because they are both procedurally and substantively unconscionable and were procured by fraud.  RSI also seeks punitive damages to punish Oracle for its illegal conduct.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on diversity of citizenship between the parties and supplemental jurisdiction over RSI's state law claims pursuant to 28 U.S. Code § 1367. Plaintiff RSI is incorporated and headquartered in Pennsylvania.  On information and belief, Defendants Oracle America, Inc. and NetSuite, Inc. are incorporated in Delaware and headquartered in Redwood Shores in San Mateo County, California.  OAI and NetSuite are also doing significant business in the District and thus are subject to jurisdiction here.  On information and belief, Defendant SPS is a Delaware corporation with its principal place of business in Minnesota.  On information and belief, Defendant Vend is a New Zealand corporation with its principal place of business in the Auckland, New Zealand and has an office in the District.  On information and belief, Defendant Lightspeed is a Canadian corporation with a principal place of business in Quebec, Canada. On

information and belief, Defendant AI is a Canadian corporation with a principal place of business in Ontario, Canada.  On information and belief all of the Oracle Partners are doing business in the District and are subject to personal jurisdiction here. The amount in controversy alleged herein exceeds $75,000.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Oracle and NetSuite are headquartered here and Oracle's Business Partners have minimum contacts here, and on information and belief, a substantial part of the events or omissions giving rise to the claims occurred in this District.  In addition, although Plaintiff does not concede that the SSA is enforceable, RSI notes that the SSA does contain a venue clause providing for venue in the District.

**THE PARTIES**

14.     Plaintiff RSI is a corporation organized and existing under the laws of the State of Pennsylvania.  RSI's principal place of business is in Brogue, Pennsylvania.  Founded in 2013, RSI is a premier architectural construction material supplier.  RSI Hardware is a dba of RSI, and RSI runs a retail hardware store also in Brogue, Pennsylvania.  KGB Equities, LLC ("KGB"), is a sister company to RSI and provides carrier services.

15.     RSI is informed and believes, and thereon alleges, that, at all times mentioned herein, Defendant Oracle America, Inc. was a corporation organized and existing under the laws of the State of Delaware.  On information and belief OAI's headquarters is in Redwood Shores, San Mateo County, California.  Defendant OAI, and certain of its related companies, are makers of database and enterprise software products, including Enterprise Resource Planning ("ERP") software.

16.     Plaintiff is informed and believes, and thereon alleges, that, at all times mentioned herein Defendant NetSuite, Inc. ("NetSuite") was a corporation organized and existing under the laws of the State of Delaware.  NetSuite was founded in 1998 with its headquarters originally in Austin, Texas. On information and belief, NetSuite has moved its headquarters to Redwood Shores in San Mateo County, California.  On information and belief, Oracle Corporation acquired NetSuite in November 2016, and OAI operates NetSuite and sells its

subscription services under the Oracle NetSuite brand.

17.     Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, Defendant SPS Commerce Inc. is a corporation organized and existing under the laws of the State of Delaware and is headquartered in Minneapolis, Minnesota.  On information and belief, SPS claims to help retail trading partners work better together by empowering data collaboration in the retail supply chain.

18.      Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, Defendant Vend Limited is a corporation organized and existing under the laws of New Zealand with its principal place of business in the Auckland, New Zealand and has an office in the District.  On information and belief, Vend provides cloud-based point of sale and retail management system solutions for the retail industry.  In 2022, Vend was acquired by Lightspeed POS Inc., which on information and belief, is a provider of cloud-based, omnichannel commerce platforms.

19.     Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, Defendant Lightspeed Commerce Inc. formerly known as Lightspeed POS Inc., is a corporation organized and existing under the laws of Quebec, Canada. On information and belief, Lightspeed markets its services by claiming that it provides a "retail POS system that streamlines operations", "seamless integrations and an open API" and "synchronized inventory management tools [that] let retailers instantly sell across channels and manage it all from a single POS system."

20.     Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, Defendant Appficiency Inc. is a corporation organized and existing under the laws of Ontario, Canada.  On information and belief, AI markets its services by claiming that they deliver "best in class NetSuite consulting, implementation and integration services".

21.     Plaintiff does not know the true names and capacities, whether individual, corporate, or otherwise, of the Defendants named herein as Does 1-100, inclusive.  Plaintiff therefore sues these Defendants by fictitious names. Plaintiff will amend this Complaint to reflect the Doe Defendants' true names and capacities when they have been ascertained by

inserting their true names and capacities in place of the fictitious names in accordance with the Federal Rules of Civil Procedure and any applicable state law.  Plaintiff is informed and believes, and thereon alleges, that whatever and wherever in this Complaint any of the Defendants are the subject of any charging allegations by Plaintiff, that Doe 1 through Doe 100 are also responsible in some manner for the events and happenings alleged herein, and it shall be deemed that such Doe Defendants, and each of them, are likewise the subject of RSI's charging allegations herein.

22.     Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, Defendants, whether sued by their true names, or as a Doe, were the principal, agent, servant, joint-venture, partner, parent, subsidiary, trustee, employee or director of each other Defendant, and acted within the course and scope of that relationship and/or were the legal alter ego of each other Defendant, having so dominated and controlled them to the point where their identities were no longer separate and it would be unfair and inequitable to treat them separately.

23.     At all relevant times, each Defendant was and is the agent of each of the remaining Defendants and, in doing the acts alleged herein, was acting within the course and scope of such agency.  Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants.

## GENERAL ALLEGATIONS
### NetSuite's SaaS Solution

24.     Defendant NetSuite is an American cloud-based enterprise software company that provides products and services tailored for small and medium businesses.  These products and services include accounting and financial management, customer relationship management ("CRM"), inventory and human capital management, payroll, procurement, project management and e-commerce software.  Defendants OAI and NetSuite market their NetSuite products as a Software as a Service ("SaaS") solution, which is cloud based.

25.     Defendant OAI and NetSuite target small and mid-size businesses such as RSI with their "SuiteSuccess" subscription cloud line of ERP and related products.  On their

website, Oracle touts their SuiteSuccess offering as "a total solution designed to manage all aspects of a business in a single system" and claims that its SaaS product gets companies "up and running quickly" and with "KPIs, workflows, reports and value-driven dashboards" meeting the "day-to-day and strategic needs of all key roles within your company — from Day 1." According to Oracle, "[w]ith SuiteSuccess, businesses realize faster time-to-value, increased efficiency and flexibility and accelerated success."

26. Defendants Vend and Lightspeed are NetSuite integration partners. On its website Vend claims that "Vend integrates with world-leading ERPs including NetSuite, to securely support complex tasks like in-store inventory management, supply chain and reporting." Vend also claims on its website that "Vend has all of the workflows you need to run your business. We integrate with leading ERP systems and retail management apps, and we offer complex multi-outlet inventory workflows, including stock ordering, fulfillment, returns and exchanges." On information and belief, Vend has recently been acquired by Lightspeed. Lightspeed claims that it provides a "retail POS system that streamlines operations", "seamless integrations and an open API" and "synchronized inventory management tools [that] let retailers instantly sell across channels and manage it all from a single POS system." Vend and Lightspeed agreed under OIA's installation plan to install and integrate a functioning point of sale and inventory tracking system within RSI's existing NetSuite environment to facilitate transactions and track inventory as it was and currently is advertised on the parties' websites.

27. Defendant SPS is a NetSuite integration partner that focuses on EDI. EDI stands for Electronic Data Interchange and allows companies to send information digitally from one business system to another, using a standardized format. SPS claims on its website that "EDI replaces order processes, transactions and communications that were done with paper or fax in the past" and is "an important component for automation in business processes." On its website, SPS claims that a "dedicated team of experts will ensure your Fulfillment EDI for NetSuite implementation is fast and easy. And because SPS is a proud member of the "Built for NetSuite" developer program, you can be confident that your solution will meet all of Oracle NetSuite's standards for quality, security and privacy."

28.     Defendant Appficiency is a NetSuite integration partner.  On its website, Appificiency claims that "Appficiency and Oracle NetSuite have been collaborating since 2015 to service customers by delivering first-rate innovative ERP and technology solutions" and "is a 100% NetSuite ERP-focused consulting firm, with a combined 250 years+ of experience on the platform" and that its "team has developed industry-leading solutions to meet the ERP business requirements for clients across several industries."

29.     RSI is a premier architectural construction material supplier and works closely with KGB and RSI Hardware in the business of supplying construction materials, hardware, machinery and tools, as well as providing carrier services.  For years RSI had been handling its various financial and accounting functions using Quickbooks® Desktop Enterprise software.  For its part, KGB was using Sage 100 for its accounting and inventory management needs, while RSI Hardware was using ECI Spruce to manage its sales, inventory and purchasing needs.

**RSI Decides to Seek One Integrated ERP Solution**

30.     Although RSI and its related companies liked the software they were using, RSI decided to search for a more robust solution, which had all the features the companies were currently using with Quickbooks Desktop Enterprise, Sage 100 and Spruce plus more in an all-in-one solution.  Specifically, RSI sought a cloud solution that could keep track of all aspects of the three businesses, including at the retail Point of Sale ("POS"), inventory management, accounting & financials, EDI, eCommerce, Warehouse Management System ("WMS"), and Customer Relationship Management ("CRM") software.  RSI identified Defendants' NetSuite product as a potential software solution and wanted to learn more about NetSuite's product offerings.  As a result, in the Fall of 2020, Mr. Tarry Bratton of RSI contacted Oracle about setting up a meeting to learn more about Oracle's ERP cloud solution.

31.     On October 2, 2020, Mr. Troy Landsberg on behalf of Defendants emailed Mr. Bratton to set up a call to learn more about what RSI was looking for in a new ERP product.  In his meeting invite, Mr. Landsberg described the call to discuss RSI's "business processes, challenges, and potential ERP initiative" and a "[h]igh level overview of [the] NetSuite platform".  In that first meeting attended by Mr. Tarry Bratton from RSI and Mr. Landsberg

from Oracle, RSI explained its business model and how the three companies (RSI, RSI Hardware and KGB) worked together and what they were looking for in a cloud solution.  Mr. Bratton described the details of the existing software that the companies were using and explained that RSI desired all the functionality of the current software plus additional features so the companies could manage all of the businesses in one integrated and seamless ERP solution.  Mr. Landsberg made the representations to River Supply that Oracle had the solution to combine all companies financially and help make process improvements to River Supply's then current system processes.  During the meeting Mr. Landsberg assured Mr. Bratton that NetSuite's SuiteSuccess product had all those features plus more and would be a great fit for RSI.  During this meeting Mr. Landsberg also represented that Oracle had experience with retail companies such as RSI Hardware and had successfully implemented similar SaaS solutions for those NetSuite customers.

**Oracle's Pre-Contractual Representations Concerning the SuiteSuccess Product**

32.     What followed from October 2, 2020 through the date of contract execution of February 26, 2021 was a series of approximately fourteen online and one in-person meetings, as well as additional email exchanges, where Oracle described the capabilities of their SuiteSuccess product and how it could be used to grow and scale RSI's and RSI's related companies' businesses.  RSI employees attending these meetings included Tarry and Tim Bratton, Joe Nolan, and Chad Rohrbach.  The Oracle team consisted primarily of Troy Landsberg, Chris Taverrite, Dan Damato, and Ben Gibson, with Mr. Landsberg leading most of the discussions.

33.     During these meetings RSI provided Oracle with detailed specifications of the attributes and functionality that it required from the NetSuite software solution, which Oracle promised that its software could deliver.  For example, in the Zoom meeting on October 2, 2020, Mr. Tarry Bratton on behalf of RSI described how RSI was using Quickbooks Desktop Enterprise, RSI Hardware was using ECI Spruce and KGB was using Sage 100.  Mr. Bratton explained RSI's requirement that the new ERP software include all of this existing functionality plus more, including the ability to perform the tasks from all of the three systems in one

seamless solution.  Mr. Bratton also detailed RSI's requirements that the software must be able to automatically update inventory from RSI's wholesaler for RSI Hardware, and that job flow and sales analytics must be fully functioning and work seamlessly.  In short, the solution needed to be a fully functional eCommerce platform, with a warehouse management module, EDI and assortment for the hardware store, and a payroll solution to replace the payroll in QuickBooks for the various companies.  In response in an October 2, 2020 email Mr. Landsberg acknowledged that the basic NetSuite solution could "handle the bulk of these requirements right out of the box" but that RSI would need to "separately license things like POS, eCommerce, and possibly Projects depending on how intricate your needs are there."  He then asked Mr. Bratton what type of budget he had in mind.  In response Mr. Bratton emphasized that the POS was a must have as RSI had a retail location, and that he did not have a lot of budget to work with as they had just purchased Spruce the previous year, which had been a $40,000 investment.

34.     On October 5, 2020 shortly after the initial Zoom call, Mr. Tarry Bratton followed up with Mr. Landsberg concerning a cost estimate for the project.  Mr. Landsberg thought that the solution would be focused around NetSuite's Manufacturing SKU with Advanced Financial Management and Advanced Inventory Management, CRM, Demand Planning, Warehouse Management Services ("WMS") and Point of Sale.  Mr. Landsberg estimated a one-time implementation fee between $40,000 to $80,000 and a yearly recurring cloud subscription cost of $50,000 to $85,000 for a total cost of ownership in Year One of between $80,000 to $165,000.  Mr. Tarry Bratton responded that this was too broad of a range and asked for a more specific number.  Mr. Landsberg responded that he believed he could get the list price of implementation, training and support at $102,000 and could get that discounted to $76,000.  On the subscription services side, he believed that he could get a list price of $80,000 with a discount to approximately $55,000.  Mr. Bratton responded that those prices were much higher than what had initially been quoted and that he would need to "test drive" the solution before paying such a high price.  Days later Mr. Landsberg attempting to entice RSI into continuing the conversation, mentioned that he had spoken to his leadership team and they were willing to

1    provide some "pretty aggressive pricing" if RSI was willing to commit to the evaluation.

2          35.     After the initial Zoom call and flurry of emails, the parties did not exchange

3    emails for several weeks.  But Oracle had RSI in its sights and wanted to get the RSI business.

4    Mr. Landsberg followed up with Mr. Bratton in November acknowledging that it was Oracle's

5    quarter-end, and that he could probably get even deeper discounts than what had previously

6    been discussed.  RSI did not take the bait and Mr. Landsberg followed up with Mr. Tarry

7    Bratton on December 18, 2020, with an email entitled "Where Do We Grow From Here?"  Mr.

8    Landsberg identified himself as the "dedicated Corporate Territory Manager" for RSI at

9    NetSuite.  He suggested that they set up another Zoom call for January and told Mr. Bratton that

10   "[i]f growth and improving operational efficiencies" are a part of RSI's plans for 2021, "I'd love

11   to connect and talk to you about an opportunity to run your business on a modern, cloud-based

12   solution like NetSuite to help companies like yourselves improve business processes,

13   particularly in areas of *Financial Management & Reporting, Inventory, Customer/Vendor &*

14   *Sales Data (CRM), Purchasing, Logistics, Marketing,* etc. on one software platform, to

15   eliminate the tedious & timely manual entry of data between multiple systems that lack

16   integrations, and propel you to make more informed business decisions with real-time,

17   unrivalled data."  Mr. Bratton did not respond and on January 5, 2021, Mr. Landsberg followed

18   up again claiming that he had "taken Journey's approach, and I won't stop believin' that there's

19   an opportunity for NetSuite to help RSI Hardware increase customer value over the

20   competition" and that he would love to talk to Mr. Bratton before he found himself locked into

21   another software solution.  Mr. Bratton agreed to a meeting but wanted to talk to NetSuite's

22   references first.  Mr. Bratton also made clear that RSI would require that a sandbox be provided

23   by Oracle as part of the deal so that RSI could test drive the system.  Finally, he requested that a

24   comprehensive demo be provided so that RSI could be assured that Oracle had all the

25   functionality included in its solution that it was promising.

26         36.     Mr. Bratton and the RSI team agreed to participate in follow-up meetings with

27   NetSuite and Mr. Landsberg on January 8, 2021 and again on January 12, 2021.  Mr. Tarry

28   Bratton, Mr. Tim Bratton, Mr. Joe Nolan, Mr. Keith Bell and Mr. Chad Rohrbach attended from

RSI.  Oracle representatives included Mr. Landsberg, Mr. Damato and Mr. Duncanson.  During both Zoom calls, Mr. Bratton again explained in detail RSI's requirements.  In response, Mr. Landsberg told the RSI team that the NetSuite solution could do everything RSI asked for, and was a one stop software solution that would house the financial, eCommerce, WMS, POS, and EDI solutions that River Supply currently performed with multiple software vendors, all in one integrated solution.  Mr. Landsberg promised that through NetSuite WMS, the inventory would be able to be tracked through multiple companies, including with locators to a specific point at RSI's facilities.  Mr. Landsberg also represented that the software was able to grow with the company to incorporate additional locations and that the solution would be able to handle the seamless flow of the data from RSI Hardware's wholesaler to the NetSuite Software and into RSI's inventory. Mr. Landsberg promised that the entirety of the solution would be provided by NetSuite only and there would be no third-party integrations.  Finally, Mr. Landsberg represented that there would be no hidden costs and the cost breakdown that he would supply would be the cost that the system would be for RSI each year and was a fixed price contract. Mr. Landsberg assured RSI that Oracle had an existing solution that it had designed for other customers in the same type of retail business as RSI Hardware.  Mr. Landsberg promised that any customization would be easy to perform given NetSuite's extensive experience with similar companies.  Mr. Landsberg also told the RSI team that given its proven track record with tens of thousands of other customers, it was able to ensure that its customers could go live faster and that implementation costs to the customer were less than Oracle's other competitors.  Mr. Landsberg and his colleagues again confirmed that their solution had the desired Quickbooks Desktop Enterprise, Sage 100 and ECI Spruce features already built in and was fully capable of meeting RSI's needs, with only minor customizations.

37.    Although Mr. Landsberg initially represented that all the work could be done by Oracle, in mid-January he introduced the idea of bringing in third party trusted Oracle Partners to take on certain parts of the project.  For example, in an email dated January 15, 2021, Mr. Landsberg indicated that NetSuite recommended bringing on its implementation partner, AppFiciency to handle some of the job costing tasks.  Then on January 20, 2021, Oracle

requested a call with RSI to prepare for the upcoming demo scheduled for February 1st.  During this call Oracle indicated that they might need to bring in a third party to perform the "Point of Sale" ("POS") part of the project, as NetSuite could not natively handle multiple units of measure, among other features required by RSI.  Mr. Landsberg explained that NetSuite worked very closely with certain third-party vendors, and these vendors were Oracle business partners and were tightly integrated into the NetSuite solution and had worked together on many successful projects.  After the call Mr. Landsberg followed up with an email attaching some preliminary pricing that was discussed in the earlier meeting and also adding in pricing for the eCommerce and Payroll modules.  In closing, Mr. Landsberg mentioned Oracle partners' Netscore, Vend, and/or Lightspeed as potential third-party POS vendors for RSI's consideration, and provided links to their respective websites.  At no time during this meeting or any of the follow-up meetings did Mr. Landsberg disclose that RSI would need to manage or negotiate directly with the third parties.  Instead, Mr. Landsberg led the RSI team to believe that Oracle would manage the project and any third-party partners they brought to the table, and that would be part of the implementation services provided.

38.     The next day on January 21, 2021, Mr. Tarry Bratton followed up with Mr. Landsberg.  In his email response, Mr. Bratton attached a previous email string and noted that from the beginning RSI had made it clear that they were seeking a "complete system" and even attached a "flow of software" chart showing the components of what was needed.  Attached hereto as Exhibit 2 is a true and correct copy of RSI's flow chart showing the required functionality.  Mr. Bratton noted that although Mr. Landsberg had firmed up the pricing earlier, his latest proposal was the highest price quoted yet.  Mr. Bratton expressed concerns after the previous day's conversation about how the discussion process with NetSuite was playing out.  Mr. Bratton again emphasized that RSI was seeking "a complete system that we can be confident that we have software solution that will not just help us this year but, in the future, as well.  We need a partner in this software company not just another sales job."  He concluded by saying "[i]f you can not do something on the flow chart, please let us know what that is".  He concluded by saying he wanted to see all of this running on a demo before he wasted any more

time sitting in meetings and not knowing whether the solution would work.  Mr. Landsberg responded explaining some of the increase in price but concluding "[a]t the end of the day NetSuite has a complete solution for River Supply Inc and we want to prove it to you, and partner with you."

39.    Mr. Landsberg followed up via email with the RSI team on January 25th, asking for a call and stating that there has "a bit of a shift in thought/strategy" for approaching the project and he wanted to share these new thoughts with RSI.   During that call Mr. Landsberg explained that rather than providing one demo, the Oracle team intended to provide several demos so that they could provide in depth details concerning each portion of the project and demonstrate all of the capabilities of the solution.

40.    On February 1, 2021 NetSuite set up the first in depth demo of the NetSuite solution, which focused on ERP and Payroll.  Attending from the RSI side were Mr. Tim Bratton, Mr. Rohrback and Mr. Dan Jamison.  Attending from Oracle/NetSuite was Mr. Landsberg, Mr. Damato, Mr. Gibson, Mr. John Barbera and Mr. Eric Puls.  At the meeting Oracle provided an in-depth demo and alignment session to the ERP and payroll portions of the solution and claimed to have made great progress in firming up the entire solution.  Tarry and Tim Bratton, Chad Rohrbach and Joe Nolan attended the demo from the RSI side.

41.    The next day on February 2nd Mr. Landsberg followed up with Mr. Bratton in an email seeking to schedule the next demo for the following week, which would focus on NetSuite WMS, NetSuite e-Commerce, AppFiciency, Material Job Costing Module, and Point of Sale.  In his email, Mr. Landsberg discussed bringing a third party on board to handle a piece of the project involving "Point of Sale" ("POS").  Specifically, Mr. Landsberg stated that "based off of our discussion yesterday, we, as a team are going to recommend that we look to a Partner for Point of Sale simply because "NetSuite's Point of Sale (SuiteCommerce In-Store) cannot natively handle multiple units of measure".  Mr. Landsberg conceded that the SuiteCommerce product, could not do things like have a customer make a deposit and pay the balance later and that Oracle was not confident on NetSuite having the drop ship feature discussed at the previous day's meeting.  He concluded by saying that the Oracle team would "look to a Built for

NetSuite partner that can handle these things and tightly integrate with NetSuite".  At no point did Mr. Landsberg express any uncertainty about the feasibility of providing the promised solution.  Instead, this portion of the conversation was framed as bringing in a close Oracle partner with a proven track record to handle this portion of the project, which Oracle would manage.  Oracle followed up on February 3rd and the parties engaged in a high-level discussion of the eCommerce portion of the solution for RSI and RSI Hardware.

42.     On February 10th Mr. Landsberg sent an email proposing a POS demo for the following Tuesday and stating that after the next demo they could do one final demo, which would "tie up the solution, just so that you can know the flow and make sure you're comfortable with everything tied together."

43.     The next Zoom call was then set for February 11, 2021.  The purpose of this meeting was to explain the e-Commerce, WMS, and the Material Job Costing/Projects pieces of the solution.  Up to this point Oracle had still not demonstrated the entire system, and RSI once again requested that Oracle show the entire solution that it would be delivering for RSI.  Mr. Landsberg responded that the entire solution would be demonstrated at the upcoming February 18th in person meeting at RSI's offices and would include Vend for the POS portion.

44.     During the meetings in early February, Defendants represented to RSI that their solution had all of the features that RSI wanted, except for the "Point of Sale" piece.  For that piece Oracle recommended Vend, which it described as its "partner", and scheduled a demo for the morning of February 18th, while the afternoon was reserved for demonstration of the NetSuite solution.

45.     On February 15th Mr. Landsberg sent the RSI team an email utilizing RSI's initial flow chart and for the first time set forth what Oracle was proposing to be standard NetSuite functionality, an additional NetSuite module, or a third-party partner solution.  The document was color coded with items highlighted in green being a NetSuite standard item, those highlighted in yellow being a NetSuite additional module, and those highlighted in purple being a partner solution.  Attached hereto as Exhibit 3 is a true and correct copy of this document.  Only three items constituted an additional module: SuitePeople Payroll, NetSuite eCommerce,

and a Warehouse Management Module.  The partner solutions consisted only of POS, EDI to Vendors, and Material Job Costing and Project Task Management.  For the partner solutions, Oracle recommended Vend for POS, SPS Commerce for EDI, and Appficiency for Material Job Costing.  The vast majority of the items in the document were highlighted in green as a standard NetSuite item.

46.     Oracle scheduled the onsite demo meeting on the afternoon of February 18, 2021.  Mr. Nolan, Mr. Tim and Mr. Tarry Bratton, Mr. Rohrbach and Mr. Jamison attended on behalf of RSI, and from Oracle Mr. Troy Landsberg, and Mr. Damato attended in person, and Mr. Gibson, Ms. Azoulay, Mr. Krajci, Mr. Tuzzo and Mr. Barbera of Oracle attended the meeting via Zoom.  During the demo, all of the portions of the solution sought by RSI appeared to be successfully demonstrated. On behalf of Oracle, Mr. Landsberg represented that the existing NetSuite solution could combine all three companies financially and that Defendants could assist RSI with making the process improvements to its then current system.  At this meeting, Mr. Landsberg also discussed that NetSuite intended to enlist several of their other long-term business partners to assist with certain parts of the implementation.  Mr. Landsberg broke the implementation down into 2 phases.  Phase 1 would be the delivery of SuiteSuccess for Wholesale Distribution, which would include a warehouse management system (Store only), Project Management, Advanced Financials and Payroll.  Mr. Landsberg explained that this would be the ERP portion of the implementation.  The second part of this first phase would be SuiteSuccess for Commerce, which would include a business-to-business portion, a connector for vendors provided by SPS, and support for NetSuite partners which included Solupay (credit card processing), Vend (POS) and Appficiency (job costing).  Oracle promised that both facets of this Phase I would "go live" no later than 4 to 5 months after contract execution.  A second phase would then follow after the "go live" date, which would include warehouse set up, rebates, and other functionality.  During this meeting Mr. Tim Bratton repeatedly emphasized that cost was very important to RSI and that RSI wanted one price, which would be "all in" and that there would be no hidden costs.  During the meeting Mr. D'Amato made it clear that all of the features and functionality that RSI sought in the solution was included in the proposed

pricing and there would be no other hidden costs, and that the price was fixed.  On information and belief, at the time that Mr. Landsberg and Mr. D'Amato made these representations they knew them to be false.

47.     In a follow-up email Mr. Landsberg sent a document entitled "NetSuite & River Supply Inc., Solution Recommendation".  Page 19 of the document set forth a schedule for Phase I, which was consistent with the promises Mr. Landsberg made during the meeting.  Mr. Landsberg represented that the Oracle professional services team would act as the Project Manager and would coordinate the work of the third party trusted Oracle partners to ensure that the work was done in a timely fashion and that the project remained on track.  Mr. Landsberg also represented that the recommended Oracle Partners were well known by Oracle and had multiple successful outcomes on similar projects, for implementations for large retail customers like RSI.  On information and belief, at the time Mr. Landsberg made these representations he knew that they were false, and there was no proven track record on complex implementations similar to RSI in the retail industry with these recommended Oracle Partners.  Mr. Landsberg made the representations knowing they were false in order to induce RSI to enter into the contract, because he knew that RSI was hesitant to have NetSuite bring in so many third-party partners, and he wanted RSI to believe that Oracle had successfully managed similar projects with these exact same Oracle Partners, and that Oracle could do so again on the RSI retail project.

48.     On February 19th Mr. Landsberg sent Mr. Bratton a new email which included new pricing.  Mr. Landsberg explained that "3 weeks ago when we presented pricing the list price was $90K for Software (Presented in Right-hand Column) and is now $121K. This is because we have added Warehouse Management, Project Management, and Advanced Financials (Project Billing) as modules since then after the Alignment meetings."  Referring to RSI's flow chart, Mr. Landsberg then represented that **"[t]he software costs now consist of all of the things that you outlined as needed** and the timing works out well with our end of quarter being next week so we have been able to pull some strings on additional discounts to get the cost discounted all the way down to $60K! We are pleased with this because we actually

went DOWN $12K from our initial pricing we shared but increased the software by about $30K."  Mr. Landsberg explained that he was able to offer a more aggressive discount as February 28th was Oracle's end of quarter, and that by including Advanced Customer Support ("ACS") Oracle was able to "discount ~$30K off of the implementation because our Professional Services team is willing to cover that ACS expense to ensure long-term customer success."  He concluded that "[w]e understand the Implementation/Training and Support costs are probably big and scary but you will be left with a much more reasonable expense for just the software moving forward."

49.    During an online meeting on February 24th, Mr. Landsberg of Oracle promised that RSI would be able to "go live" with Phase I of the solution no later than 4 to 5 months after execution of the contract.  Mr. Landsberg again reiterated to Mr. Bratton and his team that the price that Oracle would charge for the solution, would be "all in" and that there would be no additional or hidden charges. During the meeting Mr. Landsberg was adamant that NetSuite could provide all of the functionality requested by RSI for that price.  The "go live" date, the fixed price promise, Oracle's representations that it had worked successfully with the Oracle Partners on similar retail projects, along with Oracle's representations that it could deliver all of the features and functionality that RSI required were material inducements for RSI to enter into the contract, and RSI would not have contracted with Defendants had it known that Oracle and the Oracle Partners did not have a comprehensive solution with those features and functionality, at a fixed price, which could go live within 4 to 5 months of contract execution.  On information and belief, at the time that Mr. Landsberg made those representations he knew that they were not true and made the representations solely to induce RSI to enter into the contracts.

50.    Also on February 24, 2021, in a follow-up email to Mr. Bratton, Mr. Landsberg once again changed the pricing structure and claimed that if RSI didn't move fast and accept the offer that the aggressive discounting would go away.  Mr. Landsberg explained that Oracle was giving its best price and that Implementation/Training/Support would be $92,600.00, the Software would cost $42,588.00 for a total price in year one of $130,088.  Mr. Landsberg claimed that this was a savings for year one of $143,794, or a total discount of 65%.  The annual

renewal cost after the first year would be $42.5K which would include a 1% renewal cap.  Mr.

Landsberg concluded by claiming that "I've been here for 3 years and have never been in a deal

with this discount level" and that "if pricing is a concern this is the best opportunity I have

seen". Mr. Landsberg stated that RSI was "welcome to pay money up-front" but he would "need

to know by tomorrow morning what [RSI would] like to put down."  He concluded that "[n]ot

to be a used car salesman but I know for sheer fact that we are going to lose a significant portion

of these discounts on Monday because of expiring promos we have. If this new pricing works

for you guys and if you think it's the right solution like we do, I need the thumbs up so I can

sprint at this approval process and have docs signed by Friday."

**The DocuSign Agreements**

51.     In reliance on Oracle's representations concerning the fixed price nature of the

professional services contracts, the promised "go live" date, and Oracle's representations that

the NetSuite solution could do everything RSI asked for, and was a one stop software solution

that would house the financial, eCommerce, WMS, POS, and EDI solutions that RSI currently

performed with multiple software vendors (i.e. , all of the features of Quickbooks Desktop

Enterprise, Sage 100 and ECI Spruce) all in one integrated solution with all the current features

included, and that Oracle and the recommended partners had created similar solutions for

complex retail customers like RSI, RSI executed the DocuSign agreements.

52.     Oracle submitted several contract documents to RSI via DocuSign for signature.

RSI is a very small company and does not have a legal department.  Nor did it retain outside

counsel to review the DocuSign agreements, as the Oracle team made it clear that the

documents were standard and could not be revised at that point, and in any event included all of

the features promised by Mr. Landsberg and others during pre-contract discussions.  Mr. Chad

Rohrbach of RSI executed the agreements on February 26, 2021 via the DocuSign links shared

by Oracle.

53.     The documents delivered via DocuSign included two Estimate Forms and two

Fixed Price Statements of Work.  The first Estimate Form number 809145 and dated January

17, 2021 ("NetSuite SuiteSuccess Manufacturing Solution") described the main cloud product

as a 12-month subscription for the "NetSuite SuiteSuccess Manufacturing Std. Cloud Service". The subscription services in addition to Manufacturing, which were included, included a 12-month subscription for NetSuite Project Management, Financial Management, WMS, SuiteCommerce Webstore, SuitePeople Payroll, and 12 months of support, among other things. Also included was an implementation fee for professional services.  Attached hereto as Exhibit 4 is a true and correct copy of Estimate Form number 809145 ("Estimate Form 1").  The second document included with the DocuSign submission was Estimate Form number 822038 dated February 18, 2021 ("NetSuite ACS Optimize"), which was for advanced customer support. Attached hereto as Exhibit 5 is a true and correct copy of Estimate Form number 822038 ("Estimate Form 2").  Estimate Form 1 and Estimate Form 2 are referred to collectively herein as the "2021 Estimate Forms".  The fourth and fifth documents submitted for signature via DocuSign were two Fixed Price Statements of Work ("Fixed Price SOW" or "SOW") for professional consulting services, which governed the implementation portion of the contract and were for a fixed fee.  Attached hereto as Exhibit 6 is a true and correct copy of the first SOW for SuiteSuccess Manufacturing Standard and Warehouse Manufacturing System ("SOW 1"). Attached hereto as Exhibit 7 is a true and correct copy of the second SOW for SuiteSuccess Payroll ("SOW 2").  SOW 1 and SOW 2 are referred to collectively as the "2021 SOWS".  With the exception of a financing agreement with Oracle Credit Corporation ("OCC") that we discuss below, no other agreements were sent to RSI via DocuSign for signature on February 26, 2021, except for Exhibits 4 through 7.  Mr. Rohrbach signed the 2021 SOWs and the 2021 Estimate Forms via the DocuSign links believing that these were the only four governing agreements. Although SOW 1 contained an integration clause, it was RSI's understanding based on representations made by Mr. Landsberg and Mr. D'Amato and others that the list of services included in the 2021 SOWs, as well as the items set forth in the 2021 Estimate Forms contained all of the features that Oracle had promised RSI during pre-contract discussions and in the various demos, and would deliver all of the required functionality.

54.     In addition to the four contracts attached as Exhibits 4 through 7, RSI also signed a financing agreement with OCC, which provided for 10 payments of $11,306.04 for Oracle

Consulting and Cloud Services commencing April 2021 and ending February 1, 2022 and 6 payments for $ 3,966.67 for Advanced Customer Support ("ACS") commencing September 2021 and ending February 1, 2022.

### OAI's Hidden Agreements and RSI's Lack of Consent

55.     However, unbeknownst to RSI, on page 5 of Estimate Form 1 under a heading entitled A.1 Agreement, OAI included a disguised hyperlink to a June 1, 2020 Subscription Services Agreement ("SSA")[2].  The link was not set off in bold or a different color or presented in any way that would draw attention to it or that would indicate it was a hyperlink.  Only by hovering a cursor over the URL could a reader see that it was a clickable hyperlink.  On information and belief, even had one clicked on the hyperlink, it would not have taken the reader to the Subscription Services Agreement.  Instead, on information and belief, the reader would have been taken to a confusing page on Oracle's website entitled "Oracle NetSuite Cloud Services Contracts".  Attached as Exhibit 8 is a true and correct PDF copy of that web page from the Wayback Machine downloaded on March 22, 2023, showing this page on Oracle's website as of March 7, 2021.  On information and belief, the reader would then be presented with 4 different options, including a section for Cloud Service Contracts, Cloud Services Subscriptions, Cloud Services Contract Terms, and Cloud Delivery Policies.  On information and belief, assuming that the reader clicked on Cloud Service Contracts, it would be taken to a new page with a confusing menu of 13 additional agreements, addendums, and additional terms. Attached hereto as Exhibit 9 is a true and correct copy of that webpage from the Wayback Machine downloaded on March 22, 2023, showing this webpage on Oracle's website as it existed as of May 21, 2021.  Only by clicking the link for Subscription Services Agreement would the reader be able to finally access the SSA document.

56.     When RSI executed the 2021 Estimate Forms and the 2021 SOWs it was unaware of and had never reviewed the SSA, which contains several one-sided provisions favoring OAI including an integration clause, a limitation of liability, an automatic renewal clause and a very

---

[2]In September 2022 when RSI first learned through counsel of the existence of the SSA, that particular version could no longer be accessed through the link and had to be found in an archived version located at a different location on Oracle's website.

broad disclaimer of warranties, which essentially attempts to disclaim any obligation for providing a functioning SaaS solution.  The SSA contains the following clause:

9. Warranties, Disclaimers and Exclusive Remedies.

9.1 Each party represents that it has validly entered into this Agreement and that it has the power and authority to do so. Oracle warrants that during the Term, Oracle will perform (i) the Cloud Service using commercially reasonable care and skill in all material respects as described in the Oracle NetSuite Written Materials, and (ii) any Professional Services and Support Services in a professional manner consistent with industry standards (the warranties described by the foregoing clauses (i) and (ii), collectively, the "Services Warranty"). If the Services provided to Customer were not performed as warranted, Customer must promptly provide Oracle with a written notice that describes the deficiency in the Services (including, as applicable, the service request number notifying Oracle of the deficiency in the Services). For Professional Services, Customer must notify Oracle of any warranty deficiencies within 60 days from performance of the deficient Professional Services.

9.2. ORACLE DOES NOT WARRANT THAT THE SERVICES WILL BE PERFORMED ERROR-FREE OR UNINTERRUPTED, THAT ORACLE WILL CORRECT ALL SERVICES ERRORS, OR THAT THE SERVICES WILL MEET CUSTOMER'S REQUIREMENTS OR EXPECTATIONS. ORACLE IS NOT RESPONSIBLE FOR ANY ISSUES RELATED TO THE PERFORMANCE, OPERATION OR SECURITY OF THE SERVICES THAT ARISE FROM CUSTOMER DATA OR THIRD PARTY APPLICATIONS OR SERVICES PROVIDED BY THIRD PARTIES.

9.3. FOR ANY BREACH OF THE SERVICES WARRANTY, CUSTOMER'S EXCLUSIVE REMEDY AND ORACLE'S ENTIRE LIABILITY SHALL BE THE CORRECTION OF THE DEFICIENT SERVICES THAT CAUSED THE BREACH OF WARRANTY, OR, IF ORACLE CANNOT SUBSTANTIALLY CORRECT THE DEFICIENCY IN A COMMERCIALLY REASONABLE MANNER, CUSTOMER MAY END THE DEFICIENT SERVICES AND ORACLE WILL REFUND TO CUSTOMER THE FEES FOR THE TERMINATED SERVICES THAT CUSTOMER PRE-PAID TO ORACLE FOR THE PERIOD FOLLOWING THE EFFECTIVE DATE OF TERMINATION.

9.4 TO THE EXTENT NOT PROHIBITED BY LAW, THESE WARRANTIES ARE EXCLUSIVE AND THERE ARE NO OTHER EXPRESS OR IMPLIED WARRANTIES OR CONDITIONS INCLUDING FOR SOFTWARE, HARDWARE, SYSTEMS, NETWORKS OR ENVIRONMENTS OR FOR MERCHANTABILITY, SATISFACTORY QUALITY AND FITNESS FOR A PARTICULAR PURPOSE.

This provision flies in the face of and contradicts all of the other promises made by Oracle which included that Oracle had an existing solution, which would require only minor customizations to perform the required functionality detailed by RSI at a fixed price, and which would "go live" no

later than August or September 2021.  In short, RSI had no fair notice of the SSA, and therefore never assented to be bound by those terms, and there was no meeting of the minds, so as to bind RSI to the terms of the SSA.

57.     With regard to the SOW 1 and SOW 2 for professional services, OAI also drafted the documents in such a way as to be confusing and non-transparent, so that RSI never consented to the PS Terms and there was no meeting of the minds as to what exactly constituted the PS Terms.  Oracle never at any time provided RSI with a copy of the PS Terms for execution with the DocuSign link.  Instead, both 2001 SOWs merely referenced the PS Terms vaguely in the first paragraph as follows:

> "This Statement of Work ("SOW") describes the professional services (the "Professional Services") to be performed by Oracle America, Inc. ("Oracle") for Customer (collectively "Parties") pursuant to the applicable agreement governing Oracle's performance of Professional Services (the "PS Terms") listed below (in order of preference, as applicable):
>
> (i)     the Professional Services Addendum to the Subscription Services Agreement entered by and between the Parties,
> (ii)    the separate Professional Services Agreement entered by and between the Parties; or
> (iii)    if neither (i) nor (ii) are applicable, the Professional Services Agreement found at www.netsuite.com/termsofservice (or such other URL specified by Oracle).
>
> Once executed by the Parties, this SOW shall be incorporated by reference into the PS Terms.  In the event of any inconsistency or conflict between the terms and conditions of this SOW and the PS Terms, the terms and conditions of this SOW shall govern with respect to the subject matter of this SOW only.  Capitalized terms used in this SOW shall have the meaning defined under the PS Terms.  This SOW may not be modified or amended except in a writing signed by a duly authorized representative of each party.  As used in this SOW, "You" or "Your" shall refer to the Customer as defined in the Agreement."

The only conclusion that can fairly be drawn from such a provision is that Oracle is trying to make it difficult to understand what actually constitutes the applicable PS Terms.  RSI is unable to ascertain whether the Professional Services Addendum governs (section i), or if the Professional Services Agreement governs (section iii).  If Oracle wanted the SOW to be incorporated by reference into the PS Terms, it should have done so clearly and should have specifically included the PS Terms for signature with the DocuSign link.  Instead, Oracle played

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

hide the ball.  Like the SSA, the PS Terms located at www.netsuite.com/termsofservce contains a broad disclaimer of warranties:

> 5. Professional Services Warranty.
>
> 5.1 Oracle warrants that Professional Services will be provided in a professional manner consistent with industry standards. Customer must notify Oracle of any warranty deficiencies within 60 days from performance of the deficient Professional Services.
>
> 5.2 ORACLE DOES NOT WARRANT THAT THE PROFESSIONAL SERVICES WILL BE PERFORMED ERRORFREE OR UNINTERRUPTED, THAT ORACLE WILL CORRECT ALL PROFESSIONAL SERVICES ERRORS, OR THAT THE PROFESSIONAL SERVICES WILL MEET CUSTOMER'S REQUIREMENTS OR EXPECTATIONS. ORACLE IS NOT RESPONSIBLE FOR ANY ISSUES RELATED TO THE PERFORMANCE, OPERATION OR SECURITY OF THE PROFESSIONAL SERVICES THAT ARISE FROM CUSTOMER DATA OR THIRD PARTY APPLICATIONS OR PROFESSIONAL SERVICES PROVIDED BY THIRD PARTIES.
>
> 5.3 FOR ANY BREACH OF THE PROFESSIONAL SERVICES WARRANTY, CUSTOMER'S EXCLUSIVE REMEDY AND ORACLE'S ENTIRE LIABILITY SHALL BE THE CORRECTION OF THE DEFICIENT PROFESSIONAL SERVICES THAT CAUSED THE BREACH OF WARRANTY, OR, IF ORACLE CANNOT SUBSTANTIALLY CORRECT THE DEFICIENCY IN A COMMERCIALLY REASONABLE MANNER, CUSTOMER MAY END THE DEFICIENT PROFESSIONAL SERVICES AND ORACLE WILL REFUND TO THE CUSTOMER THE FEES FOR THE TERMINATED PROFESSIONAL SERVICES THAT CUSTOMER PRE-PAID TO ORACLE FOR THE PERIOD FOLLOWING THE EFFECTIVE DATE OF TERMINATION.
>
> 5.4 TO THE EXTENT NOT PROHIBITED BY LAW, THIS WARRANTY IS EXCLUSIVE AND THERE ARE NO OTHER EXPRESS OR IMPLIED WARRANTIES OR CONDITIONS, INCLUDING FOR SOFTWARE, HARDWARE, SYSTEMS, NETWORKS OR ENVIRONMENTS OR FOR MERCHANTABILITY, SATISFACTORY QUALITY AND FITNESS FOR A PARTICULAR PURPOSE.

Thus, the Professional Service Agreement, if OAI contends it applies, suffers from the same defects as the SSA and is procedurally and substantively unconscionable given both the way it was presented to RSI, and also the way it attempts to disclaim warranties and limit liability just like the SSA.  Clicking on the link in Section iii causes the reader to be taken to the Oracle website and presented with the same confusing web pages shown on Exhibits 8 and 9.  The reader is left to guess as to which of the 4 options on that page contains a link to the applicable Professional Services Agreement and thus the PS Terms.  If the reader elects the "NetSuite Cloud Services Contracts", it is taken to the page as shown on Exhibit 9, where it is presented with 9 separate agreements, including two that relate to the provision of professional services.

RSI cannot be bound by the PS Terms as it had no knowledge of them at the time of the execution of the contract, and cannot determine with any certainty as of today, exactly which one OAI claims applies. In short, RSI had no fair notice of the PS Terms, and never agreed to them, and these one-sided provisions should not be enforceable against RSI.

**Oracle's Material Breaches, Performance Failures and Fraud**

58.     Oracle breached the SOW for professional services by failing to implement a workable ERP solution and failing to perform the services in a professional manner consistent with industry standards, and as was represented by Oracle. From the beginning Oracle's professional services team appeared anything but professional. Instead, they were unprepared and over their heads and did not to have a thorough understanding of their own technology. Oracle also failed to field a stable team to manage the project, and the team was plagued by high turnover among the Oracle professional staff. For example, in June of 2021, a key member of the Oracle team, Mr. Richard Gardener announced he was leaving NetSuite. It was about that time that RSI learned that the customization prepared by Mr. Gardener would not work. This revolving door of Oracle employees and consultants also included a large number of personnel located outside of the U.S., many of whom were not able to communicate effectively in English. These language barriers among Oracle staff only exacerbated the communication problems and the chaos. Oracle professional staff missed meetings, and often Oracle failed to field the relevant key team members needed for specific meetings. Instead, work would need to be put on hold until the following weeks' meeting. In addition to the missed meetings, Oracle employees also frequently dropped the ball on tasks that had been assigned to them. For example, on multiple occasions although RSI employees had uploaded or transferred data to Oracle, Oracle failed to review or import it. Important emails about the projects from RSI personnel to Oracle would go without response for days. Throughout the project Oracle abdicated its responsibility to manage the third-party Oracle Partners, which Oracle had claimed pre-contract had extensive experience working successfully with Oracle on similar projects involving large retail clients. In short, project management and oversight appeared non-existent.

59.     Unfortunately, things only seemed to get worse with the passage of time. As the

delays continued to mount, RSI became concerned about the slippage of the "go live" date and began sounding the alarm. Oracle professional personnel proved incapable of getting the project back on track, and one "go live" date after another was blown by. In fact, almost twelve months into the project, the solution still was not live. Despite these failures, Oracle mounted an aggressive campaign to get RSI to renew the subscription. After such a significant investment of time and money RSI was loathe to abandon the project. Instead, RSI told Oracle that it would only consider renewing if Oracle could promise that it could deliver a successful ERP solution and provide some type of financial concession due to Oracle's many failures. Ultimately, Oracle agreed to provide a one-time discount of $22,851.79 to RSI if it renewed, which Oracle offered to account for unanticipated delays on implementing the SuiteCommerce and Payroll portions of the solution. Oracle also affirmed once again that it could deliver a functioning product, apparently trying to convince RSI to renew for a second year. Oracle requested that in exchange for the discount, RSI execute a settlement agreement and provide Oracle with a release for Oracle's failures during year one of the implementation. RSI declined to sign such a release, thereby preserving its claims.

60.     Oracle also never approached the project in an organized and coherent manner, which is expected for a project manager. As a result, NetSuite blew past one "go live" date after another, including, August 2021, June 1, 2022, October 1, 2022, November 1, 2022 and January 1, 2023. RSI pointed out Oracle's failures in both oral and written communications throughout calendar year 2021 and 2022. Unfortunately, Oracle failed to correct the problems and never delivered a working solution.

61.     Ultimately given the many problems with the project, on November 14, 2022 via letter, RSI provided Oracle with a notice of breach and 30-days to cure. Attached hereto as Exhibit 10 is a true and correct copy of the letter. Upon the expiration of the 30-day period on December 14, 2022, RSI extended the cure period provided that Oracle could make firm commitments on a first quarter "go live" date. Instead, of making such a commitment and effectuating a cure, Oracle came back yet again with a request for an expensive change order. By mid-January, 2023, it was abundantly clear that Oracle could not cure its breaches, and RSI

terminated the contract on January 18, 2023.  Attached hereto as Exhibit 11 is a true and correct copy of the letter terminating the contracts.

**Oracle Failed to Adequately Manage the Project**

62.     In addition to the incompetence of the Oracle professional services team themselves in providing their own services, Oracle completely failed to manage the work of the Oracle Partners. Although Oracle represented that its SuiteSuccess product only needed minor tweaks by its knowledgeable team and trusted Oracle Partners to customize the solution for RSI and that it could do so quickly, the reality was much different.  For example, in his email dated February 15, 2021, Mr. Landsberg included a "flow chart" prepared by RSI and annotated by Oracle to show the functionality that RSI required in the final product and identifying what was an Oracle existing product, an Oracle add-on product, or functionality provided by third-party Oracle partners.  Exhibit 3.  The parties used the document during their many meetings in January and February as a launching point for the discussions, and discussed the detailed functionality required by RSI under each of the various categories.  The vast majority of the attachment was highlighted in green and yellow, which showed that this functionality was to be provided by Oracle, as either an included feature in the base offering or an add on.  Only a tiny proportion of the document was highlighted in purple, indicating that the functionality would be provided by a third-party Oracle partner.  This third-party functionality included POS, bank payment processing, inventory management, and EDI, among other things.  Although Oracle had represented pre-contract that it had worked with these Oracle Partners for other Oracle retail customers similar to RSI, on information and belief it soon became abundantly clear during contract performance that Oracle had not only exaggerated these claims but most likely downright lied.

**Point of Sale ("POS") Functionality**

63.     Although Oracle had first claimed that it could deliver the total solution through its own technology, by January of 2021 it had changed its tune and began to introduce the idea of bringing in certain third-party Oracle Partners to handle specific pieces of the solution.  Mr. Bratton had made it crystal clear from the outset that the POS piece was critical to the project,

as RSI Hardware was a hardware retailer with in-store sales.  During pre-contract discussions, Mr. Landsberg eventually conceded that the Oracle POS solution, Suite Commerce, was not as robust as required to service RSI's retail needs and provided RSI with other options.  Ultimately Mr. Landsberg recommended Vend to provide the POS functionality.  On February 18, 2021 Oracle arranged for Vend to provide an online demo of its product.  During that demo, the product appeared to have all of the functionality that had been promised by Oracle and that RSI required.  In reliance on the representations that Vend's solution met RSI's requirements and Oracle's recommendation of Vend, and after learning from Mr. Landsberg that the two companies had successfully worked together on similar complex retail and other projects in the past, RSI agreed to select Vend to handle the POS portion of the project.

64.     As the project progressed it became clear to RSI that Oracle and Vend's representations concerning the capabilities of Vend's product were not true, and Oracle's recommendation of Vend as the POS partner was not working, as Vend's solution was not sophisticated enough to handle the demands of RSI's system.  As a result, Oracle's Mr. Worsham in an April 15th email suggested RSI consider another company, Lightspeed, and Oracle disclosed that its internal team was analyzing the issue and would have a final recommendation soon.  In a follow-up email dated May 3, 2022, RSI's Chief Financial Officer Mr. Fred Hansen wrote Oracle's Mr. Worsham about the POS vendor.  Mr. Hansen explained he wanted to be transparent and wanted to reiterate that RSI is "in need of a system that will encompass all needs for the retail hardware store.  We will need a system that will have a POS, able to transfer inventory, cycle count, receiving, and other normal functions that our sales associates perform.  If that is outside of NetSuite, then it would have to be able to communicate with NetSuite, and back to the POS Software."  Mr. Hansen also observed, "Suite Commerce, Shopify, Vend, and the likes seem more suited for smaller flower shops, bicycle shops, and mom/pop shops.  With an inventory list of over 20k items, we need more of a complete system that will encompass all store functions rather than just a cash register platform."  Mr. Worsham again reiterated that Oracle was looking into the matter and would get back with a recommendation.

65.     Eventually Lightspeed acquired Vend, and RSI hoped that this would solve the problems so that the POS system could get up and running.  Unfortunately, it did not.  Although RSI paid Vend $1,815.60 in year one of the implementation, the POS portion of the solution never worked.  Yet despite this failure, Vend came back in 2022 and demanded that an additional subscription payment of $4,500.00 be made.  By the Fall of 2022 it had become abundantly clear that Vend/Lightspeed did not have an existing platform with the functionality that had been promised by NetSuite and Vend/Lightspeed and required by RSI.  Although Vend/Lightspeed claimed that it was working hard on the solution, Vend/Lightspeed disclosed that the POS system would not be functional until sometime later in 2023, if ever.  Specifically, the Vend/Lightspeed solution recommended by Oracle did not meet key needs of RSI including such things as automatic use of images from NetSuite, employee and other discount functionality, purchase orders, tax exemptions, units of measure, among other shortcomings. When RSI began considering In8Sync to replace Vend/Lightspeed in December of 2022, NetSuite represented that such a change would further negatively impact a first quarter 2023 "go live" date, and seemed to infer that Vend/Lightspeed could do the job.  This, despite the fact that RSI had recently learned that the Vend/Lightspeed solution would not work with RSI's payment processing vendor.

**Payment Processing Solutions**

66.     Over the course of the project Oracle recommended several different payment processing companies to RSI claiming that they all worked and integrated neatly into the NetSuite software.  This too turned out to be false.  The first payment processing company that Oracle recommended was Solupay, which Oracle claimed in pre-contract discussions worked seamlessly with NetSuite.  Later after contract execution Oracle changed course and urged RSI to replace Solupay with Worldpay.  In an email dated August 22, 2022, Mr. Peter Desimini of Oracle stated unequivocally that he has "reconfirmed Worldpay will work on NetSuite via their certified plugin".  After Oracle's assurances, RSI invested more time and money in attending meetings with Worldpay only to learn that it would not work with the proposed NetSuite solution when a Worldpay representative contacted RSI via email on August 25, 2022.  That

email explained that "Worldpay has determined that you [RSI] would need to be on two separate platforms – one for Retail with Vend/Lightspeed, and the other 2 Ecomm accounts on another platform" and that Worldpay's tech team had determined that WorldPay would not be a "good merchant experience" for RSI.

67.    On Oracle's recommendation RSI next selected Windcave for payment processing, only to learn later that Windcave would not work with In8Syc, which was being considered by RSI to take over the Vend/Lightspeed POS piece of the project, when Vend/Lightspeed failed to deliver.  RSI spent an additional $808.70 on equipment for Windcave that did not work with any other POS vendor, which ended up being another waste of RSI's time and money.

**EDI and Connectors**

68.    Problems with the project continued to mount with Oracle selected partners through the summer and fall of 2022.  One massive problem area involved EDI, which is an abbreviation for Electronic Data Exchange.  Oracle recommended SPS Commerce, Inc. ("SPS") to handle the EDI portion of the NetSuite solution.  Using EDI, companies send information digitally from one business system to another, using a standardized format.  Some of the types of business systems to which EDI can connect include eCommerce solutions, ERP, WMS, CMS, accounting software and more.  Using EDI within the NetSuite solution, Oracle and Mr. Landsberg had promised RSI that it would be able to exchange digital information and transactions with other businesses for greater accuracy and speed of communication.

69.    On or around May of 2022, on Oracle's recommendation, RSI executed a contract with SPS to install and integrate a functioning electronic data interchange and assortment system ("EDI System") within the NetSuite environment to facilitate transmission of digital information in a standardized format between RSI and its vendors. The EDI System is prominently advertised on SPS's website, and Oracle represented that SPS could integrate the EDI System in RSI's environment.[3] RSI intended to use the EDI System to digitally exchange

---

[3] https://www.spscommerce.com/edi-guide/; https://www.spscommerce.com/products/assortment/.

and synchronize detailed product and inventory information, purchase orders, invoices, advanced ship notices and pictures of all products for the POS and eCommerce platform. The use of the Services was clearly scoped and communicated by RSI, and the installation was managed and planned by Oracle and SPS as part of the initial Oracle Agreement. On July 1, 2022, SPS provided a total timeline of 16-weeks to install the EDI System. More than one month after the expected deadline, SPS was not even close to producing a working product, stalling out RSI's inventory tracking, inventory replenishment and product flow with its vendors and customers. On December 1, 2022, RSI gave Oracle and SPS one last chance to perform, and they failed.

70.     Oracle selected SPS to handle the EDI component of the NetSuite implementation, and in pre-contract discussions Mr. Landsberg represented to RSI that Oracle had worked successfully with SPS on complex retail clients similar to RSI.  As a connector, the job of SPS was to work closely with RSI's wholesalers and distributors such as House Hasson and Orgill to keep track of product orders, inventory, shipments, etc.  As the project manager on the implementation, Oracle was in charge of coordinating and managing the activities of SPS to successfully connect distributors such as House Hasson and Orgill to the solution. Unfortunately, rather than managing the work with SPS so as to keep the project on track, Oracle abdicated its project management duties.  In fact, RSI was shocked to learn that as late as July of 2022, Oracle and SPS had failed to connect with House Hasson and Orgill to move forward on the EDI portion of the project.

71.     For example, on July 7, 2022, Robert Willette from SPS reached out to Orgill for the first time via email claiming that his "team is working with River Supply to design the solution to collect item data to be stored in NetSuite. River Supply would like to use the attributes/fields that you are currently sending to them as their starting point for the design. Tarry at River Supply has referred us to you. Could you send to me any template(s), list(s) or file spec(s) that show what you are using to send item data to River Supply?"  This was the first contact between the companies on the issue, even though Oracle had known for months that the EDI portion of the solution would need to be coordinated, and was critical to the go live date

1   and a functioning solution.  Further setbacks occurred when SPS delayed pushing ahead with

2   the project over a $500 payment dispute with RSI over Orgill, even though RSI had specifically

3   instructed Oracle, SPS and Orgill to move forward and not allow the minor dispute over

4   payment to slow anyone down.

5       72.     Oracle and SPS also failed to deliver the assortment planning portion of the

6   solution.  Assortment planning is the process of choosing which "assortment" of products to sell

7   during a certain time period, and how to allot those products between different locations and/or

8   sales channels to maximize profits.  Traditionally RSI had worked with Orgill and House

9   Hasson on assortment planning.  With NetSuite, the aim was to automate these processes and

10  use the solution to analyze data and provide the most effective assortment planning program.

11  But first the data had to be imported into the NetSuite system from Orgill and House Hasson.

12  SPS was the third-party Oracle partner tasked by Oracle with this responsibility.

13      73.     SPS dropped the ball when it came to the assortment planning portion of the

14  solution as well, and Oracle only exacerbated these failures by its incompetent project

15  management.  RSI observed that both Oracle and SPS did not do their due diligence to ascertain

16  how RSI's stored data communicated with RSI's vendors.  In addition, although Orgill had

17  provided instructions as early as May of 2022 for how to access the Orgill data, Oracle and SPS

18  delayed for months the data importation.  And when SPS finally claimed that it had gotten

19  Orgill's data into NetSuite, RSI discovered that the data gathering operation had been woefully

20  inadequate and only included 2 items and very little information on the relevant spreadsheet

21  submitted by SPS to Oracle.  RSI used its own credentials to log into Orgill's FTP hosting site,

22  where Orgill's data is stored.  Within one hour, RSI was able to gather all the necessary

23  information to import 105,000 items into NetSuite.  In fact, it was Daniel Jamison and Jeffery

24  Pilkington of RSI who suggested to SPS and Oracle that the data could be easily downloaded

25  via Excel from the FTP server.  RSI as the customer should not have been the party who was

26  required to come up with the solution.  Yet that was exactly what happened. Oracle failed to

27  oversee SPS to ensure that SPS completed this simple task, on time and with accuracy.  This

28  performance failure by Oracle and SPS is just one of many examples.

74.     Oracle continued to mismanage the implementation of the solution, and SPS continued to be the bottle neck for the assortment planning portion of the solution throughout October and November, 2022, by failing to complete the design, including the mapping for the inbound and outbound portions of the tool connecting RSI data hosted by Orgill through SPS and into NetSuite.  Mr. Landsberg of Oracle had represented to Mr. Tarry Bratton in pre-contract discussions on at least January 20, 2021 and February 18, 2021 that the product would seamlessly integrate with NetSuite just as it was working with RSI's then current solution, ECI Spruce.  Mr. Landsberg had represented that the data transfer would be automatic and update pricing, pictures, and product descriptions to be used for the ERP, POS, and eCommerce platform automatically.  But Oracle and SPS completely bungled this part of the project and failed to deliver.  Instead, SPS attempted to upcharge RSI for additional work to make the solution function.  SPS also was responsible for the delays with House Hasson and admitted as late as November 2022 that SPS had not yet begun work with that company to connect and import the relevant data into NetSuite.  All the while Oracle sat on its hands and failed to manage the project and get SPS back on track.

75.     Although Mr. Landsberg promised RSI in pre-contract discussions that NetSuite had the same ability to show inventory as RSI's then current solution, the reality was much different.  Oracle attempted to use its misrepresentation as a vehicle for attempting to extract an expensive change order in order to inflate its profits.  Although SPS could pull the images from Orgill and House Hassan, the images were in URL format and Oracle claimed that its basic SuiteSuccess product did not have the functionality to manipulate such images, and that to do so RSI would need a license to the more expensive SuiteCommerce Advanced Software, with additional customizations that would add further to the price increase.  This once again displayed the dishonesty of Oracle's fixed price promises about the functionality that it could deliver.  Moreover, by this point in the project, RSI was skeptical that Oracle had the technology to successfully implement this functionality at all, and it was concerned that it would only be throwing more good money after bad.

**Material Job Costing and & Project Management Tasks and Assignments**

76.     In pre-contract discussions on January 15, 2021, as well as in its written materials, Mr. Landsberg on behalf of Oracle touted Appfiency as the Oracle partner with deep experience working with fabricators & construction companies on material job costing and project management related tasks.  Mr. Landsberg explained that Appfiency had designed software modules built within the NetSuite application to handle these tasks and its Material Job Costing solution "ties the NetSuite WOA/MFG and NetSuite project record together to fully manage material costs, track mfg wip, periodic budgeting, tracking against actuals, & more."

77.     RSI paid Appfiency $15,500 in 2021.  However, RSI was never able to utilize Appfiency's technology as the NetSuite solution never went live.  But that didn't stop Appfiency from demanding more payments in 2022 for functionality that had never been provided the previous year.

78.      By the last quarter of 2022, with the slippage of yet another "go live" date rapidly approaching, it was no secret that RSI was dissatisfied with the lack of progress made by Oracle and the fact that the solution was nowhere close to where it needed to be in order to be useable. As a result, on November 14, 2022, RSI sent Oracle a breach letter and a 30-day cure notice. Exhibit 10.  The 30-day cure period expired on December 14, 2022 without Oracle curing its breaches.  RSI agreed to extend the cure period, provided that Oracle could meet the go live date of January 1, 2023.  Instead, the Oracle team went on Christmas holiday, and the January 1st "go live" data passed as well.

**Oracle Begins Claiming That Promised Features Are Out of Scope and Demanding Expensive Change Orders**

79.     Rather than buckling down and doing the work necessary to implement the solution, in December 2022, Oracle began backing away from its fixed price implementation contract once again, and suddenly began claiming that work, which was in scope, was somehow now out of scope and would require an expensive change order.  RSI is informed and believes that this is a tactic that Oracle has deployed on other customers as well.  For example, although Oracle had claimed that the contracts were for a fixed price, on December 19, 2022, it submitted a change order to upgrade NetSuite SuiteCommerce Standard ("SA") webstore to a

SuiteCommerce Advanced ("SCA") instance at a price of $24,900.00.  Oracle contended that RSI needed to purchase the advanced product to get the functionality that it desired. Functionality that Mr. Landsberg represented in meetings in February 2021 as being included in the solution sold to RSI by Oracle.

80.     Although RSI allocated hundreds of hours of staff time to the project and paid Oracle every penny under the contracts, including for a subscription that never went live, RSI received nothing of value in exchange.  Twenty-four months after contract execution, and after payments to Oracle totaling $139,567.32, Oracle still had not produced a working solution.

81.     Indeed, the fixed price contract that Oracle promised involving itself and its Oracle partners was not fixed price.  Moreover, for several of the Oracle recommended partners such as Appficiency, RSI paid fees in both 2021 and 2022 for services that were never provided because the system did not go live.  And for other third-party Oracle partners such as SPS, Vend, Lightspeed, In8Sync, Appficiency, Windcave and Worldpay, the actual fees charged were well in excess of what Oracle quoted pre-contract.  On information and belief, at the time that Oracle's Mr. Landsberg represented that the price for Oracle's professional services and the third-party partners would be fixed, Mr. Landsberg and Oracle knew that the statement was false.  Mr. Landsberg intentionally made the representations in an attempt to mislead RSI and induce RSI to enter into the contracts, so that Mr. Landsberg could make a sale and thereby gain a big commission, before Oracle's quarter-end of February 28, 2021.  On information and belief, at the time he made these representations, Mr. Landsberg had no intention of performing, and knew that Oracle's playbook included using change orders and escalation teams to inflate the contract price.

**Oracle Has an Unfair Business Practice of Bidding the Project Low with the Intention of Inflating the Contract Price Through Change Orders**

82.     RSI is informed and believes that Oracle's unfair business practice of promising customers an ERP solution that does not exist, and then bidding the project low and then trying to inflate the contract price through change orders has been practiced on many Oracle/NetSuite

---

customers, including RSI.  Like the facts asserted in other court cases filed against Oracle arising out of failed Oracle ERP implementations, this is yet another example of Oracle misrepresenting the capabilities of its products and/or the qualifications of the assigned team to induce unsuspecting customers like RSI to enter into ERP agreements with Oracle.  Oracle also stands accused by other customers of low balling its offer to get the contract, and then jacking up the price of the contract with change orders after execution.  And RSI knows from the lawsuit of a whistle blower and former Oracle employee, Mr. Daramola, that Oracle deploys these unfair business practices across product lines and is engaged in a massive and systematic fraud against their ERP customers.

83.     In *Daramola v. Oracle America, Inc*., Mr. Daramola was an Oracle Canada employee who lived and worked in Montreal, Canada and served as an Oracle project manager for Oracle's Campus Bookstore customers, including customers located in the United States.  In his Complaint, Daramola detailed an alleged Oracle unfair business practice of intentionally misrepresenting to Oracle's University customers that the company had a fully developed, integrated system for an online campus bookstore that could be customized and would be ready to "go live" quickly.  However, according to the Complaint, no such integrated system existed, and Oracle instead extracted subscription payments from university customers, all the while stalling the "go live" while continuing to pocket the money.  The facts pleaded in the 2022 amended complaint further highlight an alleged pattern and practice under which Oracle promised to customize a non-existent but purportedly integrated cloud system for university clients, then used escalation teams to hold off customers who were making subscription payments for the product and receiving nothing in return.  According to the complaint, project managers like Daramola, and "escalation teams" were directed to further mislead customers about the lack of development for the system the customer had supposedly acquired, by for example, blaming delivery delays on the customers' "unforeseen customization requests," extracting change orders for such "customizations," then requiring customers to pay more while buying Oracle more time to deliver a functioning ERP product.  *See* Exhibit 1.  Exactly the playbook Oracle deployed against RSI in this case.

84.     Other Oracle customers have complained of the same fraudulent tactics.  For example, in 2019, Barrett Business Services Incorporated ("BBSI") brought a lawsuit against Oracle in San Francisco Superior Court, where BBSI claimed that Oracle over-promised and under-delivered, just like RSI alleges here.  According to BBSI, only after it signed a $15 million licensing deal with Oracle and a $429,268 Statement of Work with Oracle's integration partner, did BBSI discover that the Oracle HCM Cloud was riddled with design, functionality, interface, integration and performance gaps and that its out-of-the box capabilities would not meet BBSI's needs.  Bridging some of the gaps would take over two years and customization work costing $33 million rather than the $5.9 million originally quoted.

85.     Likewise, in *Janco v. Oracle America, Inc.*, Plaintiff alleged that nearly two years after entering into the NetSuite ERP contract, Oracle had still not delivered a working product. In fact, Janco alleged that an Oracle employee admitted that the system would probably never work.  Notwithstanding its massive failures, Oracle still attempted to extract an additional $40,000 to $50,000 for further "customizations" out of Janco.  And these were customizations that Oracle was required to perform as part of its baseline agreements with Janco.

86.     *Elkay v. Oracle/NetSuite* is also instructive.  Elkay alleged that Oracle/NetSuite promised that they could implement a working ERP system to replace Elkay's legacy system within 10 months at a cost of $2.027 million.  Elkay claimed that rather than implement the ERP system within the cost and timeframe promised, Oracle began recommending additional customizations and functionality to the tune of almost an additional $1 million.  At the time of filing the complaint, Elkay alleged that it had paid Oracle $1.282 million, and still owed Oracle an additional $1.645 million for a product that "does not perform to industry standards, does not address Elkay's core business processes, and does not meet the specific pre and post agreement representations of NetSuite and Oracle regarding performance and functionality."

87.     As RSI's Complaint and these other cases make abundantly clear, Oracle and NetSuite are involved in a massive fraudulent scheme across ERP product lines to lie to prospective customers about the capabilities of their software and their professional services teams, to low ball bids for ERP projects in order to win the contract, and after contract award to

deploy "escalation teams" to concoct excuses to obtain further fees through change order customizations and to further delay delivery of the ERP solution, all the while continuing to be paid under the terms of their one-sided contracts.  Because the scheme is so ubiquitous and widespread, it likely emanates from and has the approval of, the highest echelons of Oracle's management in California, Texas and elsewhere.

88.     With their unfair and fraudulent business practices, breaches of contract, and other torts, Defendants and each of them, have intentionally, and without justification, caused damage to RSI as described herein.

89.     RSI seeks restitution and disgorgement of the monies improperly paid to Oracle and its business partners relating to the NetSuite SuiteSuccess solution and its related Agreements, which Agreements RSI was induced to enter into by Oracle's material misrepresentations, fraud, and extortionary tactics.  In addition to restitution, RSI seeks to recover its other damages, including attorneys' fees, in an amount to be proven at trial, but totaling in the multi-millions of dollars.  RSI also seeks treble damages for its claim under the California Penal Code.  Oracle's actions were willful and unlawful and subject Oracle to exemplary damages as well.

### FIRST CAUSE OF ACTION
### (Fraud in the Inducement and Promissory Fraud)
### (Against Oracle)

90.     RSI realleges and incorporates herein by reference paragraphs 1-89, inclusive, as though set forth in full in this First Cause of Action.

91.     The representations and promises made by Oracle as alleged herein were false and were known to be false or made with reckless disregard when made to RSI, as no such ERP solution existed with all the attributes represented by Oracle and these Defendants knew that they could not successfully customize such a system for RSI that met all of RSI's requirements at the fixed price quoted, and by the "go live" date promised.  Oracle through their authorized agents, represented to RSI that they possessed the capability to design, implement and deliver a fully integrated ERP software solution with the specific capability and functionality to meet

RSI's express requirements, which would go live within 4 to 5 months after contract execution and at a fixed price. The representations and promises that were made by Oracle were false and were material.  In reality, no such ERP solution existed with the attributes represented by Oracle, and Oracle knew they could not design one for the fixed price that they quoted, within the time limits promised for the solution to go live.  Instead, Oracle knew when they made the promises that they could not deliver and that they would eventually blame RSI for Oracle's failures and attempt to extract expensive change orders to increase the contract price and Oracle's profit.

92. Oracle promised RSI in pre contract discussions that they could deliver the functionality at a fixed price.  For example, at the February 17, 2021 meeting, Mr. Tim Bratton emphasized to Oracle that it was extremely important that the functionality that RSI outlined as being required could be delivered at a fixed price and would be "all in" with no price increases. During that meeting Mr. Dan D'Amato on behalf of Oracle represented that the price was "all in" and that Oracle could deliver the required functionality at the fixed price quoted, and that there would be no hidden costs.  Oracle and Mr. Landsberg assured RSI again in a February 24, 2021 meeting that NetSuite could deliver all the functionality that RSI required at the fixed price. The representations and promises were made by Oracle with the intent to induce RSI into entering into the Agreements, and at the time they were made Oracle knew that they were false.

93. RSI reasonably relied on the representations and promises made by Oracle all to RSI's detriment and injury.  RSI's reliance on Oracle's misrepresentations were justifiable in that Plaintiff had no reason to doubt the truthfulness of their representations concerning the attributes of their ERP solution because Oracle had repeatedly touted their experience with similar solutions for customers similarly situated to RSI.  Based on Oracle's superior knowledge of their software and their ability to customize, configure, and implement the software for RSI's specific needs and uses, RSI, which had no actual knowledge of the software's capabilities, justifiably relied upon Oracle's representations by entering into the agreements and by continuing the relationship with Oracle. RSI justifiably and reasonably relied on Oracle's representations and promises to the detriment and injury of RSI.  This reliance was reasonable

in light of Oracle's professed knowledge of Oracle's capabilities and RSI's requirements.  RSI believes that it is likely that Oracle may claim that RSI's reliance was unreasonable due to the integration clause of the SSA.  However, as set forth above, RSI had no knowledge of that clause before, during or after execution of the contract until it learned of the existence of the clause through counsel, and Oracle cannot succeed in arguing that it is a valid reliance disclaimer based on these facts.  Moreover, Oracle acted knowingly and with intent to deceive RSI as shown through the structure of its agreements and those agreements were obtained only due to Oracle's fraud in the inducement.

94.    RSI would not have entered into the Agreements had it known that the software solution could not perform as Oracle represented, could not be done at a fixed price, would not go live by September 1, 2021, and that it would be less robust and less powerful than the Quickbooks and other solutions RSI and its sister companies were using at the time of contracting with Oracle.

95.    As a result of Oracle's fraud in the inducement and promissory fraud, RSI is entitled to an award of damages, including but not limited to the cost of disruptions and unrealized efficiencies in bidding and quoting new jobs, managing inventory, as well as loss of resources, sales, revenue and profits due to the failed implementation; loss of process improvements; additional labor costs caused by the failed implementation; and additional costs and damages in an amount to be proven at trial.

96.    As a result of Oracle's fraud in the inducement and promissory fraud, RSI is entitled to rescind the Estimate Forms and the SOWs and related agreements and get its money back as well as be awarded other damages.

97.    Additionally, RSI is entitled to punitive damages as a result of Oracle's fraudulent conduct, because at the time Oracle entered into the Agreements, they had no intention of delivering the promised solution at the fixed price point and within the timeline represented with all of the attributes promised, and they acted with oppression, fraud and malice when seeking to trick RSI into entering into the Agreements.

1
2

## SECOND CAUSE OF ACTION
## (Fraud in the Inducement and Promissory Fraud)
## (Against Oracle)

3
4

98.    RSI realleges and incorporates herein by reference paragraphs 1-97, inclusive, as though set forth in this Second Cause of Action.

5
6
7
8
9
10
11
12
13
14

99.    RSI made it clear to Oracle during multiple pre-contract execution meetings that the POS part of the ERP Product was critical and needed to include the desired functionality. Although Oracle at first represented it could provide the required functionality, they later changed course and recommended that Vend/Lightspeed be brought in by Oracle to deliver this portion of the ERP Product.  During these discussions Mr. Landsberg represented to RSI that Vend/Lightspeed integrated tightly into Oracle's ERP Product and that Oracle and Vend/Lightspeed had worked on numerous successful implementations for retail customers such as RSI.  RSI reiterated the importance of this part of the solution during the onsite demo with Vend, and the demo seemed to confirm that Vend/Lightspeed could provide the required functionality.

15
16
17
18
19
20
21
22
23
24

100.    RSI reasonably relied on Oracle's representations concerning the capabilities of Vend and Lightspeed's existing product, including at the demo.  RSI's reliance on Oracle's misrepresentations were justifiable in that Plaintiff had no reason to doubt the truthfulness of their representations concerning the attributes of the POS software because Oracle and Vend/Lightspeed had touted their experience with similar solutions for customers similarly situated to RSI.  Based on Oracle's superior knowledge of Vend/Lightspeed's software and the representations concerning their ability working with Vend/Lightspeed to customize, configure, and implement the software for RSI's specific needs and uses, RSI, which had no actual knowledge of the software's capabilities, justifiably relied upon the representations by entering into the agreement with Vend/Lightspeed recommended by Oracle.

25
26
27

101.    RSI would not have entered into the agreements with Oracle and with Vend/Lightspeed had it known that the software could not perform as Oracle and Vend/Lightspeed represented.

28

102.    As a result of Oracle's misrepresentations, RSI has been damaged including but

not limited to the cost of disruptions and unrealized efficiencies in bidding and quoting new jobs, managing inventory, as well as loss of resources, sales, revenue and profits due to the failed implementation; loss of process improvements; additional labor costs caused by the failed implementation; and additional costs and damages in an amount to be proven at trial.

103.    As a result of Oracle's fraud in the inducement and promissory fraud, RSI is entitled to rescind its agreements with Oracle, and to get its money back as well as other damages.

104.    Additionally, RSI is entitled to punitive damages as a result of Oracle's misrepresentations and other fraudulent conduct, as they acted with oppression, fraud and malice seeking to trick RSI into entering into the Oracle and Vend/Lightspeed contracts.

**THIRD CAUSE OF ACTION**
**(Negligent Misrepresentation)**
**(Against Oracle)**

105.    RSI realleges and incorporates herein by reference paragraphs 1-104, inclusive, as though set forth in full in this Third Cause of Action.

106.    Oracle, through their authorized agents, represented to RSI that they possessed the capability to design, implement and deliver a fully integrated ERP software solution with the specific capability and functionality to meet RSI's express requirements, and to do so within 4 to 5 months of contract execution. The representations and promises that were made by Oracle were false and were material.  In reality, no such ERP solution existed with the attributes represented by Oracle, and Oracle knew or should have known that they did not have the technology and could not develop it at the price and within the time promised.

107.    At the time Oracle made these representations to RSI, they knew, or in the exercise of reasonable care, should have known, that they did not possess those capabilities, making their representations false. Oracle made the representations for the express purpose of inducing RSI to enter into the agreements.  Defendants knew when they made the promises that they would attempt to extract expensive change orders to increase the contract price and Oracle's profit.

108.    Based on Oracle's superior knowledge of their software and their ability to customize, configure, and implement the software for RSI's specific needs and uses, RSI, which had no actual knowledge of the software's capabilities, justifiably relied upon Oracle's representations by entering into the agreements and in continuing the relationship with Oracle. RSI justifiably and reasonably relied on Oracle's representations and promises to the detriment and injury of RSI.  This reliance was reasonable in light of Oracle's professed knowledge of Oracle's capabilities and RSI's requirements.  RSI believes that it is likely that Oracle may claim that RSI's reliance was unreasonable due to the integration clause of the SSA.  However, as set forth above, RSI had no knowledge of that clause before, during or after execution of the contract until it learned of the existence of the clause through counsel, and Oracle cannot succeed in arguing that it is a valid reliance disclaimer based on these facts.  Moreover, Oracle acted knowingly and with intent to deceive RSI as shown through the structure of its agreements and those agreements were obtained only due to Oracle's fraud in the inducement.

109.    RSI would not have entered into the agreements with Oracle had it known that the representations and promises were not true.

110.    As a consequence of the false representations and promises of Oracle, RSI has been damaged including but not limited to the cost of disruptions and unrealized efficiencies in bidding and quoting new jobs, managing inventory, as well as loss of resources, sales, revenue and profits due to the failed implementation; loss of process improvements; additional labor costs caused by the failed implementation; and additional costs and damages in an amount to be proven at trial.

111.    As a result of Oracle's negligent misrepresentation, RSI is entitled to rescind the agreements, and get its money back as well as other damages.

112.    Additionally, RSI is entitled to punitive damages as a result of Oracle's conduct, because at the time Defendants entered into the Estimate Forms and the SOWs they had no intention of delivering the promised solution at the fixed price point represented with all of the attributes and within the timeframe promised, and they acted with oppression, fraud and malice in representing otherwise.

## FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)
### (Against Oracle, Vend and Lightspeed)

113.    RSI realleges and incorporates herein by reference Paragraphs 1-112 inclusive, as though set forth in full in this Fourth Cause of Action.

114.    RSI made it clear to Oracle during multiple pre-contract execution meetings that the POS part of the ERP Product was critical and needed to include the desired functionality. Although Oracle at first represented it could provide the required functionality, they later changed course and recommended that Vend (later purchased by Lightspeed) be brought in by Oracle to deliver this portion of the ERP Product.  During these discussions Mr. Landsberg represented to RSI that Vend integrated tightly into Oracle's ERP Product and that Oracle and Vend had worked on numerous successful implementations for retail customers such as RSI. RSI reiterated the importance of this part of the solution during the onsite demo with Vend. During the demo Vend confirmed that it could deliver all of the functionality that RSI required with its existing product, and during the demo Oracle representatives affirmed Vend's representation and led RSI to believe that Vend could deliver the promised functionality.  On information and belief, the representations and promises made by Oracle and Vend concerning the capabilities of the Vend POS software and its ability to meet RSI's requirements were known to be false when made or were made with reckless disregard.  The representations that were made by Vend were false and they were material.  In reality no such POS software existed with the capabilities needed by RSI and as represented by Vend and Oracle to RSI.

115.    On information and belief, at the time Oracle and Vend made these representations to RSI, they knew, or in the exercise of reasonable care, should have known, that they did not possess those capabilities, making their representations false. On information and belief, Oracle and Vend made the representations for the express purpose of inducing RSI to enter into the agreements.  Defendants knew when they made the promises that they would attempt to extract expensive change orders to increase the contract price and Oracle's profit.

116.    Based on Oracle and Vend's superior knowledge of their software and their

ability to customize, configure, and implement the software for RSI's specific needs and uses, RSI, which had no actual knowledge of the software's capabilities, justifiably relied upon Oracle and Vend's representations by entering into the agreements. RSI justifiably and reasonably relied on Oracle and Vend's representations and promises to the detriment and injury of RSI. This reliance was reasonable in light of Oracle and Vend's professed knowledge of Oracle and Vend's capabilities and RSI's requirements, and Oracle and Vend's representations that Vend's software could be tightly integrated into the ERP Product, and that Vend and Oracle had successfully delivered the required POS functionality to companies in the retail space similar to RSI.

117.    RSI would not have entered into the agreements with Oracle had it known that the representations and promises were not true.

118.    As a consequence of the false representations and promises of Oracle and Vend, RSI has been damaged including but not limited to the cost of disruptions and unrealized efficiencies in bidding and quoting new jobs, managing inventory, as well as loss of resources, sales, revenue and profits due to the failed implementation; loss of process improvements; additional labor costs caused by the failed implementation; and additional costs and damages in an amount to be proven at trial.

119.    As a result of Oracle's negligent misrepresentation, RSI is entitled to rescind the agreements, and get its money back as well as other damages.

120.    Additionally, RSI is entitled to punitive damages as a result of Oracle and Vend's conduct, because at the time Oracle entered into the Estimate Forms and the SOWs and Vend contracted with RSI, Oracle and Vend had no intention of delivering the promised solution at the fixed price point represented with all of the attributes and within the timeframe promised, and they acted with oppression, fraud and malice in representing otherwise.

## FIFTH CAUSE OF ACTION
### (Breach of Contract)
### (Against OAI)

121.    RSI realleges and incorporates herein by reference Paragraphs 1 - 120 inclusive,

1    as though set forth in full in this Fifth Cause of Action.

2        122.    RSI and OAI executed the Estimate Forms and the Professional Services SOWs.

3    The Estimate Forms detailed the modules of the ERP solution that RSI was purchasing and RSI

4    understood that they included all of the functionality promised by Oracle during the parties

5    detailed pre-contract discussions, and OAI represented that all the requested functionality was

6    included at a fixed price.  Paragraph 2 of the SOW further details the professional services that

7    Defendants were obligated to provide to RSI in relation to setting up and configuring the

8    NetSuite SuiteSuccess solution.  These professional services included project management;

9    general configuration and set-up; provision of process area walk throughs; data migration into

10   the SuiteSuccess system; set up and configure the Record to Report, Design to Build, Procure to

11   Pay, Order to Cash/Return to Credit, Marketing Return on Investment, Lead to Quote, Project to

12   Cash, and the Warehouse Operations Call to Resolution process areas. User Acceptance Testing

13   ("UAT testing") and vendor coordination consulting, among other services, were also included.

14       123.    RSI performed all, or significantly all of the things required of it, or was excused

15   from performing due to OAI's breaches and other misconduct.

16       124.    OAI failed to perform the services that it was obligated to perform pursuant to the

17   Estimate Forms and the SOWs and failed to provide a working ERP Product as promised, with

18   the required features, at the agreed upon price and within the time frame promised, thereby

19   breaching the contract.  The breaches were material and went to the heart of what was promised.

20   OAI failed to adequately manage the project and had no plan to bring the project to a successful

21   conclusion.  OAI also failed to provide the professional services in a professional manner

22   consistent with industry standards.  Instead, Oracle's revolving door of employees skipped

23   meetings, ignored emails, failed to import data, ignored important questions from RSI, and

24   generally dropped the ball in relation to their performance of the professional services, in breach

25   of the agreements.  All of these failures meant that it was impossible for RSI to go live, or to use

26   the subscription or the ACS services that it had bought and paid for.

27       125.    As a result of OAI's breaches, RSI has been damaged and harmed including but

28   not limited to the the cost of disruptions and unrealized efficiencies in bidding and quoting new

jobs, managing inventory, as well as loss of resources, sales, revenue and profits due to the failed implementation; loss of process improvements; additional labor costs caused by the failed implementation; and additional costs and damages in an amount to be proven at trial.

126.    OAI's breach of contract was a substantial factor in bringing about RSI's harm.

## SIXTH CAUSE OF ACTION
### (Breach of Warranty)
### (Against Oracle)

127.    RSI realleges and incorporates herein by reference Paragraphs 1-126, inclusive, as though set forth in full in this Sixth Cause of Action.

128.    During pre-contract discussions, Oracle through Mr. Landsberg, Mr. D'Amato and others, expressly warranted that their ERP Product would have all of the features and functionality requested by RSI and promised by Oracle.  Oracle also expressly warranted that Oracle's professional services team had deep experience implementing ERP solutions for Oracle customers in retail businesses similar to RSI, and that Oracle was fully capable of providing a working solution within the fixed price and the timeframe promised with all the functionality required by RSI.  This warranty was reiterated and affirmed days before contract execution by Mr. Landsberg in a February 24, 2021 meeting.  Thus, Oracle has expressly warranted its solution would work and contain all the features and functionality required by RSI, and no enforceable Disclaimer of Warranties exists, as the one contained in the SSA is unenforceable against RSI.

129.    RSI contends that the Disclaimer of Warranties contained in the SSA is not applicable to RSI for several reasons.  First, RSI had no fair notice of the SSA, which was contained in a disguised hyperlink without conspicuous notice to RSI on one of the Estimate Forms.  Because RSI never had fair notice of the SSA it could not have agreed to it, and there was no meeting of the minds, and the Disclaimer of Warranties does not apply and is not part of the agreement between the parties.  Second, to the extent that Oracle contends that the SSA is part of the contract, it was procured by fraud in the inducement and is unenforceable.  Third, to the extent that Oracle contends that the SSA is part of the contract, the SSA is both procedurally

1    and substantively unconscionable, and therefore unenforceable.

2        130.    However, even though Oracle expressly warranted its professional services during

3    pre-contract discussions, the SSA also provides a Services Warranty.  Paragraph 9.1 of the SSA

4    provides that "Oracle will perform (i) the Cloud Service using commercially reasonable care

5    and skill in all material respects as described in the Oracle NetSuite Written Materials, and (ii)

6    any Professional Services and Support Services in a professional manner consistent with

7    industry standards (the warranties described by the foregoing clauses (i) and (ii), collectively,

8    the "Services Warranty"). If the Services provided to Customer were not performed as

9    warranted, Customer must promptly provide Oracle with a written notice that describes the

10   deficiency in the Services (including, as applicable, the service request number notifying Oracle

11   of the deficiency in the Services). For Professional Services, Customer must notify Oracle of

12   any warranty deficiencies within 60 days from performance of the deficient Professional

13   Services."  Paragraph 9.3 provides that the Oracle customer may terminate the SSA and end the

14   services in the event that Oracle breaches the warranties and fails to correct the deficient

15   services.

16       131.    RSI gave written notice via email and oral notice during the various meetings and

17   phone calls with Oracle within 60 days of the performance of the deficient services, and Oracle

18   failed to correct the problems and deficiencies.

19       132.    Oracle has breached the warranties by failing to perform the services in a

20   professional manner consistent with industry standards.

21       133.    Oracle has also breached the warranties by failing to correct the services, all the

22   while keeping the monies paid by RSI, without delivering a working ERP solution.

                            **(SEVENTH CAUSE OF ACTION)**
23                              **(Breach of Warranty)**
24                                 **(Against SPS)**

25       134.    RSI realleges and incorporates herein by reference Paragraphs 1 – 133 inclusive,

26   as though set forth in full in this Seventh Cause of Action

27       135.    The agreement entered into between RSI and SPS contains a warranty that states:

28   "SPS represents and warrants that SPS will perform all Services in a workmanlike and

---

reasonably diligent manner, consistent with professional standards of performance generally accepted within the industry."  SPS breached this warranty by failing to provide the Services in a workmanlike and reasonably diligent manner, consistent with such professional standards of performance.

**EIGHTH CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith & Fair Dealing)**
**(Against OAI)**

136.    RSI realleges and incorporates herein by reference Paragraphs 1-135, inclusive, as though set forth in full in this Eighth Cause of Action.

137.    RSI and OAI entered into the 2021 Estimate Forms and the 2021 SOWs, and the subsequent renewal.  There is and was implied in these agreements a covenant of good faith and fair dealing by which OAI assumed a duty to fully perform its contractual obligations and impliedly covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff fairly and honestly and do nothing to impair, interfere with, hinder or potentially injure the rights of Plaintiff to receive the benefits of the aforementioned contract.

138.    OAI has breached the implied covenant of good faith and fair dealing owed to Plaintiff by their actions herein above alleged with the intent to deprive Plaintiff of its rights under the various agreements.  Oracle made promises and other representations to Plaintiff both before and after contract execution about the capabilities of their ERP Product, which they knew were false.  Oracle made those representations without any intent to perform or to provide the integrated solution that they had promised with all the features that they had promised. Oracle represented to Plaintiff that the third-party providers such as SPS, Vend, Lightspeed, In8Sync, AppFiciency, Worldpay and others were long standing and skilled Oracle business partners with extensive experience working with Oracle in the retail industry on successful NetSuite SuiteSuccess solutions for retail customers like Plaintiff.  Oracle also represented that the technologies provided by these third-party Oracle Partners would work seamlessly with the ERP Product.  All of these representations and others were false, and at the time Mr. Landsberg, Mr. D'Amato and other Oracle employees made the representations they knew them to be false.

139.    Plaintiff has performed all of its obligations under the Agreements, including

working and collaborating with Oracle in good faith, making its employees available, attending meetings, and paying all payments owed under the agreements.  By their actions Oracle prevented RSI from gaining the benefits of the contract that it had bought and paid for.

140.    As a direct and proximate result of OAI's breach of the implied covenant of good faith and fair dealing, Plaintiff has been damaged in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### (Penal Code Section 496)
### (Against Oracle)

141.    RSI realleges and incorporates herein by reference paragraph 1 – 140, inclusive, as though set forth in full in this Ninth Cause of Action.

142.    Penal Code § 496(a) makes receiving or buying property "that has been obtained in any manner constituting theft" a criminal offense punishable by imprisonment.  Penal Code § 496(c) provides that any person "who has been injured by a violation of [§ 496(a)]…may bring an action for three times the amount of the actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

143.    Section 496(a) extends to property "that has been obtained in any manner constituting theft."

144.    Penal Code § 484 describes acts constituting theft.  The first sentence of § 484 (a) states in relevant part: "Every person… who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money… and thereby fraudulently gets or obtains possession of money… is guilty of theft."

145.    Section 484 thus defines theft to include theft by false pretenses.  Penal Code § 532 also defines criminal fraud in terms nearly identical to § 484(a) and provides that these acts are punishable "in the same manner and to the same extent" as larceny.

146.    As a result of the false and fraudulent representations by Oracle and its agents and representatives set out above, Oracle purposely, knowingly, and designedly and with criminal intent, by false or fraudulent representation or pretense, defrauded RSI of the money and funds it paid to Oracle and thereby fraudulently got or obtained possession of money from RSI.  RSI

has asked that Oracle refund all of the monies that it paid to Oracle, including amounts paid to the Oracle Partners, but Oracle has refused to refund the monies and continues to wrongfully withhold them.

147.    RSI has been injured by a violation of Penal Code § 496(a) and is therefore entitled pursuant to Penal Code § 496(c) to three times the amount of its actual damages, together with its costs of suit and reasonable attorney's fees.

## TENTH CAUSE OF ACTION
### (Violation of Business & Professions Code § 17200 et. seq.)
### (Against OAI, NetSuite, Vend, Lightspeed, SPS, and AppFiciency)

148.    RSI realleges and incorporates herein by reference paragraphs 1- 147, inclusive, as though set forth in full in this Tenth Cause of Action.

149.    Defendants have committed, and on information and belief continue to commit, certain business acts and practices that actually harmed RSI, and those in the general public similarly situated to RSI.  Those actionable and unfair business acts and practices are already alleged with factual particularity above, and those allegations are incorporated by reference as though set forth fully herein.  The hereinabove allegations of business acts and practices become actionable under California's Unfair Competition Law in conjunction with the following additional allegations.

150.    Such business acts and practices are "unlawful" in that they are forbidden by law.

151.    Such business acts and practices are "unfair" in that they offend an established public policy and/or are immoral, unethical, oppressive and/or substantially injurious to RSI and other of Defendants' customers, competitors, and the public in general.  Oracle competes unfairly by lying to the public and to prospective customers about having a fully functioning SaaS solution, when they know that they do not.  Oracle also has drafted contract documents where key contracts and terms are not made clear, and the contracts as written and as presented to RSI and to other Oracle small and medium size customers for signature are deceptive and do not provide fair notice of the terms of the contract, causing the contracts to lack mutual assent. When OAI and NetSuite make a proposal to provide a fixed price contract to provide

professional services and use steep discounts to obtain the contract award, all the time never intending to provide the solution at the price promised, and instead intending to inflate the contract price through change orders, Oracle's customers (including RSI) are harmed, but competition and the general public are harmed as well.  When Oracle claims that it has extensive experience working with Oracle Partners like SPS, Vend, Lightspeed, and AppFiciency for customers similar to RSI and in the same industry, and they do not, Oracle's customers (including RSI) are harmed, but competition and the general public are harmed as well.  When SPS, Vend, Lightspeed, and AppFiciency claim that they are Oracle partners with extensive expertise in delivering certain functionality with the NetSuite solution for customers similarly situated to RSI, and then cannot and those representations turn out to be false, RSI is harmed, but competition and the general public are harmed as well.

152.    Such business acts and practices are "fraudulent" in that they did mislead RSI and are likely to mislead members of the general public that are Defendants' customers or potential customers. At all relevant times, RSI relied on Defendants' misrepresentations, misleading statements, and conduct, such as their assertions that they could deliver a working ERP Product with certain features for the fixed price quoted, within a certain period of time, and those in the general public similarly situated will likely also rely on the same fraudulent and material misrepresentations in the future.

153.    Because such business acts and practices are unlawful, unfair, and fraudulent, they violate California's Unfair Competition Law ("UCL "), Business & Professions Code §§ 17200, et seq., and are actionable by RSI for injunctive relief and restitution in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION
### (Declaratory Relief)
### (Against Oracle)

154.    RSI realleges and incorporates herein by reference paragraphs 1- 153, inclusive, as though set forth in full in this Eleventh Cause of Action.

155.    An actual controversy has arisen between Plaintiff and Defendants as to their

respective rights and duties under the 2021 Estimate Forms, 2021 SOWs, SSA and PS Terms, and any extensions of those agreements.

156. Resolution of the parties' respective rights and duties under these agreements, and an identification of which of the agreements, or provisions of the agreements, are binding, if any, by declaration of the Court is necessary, and there exists no adequate remedy at law.

157. RSI contends that the disguised hyperlink in the SSA, the 2021 SOWs and the PS Terms, and certain provisions therein including the broad disclaimer of warranties, the integration clauses, the limitations of liability, the no liability for the work of Oracle recommended partners, the no refund and no cancellation provisions, as well as others, were procured by fraud and are both procedurally and substantively unconscionable and are therefore unenforceable.  RSI also contends that it did not have notice of the SSA and the applicable PS Terms and therefore never assented to them, and they are not part of the contract and not binding on RSI.  RSI seeks a declaratory judgment as to whether the SSA, the PS Terms and the 2021 SOWs, the 2021 Estimate Forms and/or certain of the clauses contained therein or in any contract extension, are enforceable against RSI.

158. RSI also seeks a declaration that due to Oracle's fraud, including its fraud in the inducement and promissory fraud, that any and all of the contracts including the 2021 Estimate Forms, the Subscription Services Agreement, the 2021 SOWs, the Professional Services Agreement and PS Terms, and any extensions thereof, and the OCC financing agreement are rescinded, and that such agreements are null and void and that RSI is entitled to the restitution of all monies paid under those agreements or any extension of those agreements, as well as other damages.

159. RSI also seeks a declaration that due to Oracle's fraud, including its fraud in the inducement and promissory fraud, that any and all of the contracts including the 2021 Estimate Forms, the Subscription Services Agreement, the 2021 SOWs, and any extensions thereof, and the OCC financing agreement are rescinded, and that such agreements are null and void, as they are procedurally and substantively unconscionable, and in the case of the SSA and PS Terms lacked mutual assent.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for damages and other relief against Defendants, and each of them, as follows:

A. A declaratory judgment affirming: (1) what agreements, if any, constitute the governing agreements between Plaintiff and Defendants; (2) and identifying what provisions of the contracts, if any, are unconscionable and therefore unenforceable against RSI.

B. A declaratory judgment rescinding all Agreements due to Oracle's fraud in the inducement and negligent misrepresentations and returning RSI and Defendants to the position that they were in pre-contract, and restoring all payments made by Plaintiff to Defendants, including all payments made by Plaintiff to any third-party bank or financing institution due to the assignment of the OCC financing contract from OCC to such bank or financing institution.

C. A declaratory judgment finding that the SSA and the PS Terms are not binding, as they were never agreed to by RSI, there was no mutual assent, and there was no meeting of the minds.

D. A preliminary and permanent injunction against Defendants, their servants, employees, attorneys and all other persons in active concert or participation with Defendants prohibiting Defendants from practicing on other customers such unfair and unlawful practices.

E. A preliminary and permanent injunction against Defendants, their servants, employees, attorneys and other persons in active concert or participation with Defendants such as third-party assignees of OCC, directing Defendants to reimburse or make restitution to Plaintiff of all monies paid to Defendants under the various agreements.

F. For general and other damages, including but not limited to the cost of disruptions and unrealized efficiencies in bidding and quoting new jobs, managing inventory, as well as loss of resources, sales, revenue and profits due to the failed

implementation; loss of process improvements; additional labor costs caused by the failed implementation; and additional costs and damages in an amount to be proven at trial.

G.    For treble damages pursuant to Penal Code § 496 for Oracle's theft of RSI's money.

H.    For a Declaration of the rights and obligations of the parties to the Agreements, to the extent the Agreements are not rescinded or terminated;

I.    For punitive damages;

J.    For restitution;

K.    For attorneys' fees and costs;

L.    For pre-trial interest; and

M.    For such other and further relief, as may be appropriate.

## JURY DEMAND

RSI requests a jury trial on all issues so triable.

DATED: June 19, 2023                    TACTICAL LAW GROUP LLP



By:  /s/ Pamela K. Fulmer
        Pamela K. Fulmer
        Attorneys for Plaintiff
        RIVER SUPPLY, INC.

Exhibit 1

Mary Schultz (CSB No. 231962)
MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA  99031
Tel:     (509) 245-3522, Ext. 2
Mary@MSchultz.com
*Attorney for Plaintiff Tayo Daramola*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAYO DARAMOLA,<br><br>Plaintiff,<br><br>v.<br><br>ORACLE AMERICA, INC., a Delaware Corporation, on its own behalf and through its wholly owned subsidiaries NetSuite Inc., and Oracle Canada,<br><br>Defendant.<br><br>and<br>Pat Merell, Mita Patnaik, James Bork, Dionis Gauvin, Douglas Harris, Doug Riseberg, and John/Jane Does,<br><br>Defendants | Case No.  3:19-cv-07910 -JD<br><br>**SECOND AMENDED COMPLAINT FOR**:<br><br>(1)  Violation of Whistleblower Protections under the Sarbanes-Oxley Act (18 U.S.C. § 1514A *et seq.*);<br><br>(2)  Violation of Whistleblower Protections Under the Dodd-Frank Wall Street Reform and Consumer Protection Act (15 U.S.C. § 78U-6 *Et Seq.*);<br><br>(3)  Violation of RICO (18 U.S.C. sec 1962)<br>(4)  Retaliation under California Labor Code § 1102.5;<br>(5)  Wrongful Termination in Violation of Public Policy<br><br>**DEMAND FOR JURY TRIAL**<br><br>(UNLIMITED CIVIL) |

Plaintiff TAYO DARAMOLA, requesting trial by jury of all issues joined herein, alleges as follows:



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

## I.     **INTRODUCTION.**

1.     This complaint centers on Plaintiff Tayo Daramola, and his employer, Defendant Oracle NetSuite. Defendant Oracle America, through its NetSuite entity, contacted college and university bookstores across the country, and, via a remote presentation, demonstrated an allegedly integrated, industry specific, "Campus Store Solution" Software as a Service (SaaS) to which the customer could allegedly subscribe. Following the presentation of that integrated system, Oracle gave the customer an estimate and order form containing a menu of "a la carte" subscription modules that would ostensibly work together to achieve the functionality the customer had been shown. These modules, combined, would cost the customer several millions of dollars. Unbeknown to the customer, but known to Oracle, was that the customer's menu of modules was not able to accomplish the functionality expected by that customer *then*, and it wouldn't be able to do that in the near future –at least, not without the customer paying hundreds of thousands of dollars more to help Oracle actually develop the functionality it represented as then existing to that customer *for* that customer. In fact, only one store in the country had achieved "Go Live" functionality on Oracle's system at the time of the sales referenced in this complaint, and that single system was not able to scale to the stores Oracle now solicited. Post sale, this lack of actual functionality, therefore initiated the process of Oracle's engaging its second phase, which was to assess the "gap" between the customer's anger regarding what they thought they bought, verses what they received. Oracle would then sell additional "modules" for additional money to its "escalating" customers to "fill the gap." It did this through people who had no understanding of what the modules already

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

sold to the customer were, nor what modules would now be needed, if that functionality even existed.

2.      Mr. Daramola was assigned at this gap escalation stage. He was included in anxious internal communication about yet another unachievable Go-Live date, and a customer refusing to sign more "change orders." He realized from those threads that Oracle had sold a functionality that did not exist. The individuals involved were now trying to stealthily "pro rata" divide the cost of the necessary development among all of the customers who had bought the represented functionality. Mr. Daramola was placed on a conference call with his customer, following this communication chain verifying that the product sold still had to be developed, and listened as his supervisor deceived and diverted the customer. He refused to participate. Mr. Daramola sought immediate legal assistance to internally report what he believed was a fraud on the customer. He was as quickly removed from his role as a project manager, thereafter isolated to veritable nothingness for his work, and then institutionally muzzled through Oracle's deceptively named "business ethics hotline." He was ultimately constructively discharged from Oracle as a direct result of these deceptive actions. Since his refusal and reporting, Mr. Daramola has been unable to obtain employment in the United States software industry, nor has he received any work from the United States industry as he had enjoyed previously.

3.      Defendant Oracle America's conduct towards Mr. Daramola violated the Sarbanes-Oxley Act, 18 U.S.C. sec 1514A, by unlawful retaliation against legally protected conduct under that Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. sec 78u-6, by constructive discharge of Mr. Daramola following



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

SEC reporting, the state of California's Labor Code, section 1102.5, by retaliation against Mr. Daramola for his refusing to participate in the unlawful activity he reported, and constructive discharge in violation of the public policy of the state of California, through his professional isolation and constructive discharge. The conduct engaged in by the named individual defendants was a racketeering scheme effected through the enterprise of Oracle NetSuite, which brought each individual Defendant continuing benefits, but substantially damaged Mr. Daramola.

## II.  JURISDICTION AND VENUE.

4.     Plaintiff Tayo Daramola is, and at all times mentioned herein was, a resident of Montreal, Quebec, Canada.

5.     Mr. Daramola was employed with Defendant Oracle America, Inc. from November 30, 2016 until his constructive discharge on September 29, 2017, effective October 13, 2017, through employment with its wholly owned subsidiaries NetSuite, Inc, and Oracle Canada (hereafter collectively referred to as "Oracle," "Oracle/NetSuite," "Defendant(s)" or "the Company").

6.     Mr. Daramola was hired by Oracle to perform work in the United States, exclusively with United States customers, supervised by United States personnel, and subject to Oracle policies, procedures, and business practices.

7.     Oracle America Inc. is a corporation licensed and authorized to do business in, employing individuals in, and existing under the laws of, the State of California, with its principal place of business in San Mateo County at 500 Oracle Parkway, Redwood Shores, CA 94065. This Court has jurisdiction over Oracle under 28 U.S.C. § 1391.

SECOND AMENDED COMPLAINT
CASE NO. 3:19-cv-07910 –JD
Page 4 of 75



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

8. Oracle transacts business within the County of San Mateo, State of California, and venue is proper in this Court. 28 U.S.C. § 1391.

9. The material acts causing the violations of law and the injuries claimed of herein occurred domestically within the United States, by Oracle and the individually named Defendants, with and against Oracle's United States-based customers.

10. At all relevant times herein, Defendant Pat Merell was a resident of the state of California, and was employed in an executive position with Oracle.

11. At all relevant times herein, Defendant Douglas Harris was a resident of the state of California.

12. At all relevant times herein, Defendant Mita Patnaik resided in the state of New Jersey (ECF 55-2), but continued to own rental property in and received rents from California real properties. Ms. Patnaik reported to California based Pat Merell.

13. At all relevant times herein, Defendant James Bork resided in the state of Minnesota (ECF 50-1).

14. At all relevant times herein, Defendant Douglas Riseberg resided in the state of Massachusetts (Doc. 55-1).

15. At all relevant times herein, Defendant Dionis Gauvin resided in Washington, D.C. (55-3).

16. This district court has federal question original jurisdiction over this action, per 28 U.S.C.A. § 1331. This Court also has diversity jurisdiction over this claim involving citizens of different states and a foreign subject, per 28 U.S.C.A. § 1332.

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

17.     This Court has RICO jurisdiction over all individually named Defendants under 18 U.S.C. § 1965(b).

18.     For Plaintiffs' RICO claim, this Court has personal jurisdiction over California resident Oracle and California resident Defendants Pat Merell and Douglas Harris, and both of the latter individual Defendants are alleged to be participants in the RICO conspiracy. 18 U.S.C. § 1965(b) therefore provides for personal jurisdiction over each individual Defendant.

19.     There is no other court that will have jurisdiction over all the alleged co-conspirators, as the other named individual defendants claim to reside in states other than California, and in states that are different from each other.

20.     Given the array of residences maintained by all individual defendants, no court other than a California court would have general "residence" personal jurisdiction over all of the individual defendants, while retaining general residence jurisdiction over Defendants Oracle, Merell, and Harris.

21.     This Court therefore has RICO jurisdiction over all individual Defendants under 18 U.S.C. § 1965(b), and should apply such here, because, as detailed herein, the exercise of this jurisdiction comports with fair play and substantial justice; exercising jurisdiction is reasonable.

22.     As explained infra, both general and specific jurisdiction exist over each defendant in any event; moreover, each individually named Defendant consented to the personal jurisdiction of this court regarding the acts complained of herein.

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

## **This Court has general and specific personal jurisdiction over all named defendants**.

23.     California resident Oracle America, Inc. and California residents Defendants Pat Merell and Douglas Harris resided in California during all relevant times complained of, and this court has general jurisdiction over each.

24.     Each of Defendants Bork, Patnaik, Riseberg and Gauvin were not domiciled in California at the time of the acts pled herein, but this Court has jurisdiction over each of the foregoing individual Defendants through California's long-arm statute, Cal. Code Civ. Proc. § 410.10, which is coextensive with the limits of the Constitution's due process clause, and which permits its jurisdiction over each of the foregoing Defendants here.

25.     This Court has general jurisdiction over each non-resident individual defendant Bork, Patnaik, Riseberg and Gauvin because each individual non-resident individual defendant consented to the above court's exercise of personal jurisdiction over them for the type of acts they committed as detailed herein, by both Proprietary Information Agreement contract, and by a Terms of Use agreement which subjected them to the jurisdiction of this court each time they accessed Oracle's web resources in the course of their employment, which occurred in each and every instance alleged in this complaint.

26.     This Court has general jurisdiction over each non-resident individual defendant Bork, Patnaik, Riseberg and Gauvin because, even if not domiciled in California, each named individual Defendants' contacts with California were so systematic and continuous that each Defendant can accurately be called "at home" in the forum state during the relevant times herein for purposes of general jurisdiction.

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

27.    The acts supporting "at home" general jurisdiction are defined below for each individual defendant under the section related to specific jurisdiction, because those same acts supporting specific jurisdiction are of such a degree and volume so as to support general jurisdiction.

28.    Each nonresident defendant deliberately engaged in such a level of daily, systematic and continuous activities within the state of California, each Defendant created continuing obligations between him or herself and California residents, including Oracle Inc., and California customers, each Defendant manifestly availed himself or herself of the privilege of conducting business in and through California thereby, each Defendant employee's activities were shielded by the benefits and protections of California laws, and the exercise of personal jurisdiction over each Defendant is consistent with due process.

29.    It is not unreasonable to require each of the non-resident individual defendants to submit to the burdens of litigation in California.

30.    Each non-resident individual defendant also caused an act in the state to be done from which an action arose in tort, including the wrongful discharge of Tayo Daramola and the unlawful business practices which caused such. *See* Cal. Civ. Proc. Code § 410.10.

Specific Jurisdiction.

31.    This Court also has specific personal jurisdiction over each non-resident individual defendant, based upon the above and as applied to the facts detailed hereunder, in that:

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

32.     Each individual Defendant entered California virtually every time he or she logged onto his or her Oracle laptop, and each act identified in this complaint took place through each individual Defendant's laptop connection with Oracle's data center and secure web resources, which are housed in California.

The specifics as to each Defendant are as follows:

33.     **Defendant James Bork** was an Oracle Senior Sales Director and Vice President of Sales and individually consummated a contractual employment agreement/transaction with California resident Defendant Oracle, where he invoked the benefit of its protections and laws by availing himself of California's invention agreement assignment exceptions "under the provisions of section 2870 of the California Labor Code."

34.     Defendant Bork received salary from California resident Oracle.

35.     Defendant Bork received commissions from California resident Oracle as a result of that contract.

36.     Defendant Bork effected his daily work by entering into Oracle's secure server and web resources housed in, maintained in, and accessed by each employee in Santa Clara, California through processes of electronic authentication.

37.     Defendant Bork sold a California SaaS product to customers across the country by selling subscription which required those customers to access their California SaaS product in California, because the product was delivered from, developed within, modified within, and provided to that customer from Oracle's California data center.

MARY SCHULTZ LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

38.     Defendant Bork sold these California subscription products to customers University Book Store in Washington, University of Texas at Austin, in Texas, Brigham Young University in Utah, California State University at Fullerton in California, and the University of Southern California in Los Angeles California, and each of these customers was then required to access their product within and by entry into California resident Oracle's server via web access.

39.     In many instances, Defendant Bork's sales committed that customer, regardless of residence, to personal jurisdiction in California, and to the jurisdiction of the very above federal court in San Francisco, for and resulting from each customer's access to their product. This occurred both by sale contract with that customer, but also by a Terms of Use agreement that each customer committed to each time they accessed their product on Oracle's California server.

40.     Because Defendant Oracle and Defendant Bork understood and agreed that Defendant Bork's sales transactions were taking place in and emanating from the state of California on California resident Oracle's behalf, Oracle itself required that Defendant Bork commit to an explicit Proprietary Information Agreement, whereby Mr. Bork agreed that "any legal action or proceeding involving Oracle" which was "in any way connected with this agreement," meaning Defendant Bork's receipt of or access to Oracle's confidential, proprietary or trade secret information, "may be instituted in federal court in San Francisco or San Jose, California or state court in San Mateo County or Santa Clara County, California," and that where such occurred, as it has here, then Defendant Bork

MARY
SCHULTZ
LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

"agree(d) to submit to the jurisdiction of, and agree that venue is proper in, the aforesaid federal courts (San Francisco) in any such legal action or proceeding."

41.     Defendant Bork also committed to the jurisdiction of this Court through a "Terms of Use" agreement, agreeing that he would submit himself to personal jurisdiction in the above federal court in San Francisco for and resulting from each time he accessed Oracle NetSuite's web resources for any purpose, which Defendant Bork did daily in the course of his sales work,.

42.     Defendant Bork committed to the jurisdiction of this Court each time he accessed Oracle web resources from the laptop provided to him by Oracle and configured by Oracle to access Oracle's internal web resources.

43.     Defendant Bork committed to the jurisdiction of this Court each time he accessed his email system, Oracle's internal virtual private network (VPN) containing employee information, internal policies and controls, shared folders, and Oracle proprietary information deemed valuable to California resident Oracle, including customer folders and contracts and customer communications, for the express purpose of his work.

44.     Each of the transactions engaged in by Defendant Bork, as detailed herein in this scheme, occurred within California resident Oracle's California server by explicit design of Oracle, through its web resources and VPN, and through and by use of Defendant Bork's "access to confidential, proprietary or trade secret information access," and Defendant Bork committed to the jurisdiction of this Court for each and every action detailed herein in which he engaged, and for each act referenced in this complaint and in this scheme.



Mary Schultz Law, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

45.     Defendant Bork made, authorized, and financially benefitted from, sales of Oracle SaaS on behalf of California resident Oracle to customers University Book Store in Washington in the years 2015-2016, the University of Texas at Austin in Texas, likely during that same time frame, Brigham Young University in Utah, California State University at Fullerton in California, and the University of Southern California in Los Angeles California, all equally within that same time frame.

46.     Defendant Bork also physically appeared in California for Defendant Oracle for purposes of carrying out the employment.

47.     **Defendant Mita Patnaik** was an Oracle Vice President of Customer Success, and individually consummated a contractual employment agreement/transaction with California resident Defendant Oracle, where she invoked the benefit of California protections and laws by availing herself of California's invention agreement assignment exceptions "under the provisions of section 2870 of the California Labor Code."

48.     Defendant Patnaik received salary from California resident Oracle thereby, and received commissions from the entirety of California resident Oracle's revenue, which was compiled in and reported in California in part from her supplemental service contracts and "escalation stage" change orders which she sold customers.

49.     Defendant Patnaik performed her daily work under the same Terms of Use and Proprietary Information Agreement required of Defendant Bork, and did so as generally defined above at paragraphs 37-44 above.



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

50.     Defendant Patnaik thereby committed to the jurisdiction of this Court each time she performed her sales and oversight work for Oracle from the laptop provided to her by Oracle and configured by Oracle to access Oracle's internal web resources.

51.     Defendant Patnaik committed to the jurisdiction of this Court each time she accessed her email system, Oracle's internal virtual private network (VPN) containing employee information, internal policies and controls, shared folders, and Oracle proprietary information deemed valuable to California resident Oracle, including customer folders and contracts and customer communications, for the express purpose of her work.

52.     Each time Defendant Patnaik sold California resident Oracle's professional services to customers across the country, she sold services to those customers which required them to access California resident Oracle's data accessed within, developed within, modified within, and delivered from Oracle's California data center.

53.     Defendant Patnaik sold California professional services through "change orders" to customers University Book Store in Washington, University of Texas at Austin, in Texas, Brigham Young University in Utah, California State University at Fullerton in California, and the University of Southern California in Los Angeles California, and each of these customers was then required to access their product within and by entry into California resident Oracle's server via web access.

54.     In many instances, Defendant Patnaik's sales committed that customer, regardless of residence, to personal jurisdiction in California, and to the jurisdiction of the very above federal court in San Francisco, for and resulting from each customer's access to their product. This occurred both by sale contract with that customer, but also by a Terms



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

of Use agreement that each customer committed to each time they accessed their product on Oracle's California server.

55.    Defendant Patnaik derived economic benefit from her sales to customers University Book Store in Washington, University of Texas at Austin, in Texas, Brigham Young University in Utah, California State University at Fullerton in California, and the University of Southern California in Los Angeles California, in the year 2017.

56.    Defendant Patnaik made, authorized and financially benefitted from her sales of Oracle SaaS on behalf of California resident Oracle to customers University Book Store in Washington, University of Texas at Austin, in Texas, Brigham Young University in Utah, California State University at Fullerton in California, and the University of Southern California in Los Angeles California.

57.    Defendant Patnaik reported directly to California defendant Pat Merell.

58.    Defendant Patnaik physically worked from Oracle's California brick and mortar office in San Mateo during the week of July 20, 2017, while she was communicating with Oracle's California executive staff specifically about the funding and change orders needed at that time due to the escalation of the University of Washington Bookstore scheme, and the University of Texas scheme. During that week, she interacted in person with Defendants Merell, Riseberg, and Plaintiff Daramola, working from an office in San Mateo, as Mr. Daramola was being required to falsify "Go Live" dates to the Texas and Washington customers.

59.    Defendant Patnaik also resided in California and ran California business interests in California for the years immediately prior to her hire by Defendant Oracle



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

NetSuite in April 2016, and she continued to run business, including owning and renting real property in California and deriving rental income from those California real properties in California through late 2018, thereby availing herself of the benefits of the law and rents in the state of California throughout the Complaint's relevant time period.

60.     Defendant Patnaik also previously used the courts in the state of California as a Plaintiff party for her own employment discrimination claims, from which she derived a settlement, and thereby had a history of availing herself of and benefitting from this state's laws thereby.

61.     **Defendant Douglas Riseberg** was an Oracle Consulting Practice Manager, and individually consummated a contractual employment agreement/transaction with California resident Defendant Oracle, where he invoked the benefit of its protections and laws by availing himself of California's invention agreement assignment exceptions "under the provisions of section 2870 of the California Labor Code."

62.     Defendant Riseberg received salary from California resident Oracle thereby, and received commissions from California resident Oracle as a result of that contract.

63.     Defendant Riseberg performed his daily work under the same Terms of Use and Proprietary Information Agreement required of Defendant Bork, and did so as generally defined above at paragraphs 37-44 above.

64.     Defendant Riseberg thereby committed to the jurisdiction of this Court each time he performed his oversight and "gap assessment" work and communications with

SECOND AMENDED COMPLAINT
CASE NO. 3:19-cv-07910 –JD
Page 15 of 75

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

customers for Oracle from the laptop provided to him by Oracle and configured by Oracle to allow him to access Oracle's internal web resources.

65.     Defendant Riseberg committed to the jurisdiction of this Court each time he accessed his email system, Oracle's internal virtual private network (VPN) containing employee information, internal policies and controls, shared folders, and Oracle proprietary information deemed valuable to California resident Oracle, including customer folders and contracts and customer communications, for the express purpose of his work.

66.     Defendant Riseberg promoted California professional services through "change orders" to customers University Book Store in Washington, University of Texas at Austin, in Texas, Brigham Young University in Utah, California State University at Fullerton in California, and the University of Southern California in Los Angeles California, and each of these customers was then required to access their product within and by entry into California resident Oracle's server via web access.

67.     In many instances, Defendant Riseberg's promotions resulted in sales committing that customer, regardless of residence, to personal jurisdiction in California, and to the jurisdiction of the very above federal court in San Francisco, for and resulting from each customer's access to their product. This occurred both by sale contract with that customer, but also by a Terms of Use agreement that each customer committed to each time they accessed their product on Oracle's California server.

68.     Defendant Riseberg received bonuses from California resident Oracle based upon the number of hours of work he performed on any given customer's implementation services.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

69.     Defendant Riseberg transferred his worked hours on a project to Oracle in California, by entry into California resident Oracle's server via web access, for Oracle's use of those hours to now satisfy its own contractual hourly obligation to its customers; in other words, Defendant Riseberg's hours were submitted into the database in California, and used by Oracle in California as its own work, thereby satisfying Oracle's contractual professional service obligation to its customers University Book Store in Washington, University of Texas at Austin, in Texas, Brigham Young University in Utah, California State University at Fullerton in California, and the University of Southern California in Los Angeles California.

70.     Defendant Riseberg thereby directly reduced Oracle's California obligation to that customer.

71.     Defendant Riseberg was also credited in California, at Defendant Oracle, for those hours and derived bonuses from Defendant Oracle from such.

72.     Defendant Riseberg made, authorized, and financially benefitted from his customer management of and sales of Oracle SaaS to customers University Book Store in Washington, University of Texas at Austin, in Texas, Brigham Young University in Utah, California State University at Fullerton in California, and the University of Southern California in Los Angeles California.

73.     Defendant Riseberg reported to Defendant Patnaik, who reported directly to California defendant Pat Merell.

74.     **Defendant Dionis Gauvin** was a General Legal Counsel for Oracle and individually consummated a contractual employment agreement/transaction with



California resident Defendant Oracle, where she invoked the benefit of its protections and laws by availing herself of California's invention agreement assignment exceptions "under the provisions of section 2870 of the California Labor Code."

75.     Defendant Gauvin received salary from California resident Oracle thereby as a result of that contract.

76.     Defendant Gauvin performed her daily work under the same Terms of Use and Proprietary Information Agreement required of Defendant Bork, and did so as generally defined above at paragraphs 37-44 above.

77.     Defendant Gauvin's role as an internal legal counsel was to intercept, collect, minimize, and suppress external reporting of internal whistleblower reporting and to report the whistleblower and claims to executives at Oracle.

78.     Defendant Gauvin's role was to engage whistleblowers such as Plaintiff Daramola through a "hotline" for the reporting of deceptive business acts, via the use of Oracle's web resources, and by phone calls. Defendant Gauvin may or may not record those calls, at her discretion.

79.     Defendant Gauvin used Oracle web resources and communication to obtain all documents which whistleblower Daramola had compiled to show the fraud via electronic transmission to her at Oracle.com, placed the information and documents under attorney client protection for California Defendant Oracle, packaged the interview notes and documents for Oracle's use in California, and transmitted her information and documents within and through Oracle's web resource links through an upward chain that

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

ended with Oracle's General Counsel in California, and thereon to Oracle's Chief Executive Suite of Officers in California.

80.   Defendant Gauvin thus performed her work for Oracle's General Counsel in California, for delivery to Oracle executives in California.

81.   Defendant Gauvin's role was additionally to suppress external reporting to protect California resident Oracle, by "mitigating the risk" of internal whistleblower activity, including, as here, that reporting of Plaintiff Daramola.

82.   Defendant Gauvin thus received and suppressed the information she received and collected regarding the deceptive business practices and fraud as to the specific sales made as alleged in this complaint to customers University Book Store in Washington, University of Texas at Austin, in Texas, Brigham Young University in Utah, California State University at Fullerton in California, and the University of Southern California in Los Angeles California.

83.   Defendant Gauvin financially benefitted from her risk reduction in the context of Plaintiff's reporting of deceptive business practices in Oracle's sales of SaaS and professional services on behalf of California resident Oracle to customers University Book Store in Washington, University of Texas at Austin, in Texas, Brigham Young University in Utah, California State University at Fullerton in California, and the University of Southern California in Los Angeles California.

84.   Defendant Gauvin also physically appeared in California for Defendant Oracle for purposes of carrying out her employment.




MARY SCHULTZ LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

    All non-resident Defendants purposefully directed his or her activities toward California.

85.    Based upon and because of the above actions, their contractual agreements, and the actions of each Defendant detailed below, each non-resident Defendant Bork, Patnaik, Riseberg and Gauvin continuously, systematically, and purposefully directed his or her activities toward California; consummated transactions with the California forum; consummated transactions with a California resident; and performed acts by which each purposefully availed himself or herself himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws.

86.    Based upon and because of the actions detailed above, the contractual agreements, and the acts detailed below, each Defendant Bork, Patnaik, Riseberg and (1) committed an intentional act by sales of SaaS and professional services (Defendant Bork), additional sales of professional services (Defendant Patnaik and Riseberg), and the collection of evidence from whistleblowers to notify Oracle executives of the identity of such whistleblowers, and suppress reporting to agencies (Gauvin and Harris); (2) such acts were expressly aimed at California, California resident Oracle, and each California customer, including Cal State Fullerton and the University of Southern California; and (3) such acts caused harm that each Defendant knew was likely to be suffered in the forum state by California resident Oracle, and by each California customer, including Cal State Fullerton and USC.



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

87.    There is an affiliation between the California forum and the underlying RICO controversy, including, principally, the activities and occurrences detailed above that took place in and through California.

88.    Each defendant's individual participation as described are those acts from which Plaintiffs' claims arise, on a per-defendant basis.

89.    The exercise of specific jurisdiction over each individually named Defendant comports with fair play and substantial justice, and it is reasonable.

### III.    INTRADISTRICT ASSIGNMENT.

90.    This action arises in San Mateo County as a substantial part of the events or omissions giving rise to the claims occurred in, and originated from, San Mateo County, and all parties contractually consented to and committed to venue in the above court through their "Terms of Use" of use of Oracle web resources and through their Proprietary Information Agreements with Oracle.

### IV.    OPERATIVE FACTS

**A.    The "Campus Store Solution" revenue scheme.**

91.    Defendant Oracle, in its NetSuite form, is a service provider. NetSuite provides on-demand business applications to small and mid-sized companies which are accessed via the Internet, rather than requiring on-site installation.

92.    Defendant Oracle, acting primarily as NetSuite, sells "Software as a Service" (SaaS) to customers throughout the United States.

93.    SaaS means that Oracle hosts software applications for customers across the world, and makes those applications available to its customers, wherever they are, via the

MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

internet.

94.     SaaS is a method of software delivery to a customer from an Oracle host data center, with the subscription sold allowing the customer to access Oracle's host server and data from any device, from any location, with an internet connection and a web browser.

95.     Oracle NetSuite maintains the data center/servers which host Defendant's SaaS applications, databases, and the code that makes up its applications.

96.     Oracle NetSuite's primary data center/server is located in Santa Clara, California.

97.     Defendant Oracle NetSuite's individually named defendants were engaged in a  financial scheme which would come to be known and marketed as "Campus Store Solution," with the origins of this scheme beginning in and around 2015-2016, when NetSuite developed a single existing integrated software product for a college campus bookstore in Oregon, known as "The Duck Store."

98.     The program worked well enough for The Duck Store that when Oracle bought NetSuite, it decided that, using this single system deployment in Oregon, it would now approach other university and college bookstores across the country and sell The Duck Store's system as what it rebranded to be a "Campus Store Solution" SaaS.

99.     NetSuite targeted certain universities it believed could be flagship stores as an allegedly new "microvertical" industry-specific line of subscription software for campus bookstores.

𝓜ARY
𝓢CHULTZ
𝓛AW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

100.    Among others, NetSuite targeted the University of Washington in Seattle, Washington's University Book Store (UBS), Brigham Young University in Utah (BYU), the University of Texas in Austin, Texas (Co-Op), California State University at Fullerton in California, and the University of Southern California in Los Angeles, California, in a generally successive order selling subscriptions to what was now alleged to be an integrated and deliverable system for those customers.

101.    Prior to the sale, Defendant Bork's sales team used a "presales" person to demonstrate online by a remote web presentation the functionality of the "Campus Store Solution." The product being shown the prospective customer was the integrated system that had been developed for "The Duck Store."

102.    The customer would ask for that system, via Oracle NetSuite sales personnel, including Defendant Vice President of Sales James Bork.

103.    The customer was not told that the product they had been shown was not scalable for their store. In other words, there was no existing integrated and deliverable product available to the customer by subscription as had been demonstrated. There was only a system developed for a store in Oregon.

104.    Notwithstanding their knowledge of this fact, NetSuite sales personnel, headed by Defendant Vice President of Sales James Bork, now sold the customer a menu of "a la carte" subscription modules which the customer was led to believe would effectuate the functionality of the system demonstrated.

105.    Each subscription module was listed by a part number, implying an existent subscription product, and each module had a name and a price assigned to that subscription.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

The modules were represented as parts of an "edition," such as the "Mid-Market Edition,"
signifying to the customer a developed integrated and accessible software product for use
in a certain defined market of stores.

106.     The menu of modules being sold the customer, however, contained no
description of what each module piece being acquired actually did, nor was there any
description telling the customer, or even the sale person, how that module would work with
other modules to accomplish the functionality of the product demonstrated to the customer.

107.     The price for each module could be in the hundreds of thousands of dollars,
signifying substantially valuable and sophisticated products that would work together to
produce the result demonstrated to the customer.

108.     NetSuite executives in San Mateo at the level of Defendant Pat Merell,
James McGeever, and David Rodman would represent "discounts" to the customer on their
menu of items which totaled millions of dollars of discounts to convince the customer they
were getting an exceptional deal on these valuable integrated product components.

109.     When the customer bought the menu of modules, Defendant James Bork,
both personally and through his sales team, would deliver the customer a consolidated
contract consisting of some 82 pages of interior contracts and addendums, with the first
pages being the modules to which the customer subscribed, and the included documents
being multiple internal contracts including subscription agreements and professional
services agreements and addendums, all of which was intended to represent to the customer
their acquired system and its implementation services.

$\mathcal{M}$ARY
$\mathcal{S}$CHULTZ
$\mathcal{L}$AW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

110.    Oracle NetSuite in California realized revenue from these sales of the modules at the inception and on an ongoing subscription basis.

111.    Defendants Pat Merell and Mita Patnaik realized bonuses based upon Oracle's overall revenue, which would include the sales of these modules and services.

112.    Defendant Bork received a commission based on the value of each subscription module he or his team sold in each estimate, credited to Mr. Bork at the time of sale.

113.    Defendant Bork also qualified for additional commissions calculated from follow up "escalation" sales of additional a la carte subscription modules.

114.    The menu of modules purchased included twelve months of training on how to use their new integrated system to accomplish what the demonstration showed them their system would do.

115.    Now, having signed onto a multimillion dollar term subscription agreement full of modules on a sheet of paper, the customer found no "Duck Store" subscription system to access, because there wasn't one.

116.    The customer would now invariably "escalate," in NetSuite parlance, meaning the customer would get increasingly angry that what they received was nothing like what they were shown.

117.    The customer would increasingly realize that they could not Go Live on anything, nor customize their "software solution," because there was no "solution" that could go live, nor be customized.

118.    Under the guise of the "professional services contract," another NetSuite

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

team, to which Defendant Riseberg belonged, and worked with as an Oracle NetSuite consulting practice manager, was now responsible for "helping customers get live on the software platform," on a product that his team could not deliver.

119.   Mr. Riseberg's role was thereby more accurately described as the role of assessing the percentage degree of the customer's fury over what they had been led to believe they would get, versus what they ended up being able to access, as a "percentage gap."

120.   Now, with the percentage degree of the customer's anger assessed as a "percentage gap," Defendant Mita Patnaik, the Vice President of Customer Success, became involved.

121.   Defendant Patnaik had no understanding of what the subscription modules on the customer's contract were, or what they did, or how they worked, and did not believe it was her job to find out.

122.   Defendant Patnaik did not contact Defendant Bork or his sales team to determine what they had sold the customer, or what they had represented to the customer that these modules would actually do for the customer.

123.   Instead, Defendant Patnaik and Defendant Riseberg, in concert, would work to sell the angry customer more SaaS modules and more professional services to "close the gap."

124.   Defendant Riseberg and the services team would explain to the customer that the specific a la carte modules the customer bought did not accomplish the integrated system the customer "now" wanted, shifting blame to the customer for "changing their

order," when in fact, NetSuite was simply unable to deliver the integrated product it sold in the first place.

125.    Defendants Patnaik and Bork would promote and sign change orders with the customer, selling additional modules of service hours and subscriptions to the customer, implying that the customer was responsible for the inability of their system to Go Live, because the customer had now changed their original order.

126.    This scheme was a fraudulent revenue generating practice, because the customer was shown an integrated product, made clear to NetSuite Sales that the customer wanted that product shown them, and was then sold a series of a la carte products that NetSuite represented would effect that very result, but which could not do so, leading to more and more revenue for Oracle, and more and more commissions and bonuses to the participants, from change orders.

127.    Defendant Oracle NetSuite delayed and deferred "Go Live" dates through the use of "SWAT" technical teams who would contact the customers remotely to try and soothe the customer by and including attempting remote technical "workarounds" to get the angry customer functioning in some limited capacity.

128.    The customer was also sold "sandbox" environments on Oracle's host server where that customer could try and "experiment" to allow for such work-arounds to be transferred to and effectuated in the customer's actual product site.

129.    Defendant Patnaik signed hundreds of such change orders daily, selling customers additional services and products, to customers who had found themselves unable to Go Live on the original product.

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

130.    Defendant Patnaik did not know what the change order products or services she was selling would do. Assigned to "customer satisfaction" in an escalation situation, Defendant Patnaik did not know what the Campus Store Solution products were, nor how they functioned; she did not know what the customer had been sold, nor what she was selling them now.

131.    The purpose of the change orders was to generate additional revenue for Defendants Oracle which would fund Oracle's now developing the "solution" the customer was led to believe they had already bought.

132.    As angry customers ultimately began refusing more change orders, Defendant Patnaik would take that customer's refusal to Defendant Pat Merell and Oracle NetSuite's "Executive Steering Committee" in San Mateo, designed to handle the funding of these predictable escalations.

133.    The Executive Steering Committee included Defendant Merell, Oracle executive David Rodman, Defendant Vice President Patnaik, and others who could report on the current failure at hand, so that the Executive Steering Committee could determine who would fund the development that was needed to get the customer Live.

134.    One mode of funding used by Defendant Merell was that of spreading the cost of the development of the functionality already sold out among other customers who had bought what they believed to be the same functionality, but couldn't access that functionality either. This was done by committing all of these customers to change orders whereby Oracle NetSuite would covertly pro rata apportion the hours NetSuite needed to develop the functionality among those customers.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

135.    By this scheme, Oracle targeted a niche market of campus bookstores consisting of what it believed to be some 4,352 degree granting universities, touting a "revolution in campus bookstores with evolving business models." *PEX 45*.[1]

136.    All participants in this Campus Store Solution scheme knew that the system being demonstrated to the customer could not be delivered to that customer, that the modules and services sold would not achieve that functionality for the customer, that the product could not be delivered as demonstrated, but with the intent to gain, not just the original sales revenue, but the continued additional revenue that would become necessary thereafter and could be implemented through "change orders," whereby Oracle could then try and develop the functionality of the product already sold.

**B.**     **The customer escalations into which Mr. Daramola was to be inserted.**

137.    In 2015, Oracle, and Defendants Pat Merell, Mita Patnaik, and James Bork selected UBS as a target sale specifically because UBS's Chief Executive Officer Louise Little was associated with the Independent College Bookstore Association (ICBA)—an organization which had been in existence since 1927. CEO Little would become the ICBA Board President between 2017 and 2019.

138.    ICBA prioritizes national networking within the bookstore industry and promotes "vendor partner" programs. Selling software to CEO Little at UBS would integrate Oracle NetSuite into the ICBA network, cementing priority of its product. *See*

---

[1]    PEX references are to documents provided to Oracle for notice purposes, but are not attached to this Complaint.

*PEX 45.*

139.    By October 19, 2015, Defendant James Bork presented CEO Little a menu of subscription modules ostensible to allow UBS to acquire the product demonstrated to UBS as the integrated Campus Store Solution. *PEX 2.*

140.    The estimate contract included a SaaS product of "NetSuite's online business application suite and modules," listed via a number of modules with a product number and price for each. *PEX 22.*

141.    The estimate contract involved a <u>subscription term</u> of sixty-three months, effective as of the date the contact was signed, allegedly allowing UBS subscription access to that integrated SaaS. *PEX 2, 00021, 22, 26, 28-43.*

142.    The estimate contract included a <u>professional services implementation,</u> sold for a period of twelve months, as of the date of signing.

143.    Oracle NetSuite and Defendant Bork knew that they had no ability to deliver an integrated Campus Store Solution package to UBS, or effect the subscription sold as a part thereof, or implement the product as sold.

144.    On April 30, 2016, UBS CEO Little electronically signed what had now become the above referenced 82-page document containing multiple contracts, signed by Defendant James Bork and transmitted through his sales person Brenee Staples, in San Mateo California. UBS would pay $2,049,958.06 for its system. *PEX 2.*

145.    In and around the same time, Defendant Bork would be signing similar sales documents with the University of Texas at Austin's "Co-Op" bookstore, Brigham Young University in Utah, California State University at Fullerton, and the University of Southern



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

California, all touting the system and the fact that Louise Little and UBS had bought the system.

146.    The dates of these sales and the contracts are currently unknown, as NetSuite has refused to produce them under formal discovery.

147.    As was foreseeable, and indeed predictable, by February 2017, multiple Campus Bookstore Solution customers were in escalation status because they hadn't received what they had been shown.

148.    UBS's contract was sold in April 2016, and as of February 2017, the integration and functionality it thought it had acquired was still not available to it. It could not Go Live.

149.    As only one example, part of the Campus Bookstore Solution's "specialized features" allegedly included what was called an "Integration to Verba," and that integration was to include the functionality to "support a store buyback of books at the end of the year," a function allowing stores to determine the quantity, quality and pricing to maximize revenues, a rental feature, and other features for reminders and associate charges. *See PEX 45.* Nearly a year after UBS bought the Solution, this feature was not available.

150.    Through that time, Go Live dates were continually being deferred.

151.    Through that time, Defendant Oracle, Bork and Patnaik, and potentially others to be determined, were extracting change orders from UBS to enable someone at Oracle NetSuite the time necessary to develop the system that would function sufficiently for UBS to Go Live in some way UBS had envisioned.

MARY SCHULTZ LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

152.    By February 2017, UBS's Louise Little sent a letter to Oracle's James McGeever, Oracle's Executive Vice President of the NetSuite Global Business Unit, regarding Oracle's systemic product failures. *PEX 22.*

153.    On March 9, 2017, Oracle NetSuite's Scott Williams, Oracle's "Practice Director, Professional Services," obtained UBS CEO Little's signature on another change order contract.

154.    The change order committed UBS to agreeing that UBS had initiated a change to an existing implementation, integration or training service item, and, as a result, "further customizations requested during the development process and the proposed implementation solution" would require UBS to pay more money and wait longer for their expected Go Live, that is, UBS would now await the foregoing changes that UBS purportedly "would like to be implemented on their site *before* launch." (emphasis added).

155.    Oracle's change order commits UBS to agreeing that they are to blame. It states, variously, that, e.g., "a) This (change order) outlines the additional changes that (UBS) would like to be implemented on their site before launch. b) It is accepted an understood that once this CO is signed, the PM (project manager) will incorporate these tasks into the project, and there will most likely be an impact to overall project schedule, due to the above change in scope......d) If any further changes are required, then *this will change the quote and potentially the project schedule, a*s already highlighted in point (b) above." *PEX 27, "Project Assumptions"* (emphasis added).

156.    The change order shows UBS being charged another $77,066 for additional professional services under an "ERP implementation service-fixed bid." *PEX 27.*

MARY
SCHULTZ
LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

157.    This change order was signed by Oracle NetSuite's "gap assessing" professional services team then director, Scott Williams.

158.    All name Defendants NetSuite, Merell, Patnaik, and Bork knew that the delay was not caused by the customer's changes or desire for customization, but because there had never been an integrated software subscription product as demonstrated pre-sale available to that customer, and there still wasn't.

159.    By April 2017, Defendants Jim Bork and salesperson subordinate Brenee Staples met with UBS CEO Little, and now the new Board President of ICBA, regarding yet another UBS deferred Go Live date, which had been now delayed until May 15, 2017. *PEX 22*.

160.    By April 2017, UBS was now refusing to pay its annual invoice, because according to CEO Little, "their system is failing and they need to Go Live with ERP/POS/SCA and the Campus Store Bundle." *PEX 22 (February 15, 2017)*.

161.    By May 1, 2017, Oracle's Executive Vice President Jim McGeever was publicly touting NetSuite's "SuiteSuccess" functionality, which he claimed allowed NetSuite customers a baseline implementation of their subscription products within 100 days.[2] *PEX 32, 33*.

162.    By May 4, 2017, the only campus bookstore that had ever achieved Go Live status was, still, The Duck Store. *PEX 33a*.

---

[2]    https://diginomica.com/NetSuites-secret-weapon-the-stairway-to-suitesuccess; *and see, e.g.,* https://www.NetSuiteblogs.com/jim-mcgeever-mark-hurd-promise-more-more-more-in-suiteworld-2017-keynote-next-starts-now.



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

163.    By June 9, 2017, with an increasing number of Campus Store Solution customers in varying percentage degrees of anger, with UBS outright refusing to sign more change orders, and other customers now threatening cancellation of contracts with NetSuite and demanding that their money be returned to them, Defendants Merell, Patnaik, Bork, and Riseberg, along with others were now discussing a call that Oracle professional services' Ryan Murphy had with UBS CEO Little to "verbally" address her February 2017 letter. *PEX 22.*

164.    While this was ongoing, and by June 23, 2017, knowing of Net Suite's inability to implement the "solution" sold, Defendant Patnaik extracted another change order from the University of Texas requiring the Texas Co-Op to pay another $400,000 for an implementation program. *PEX 41.*

165.    From July 17, 2017 through July 19, 2017, NetSuite's professional services director Scott Williams, along with various project implementation personnel, including Karen Johnson, were confirming their understanding that the contract language being used by its sales personnel needed to be changed to "accurately describe what is included," to avoid these continuing escalations. *PEX 57c.*

166.    On July 19 and 20, 2017, a critical event arose with UBS.

167.    Having strung UBS along for well over a year without allowing it to Go Live, Defendants Merell, Patnaik, Bork, and Riseberg, along with Karen Johnson and other project implementation personnel, were needing to obtain another three-week delay before UBS could Go Live, which they all knew would "likely trigger a significant escalation." *PEX 46 (at 000578), 47 (000586).*

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

168.     On July 20, 2017, at 10:28 a.m., via an email chain entitled "Campus Stores," Defendant Patnaik directed the group, including Defendants Bork and Riseberg, to maintain the fraudulent scheme, directing them to "push back on the customer," while "building out the new functionality that got identified at this late a stage." *Id.* *(46 at 000577, 47 at 585).*

169.     On July 20, 2017, at 2:58 pm, Oracle's Kate Davis, on the same email chain, reported having talked with UBS's Little and UBS's Chief Information Officer, Erin Olinick, who continued to insist on some promised Go Live date. *PEX 46, 47.*

170.     Ms. Davis's 2:58 p.m. transmission now attached for the group a letter authored by UBS's Olinick, where UBS detailed the ramifications of NetSuite's systemic failures. In NetSuite parlance, this was an "escalation document." *Id.*

171.     The letter details an utter lack of functionality and disarray with the NetSuite SaaS product, and reveals that UBS had by now been subjected to three successive Go Live dates.

172.     The letter details NetSuite's continuing failure to deploy the promised "special features" for which UBS had purchased the system, and describes the lack of functionality of the purported special features, the failure of Oracle to have developed those features, and the programs in disarray.

173.     The letter confirms what NetSuite already knew, but that the customer was now realizing hundreds of thousands of dollars later--the Campus Store Solution had plainly been built for a "one-school" or "one-store term," (indeed, The Duck Store), but not a multi-school organization. The customer was now realizing and correctly telling

MARY SCHULTZ LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

NetSuite that this one-school system was not "mass market" transferrable to customers like UBS as represented. *Id.*

174.    The letter detailed NetSuite's professional service teams continuing to execute "manual work-arounds," while "fundamentally ignoring the basic functional requirements of the UBS business." *Id.*

175.    UBS described being repeatedly subjected by NetSuite project managers and personnel to new proposals of "manual workarounds" and work "that must be completed outside NetSuite or in between the two systems" that would "cripple us in terms of efficiency." *Id.*

176.    The letter gave examples, confirming that, e.g., "The Ingram integration has not been developed," and that there was "NO trade buyback functionality at all" (capitalization in original). *Id.*

177.    The letter confirmed, e.g., that the "vendor parent-child relationship is in complete disarray," that "due to incorrect and missing instructions, 80+ registers have been provisioned after replication with malfunctioning configurations," and that "[T]here is NO ONE PERSON on the NetSuite side holding together all of the pieces in this project." *Id.*

178.    The letter described UBS being repeatedly given work to do by NetSuite personnel, with "constantly changing/shifting the field requirements" that resulted in "countless hours wasted on updating already imported items…and multiple revisions to mater templates…" UBS reported that "major inconsistencies were in the product (which resulted) in a major increase in work for us, your customer." *Id.*

179.    The letter described NetSuite consultants and project managers



contradicting each other, being misinformed, not knowing the customer's basic requirements, creating confusion, and repeatedly requiring work-arounds for lack of functionality. *Id.*

180. The letter reported how the same concerns had been repeatedly aired "to every functional consultant on our project…to no avail." *Id.*

181. The letter confirmed the lack of functionality of the subscription-based accounting service, as the system was not workable. UBS was experiencing "no demonstrated ability in NetSuite to perform our day-to-day processes for the two pillars of any retail organization—receiving merchandise and paying our bills." *Id.*

182. The letter thus explicitly put into writing what the named Defendants already knew—there was no pre-integrated product available to customers like UBS, and there never had been.

183. The punch line of the letter was that UBS would not pay for any further change orders until it received a functioning system, and UBS demanded a Go Live date by August 2017. *Id.*

**C.    Tayo Daramola is inserted into Campus Store Solutions and realizes this is a likely fraud.**

184. By July 19, 2017, Defendant Douglas Riseberg had been brought in to take over for Ryan Murphy, who had abandoned the Campus Store Solution professional services implementation process.

185. By July 19, 2017, project manager Andrea Scully had equally abandoned her role as the UBS/Texas project manager and abruptly left Oracle NetSuite.



MARY
SCHULTZ
LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

186. On July 20, 2017, at 2:31 p.m., as the Campus Stores e-mail with the attendant UBS "escalation" letter detailed above circulating among the named Defendants, Defendant Riseberg formally transitioned Plaintiff Daramola to the position of lead project manager on both the UBS and Texas Co-Op projects.

187. On July 20, 2017, at 3:48 p.m., Defendant Riseberg forwarded Daramola the pending July 20, 2017 communication between Oracle's Karen Johnson, and Defendants Patnaik and Riseberg, reporting that customers UBS and BYU were "very much wanting to go live in August."

188. Plaintiff Daramola immediately recognized that the functional requirements documents (FRD) for a number of the customer's special features did not yet exist. An FRD is an essential blueprint for how that feature *will be developed.* Because the FRD was not yet developed, then the feature plainly did not exist.

189. Daramola read Karen Johnson's reporting to Defendants Patnaik and Riseberg of how an estimate of the work needed to simply develop the FRD for all of the features needed would take another 2047 hours, and perhaps more. An estimated 278 hours, as an example, would be required to develop the FRD for the Ingram Integration alone.

190. Plaintiff Daramola noted Defendant Patnaik's directive to "push back" on the customer, and UBS's Olinick letter. *PEX 46.*

191. Daramola noted a message referring to a "Release 2," which, at that stage, caused him to assume that "Release 1" existed somewhere and was surely already

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

functional. But review of the UBS letter caused Daramola to realize that there was no functional "Release 1" of anything. *PEX 46.*

192.    On July 22, 2017, Defendant Riseberg told Daramola that he was to immediately assist a "SWAT team" for UBS's escalation, revealing to Daramola that there was a systemic response ready for customer escalations.

193.    Defendant Riseberg began submersing Daramola into NetSuite's language of "product gaps," which Daramola now understood meant that UBS did not have the system they had expected.

194.    Defendant Riseberg directed Daramola that he and the SWAT team were to obtain "significant change orders" from UBS, to make UBS pay for more work, and that if UBS refused to sign those change orders, the newest Go Live date represented to UBS of September 5, 2017 Go Live was "unlikely." *PEX 50a* (involving Johnson and Patnaik, and, on July 24th, with Johnson referencing the involvement of Defendant Merell).

195.    By July 24, 2017, Plaintiff Daramola had spoken with his UBS customer briefly, but he had refused to set a false Go Live date with UBS until he could determine whether that date was able to be achieved by NetSuite. *PEX 49* (Olinick July 24th letter).

196.    By July 24, 2017, UBS was now complaining that it was being billed by Oracle NetSuite for its SWAT team, when that team was addressing Oracle NetSuite's own failures, i.e. Oracle NetSuite was billing UBS for Oracle personnel's travel and "onsite resources that were/are being sent in an attempt to address inadequacies on NetSuite's part." *PEX 49.*

*MARY SCHULTZ LAW, P.S.*

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

197.    UBS's CIO Olinick told NetSuite's Kate Davis that it would not be responsible for Oracle personnel and travel in the upcoming week, and UBS had "made it very clear in (UBS) list of grievances that (UBS) will not pay any more until we are up and running on a functioning system." *PEX 49*.

198.    UBS's CIO Olinick demanded a "hard and fast (Go Live) date within the next two days so that we can communicate to all stakeholders accordingly." CIO Olinick directed Oracle that the Go Live date should be "Tuesday, September 5 (2017)." *PEX 49*.

199.    These foregoing communications were shared among Defendant Patnaik, Riseberg, and now Plaintiff Daramola.

200.    By this week of July 2017, Defendants Patnaik, Merell, along with Oracle's Karen Johnson, were conferencing with Oracle executive David Rodman in Oracle's office in San Mateo, California, participating in an "Executive Steering Committee" designed for the Campus Store escalations, to determine how funds could be generated or allocated to correct the escalations, including this escalation with UBS.

201.    On July 27, 2017, at 4:48 a.m., NetSuite's Karen Johnson reported that, because NetSuite had been repeatedly deferring UBS's Go Live date, UBS was now demanding the "full implementation of Ingram," not Oracle's "phased approach." *PEX 50d*.

202.    Johnson confirmed to Defendants Patnaik and Riseberg, and Plaintiff Daramola, that the "Ingram Integration" UBS needed was still not developed.

203.    Johnson reported that in order to perform a full implementation of the Ingram Integration, the integration had to first be developed. The previously estimated 278

*MARY SCHULTZ LAW, P.S.*
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

hours for the FRD was only a writing and development estimate—if NetSuite were to leverage a code it had developed for *another* feature as a *starting* point for the Ingram Integration, the writing and deploying of that integration would be "800 hours." *PEX 50d (v PEX 45a).*

204.   This Ingram development work would not be able to be *started*, however, without a new change order at UBS's expense: "Before any work is started, we will need to get an approved change order from UBS." *PEX 50d.*

205.   But UBS was already refusing to sign a change order until it had a guarantee of a Go Live date. *PEX 50d.*

206.   Defendants understood that the UBS situation was about to unravel— "asking UBS to fund the total cost will most likely be a show stopper." *Id.*

207.   Other customers had already escalated to the point of demanding refunds, and if UBS terminated its contract, the scheme would come to a halt.

208.   Already pending in the mix was an anticipated publicity blow to NetSuite. Four days later, on July 28, 2017, news reports revealed that retail company Billabong had terminated its contract with Oracle/NetSuite, giving up entirely on NetSuite's alleged sales platform, and taking a $11.7 million impairment charge in order to "cut its losses and dump its new ecommerce platform provider NetSuite following technical implementation issues." *PEX 51.*

209.   Mr. Daramola saw this public release, and noted that Billabong had been sold a similar "Suite Commerce cloud-based set of ecommerce and retail point-of-sale tools" in 2015 that was still not functional in 2017. Plaintiff Daramola found himself



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

assigned to the Campus Store Solution sold in 2016, which was still not functional in July 2017.

210.    On July 24, 2017, Daramola began realizing that he was now being directly involved in an artifice to cover the UBS Ingram integration deficiency, which involved apportioning the cost of the development to other Campus Store customers who were experiencing the same deficiency.

211.    The Ingram Integration feature had also been explicitly sold to the Texas Co-Op, and the University of West Virginia, but "not specifically called out" to programs NetSuite had also sold to "Cornell" or California State Fullerton (CSU). Defendants, including Defendant Patnaik, determined to assign employee David Homyak to obtain information from "Ingram" as to whether there were other customers in Netsuite's sales pipeline to whom Defendant Bork and his sales team had sold the Ingram Integration.

212.    Once having identified those customers, Defendants Merell, Bork, and Patnaik, through sales of additional services and modules, could divvy up the cost of its Ingram development among those customers, using change orders, instead of "asking UBS to float the entire bill." *PEX 50d.*

213.    Defendant Patnaik told the group that the primary concern was that "writing and deploying a new integration" by a now-promised date of September 5, 2017 could not likely be done—such an endeavor created "huge risk." *PEX 50d.*

214.    Defendant Patnaik considered the cost of the "FRD or development" as now secondary. Impending potential strategic cancellations were now quite foreseeable.

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

215. Plaintiff Daramola now understood that his role was to involve deceiving the customers and projects to which he had been assigned to buy more time for his superiors.

216. On July 27, 2017, at 5:42 p.m., Defendant Riseberg directed Plaintiff Daramola to directly misrepresent to the customer.

217. Defendant Riseberg told Mr. Daramola that NetSuite's Karen Johnson would "send an email to Texas asking to set up an alignment call" to "deal with the solutions miss." *PEX 50b.* On that call with Texas, Plaintiff Daramola was to assist Defendant Riseberg in trying to "finesse the call with Texas and get them to align with what we can deliver." *Id.*

218. On July 28, 2017, Defendants Merell (Group Vice President), Defendant Patnaik (Regional Vice President), and Defendant Riseberg held a conference call in which Plaintiff Daramola participated. *PEX 52 (invitation); 52a.*

219. On that call, the foregoing actively discussed how to continue to conceal the lack of development of the products, and how to obtain more time to develop the products that were not deliverable.

220. On July 30, 2017, before the Texas Co-Op call, NetSuite's Karen Johnson sent an email to Defendants Patnaik and Riseberg entitled "UBS next steps," detailing the number of "critical components" required in order for UBS to Go Live on September 5, 2017, including the non-existent Ingram Integration. Johnson reported that even on an accelerated schedule, Oracle could not render even the Ingram feature functional until August 29, 2017. *PEX 53.*

SECOND AMENDED COMPLAINT
CASE NO. 3:19-cv-07910 –JD
Page 43 of 75



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

221. On July 31, 2017, as directed, Mr. Daramola issued notice to Defendant Riseberg and others of an internal WebEx conference call prior to he and Defendant Riseberg's upcoming meeting with the still stalled Texas Co-Op. This was called an "Internal Alignment Meeting" to "align internally, and address solution gaps and planning, and customer expectations" in advance of communicating with the Texas Co-Op customer. *PEX 56a, and 56b.*

222. The participants in the August 1, 2017 alignment call were Plaintiff Daramola, Defendants Riseberg, and NetSuite's Karen Johnson, among others. *PEX 56b.*

223. On August 1, 2017, at 11:38 am, Plaintiff Daramola messaged Defendant Riseberg and Johnson, confirming that the Texas conference call was arranged with Texas, so that Defendant Riseberg could introduce Plaintiff Daramola as Texas's new project manager, and thereby "review (Texas) functionality needs, to discuss prioritization and to discuss next steps." *PEX 57.*

224. On August 1, 2017, at 10:43 p.m., Karen Johnson confirmed her earlier internal discussion—"New Campus Stores functionality (has not been developed)." *PEX 57c.* Some functionality that was required for the Texas customer, but was not developed, included "Verba Collect and Compete" and the "Ingram Catalog load." *PEX 57c.*

225. On August 3, 2017, prior to the call with the Texas Co-Op, Defendant Riseberg, copying Defendant Patnaik and Plaintiff Daramola, identified the myriad of customers now in escalation status, including the Texas Co-Op, with the attendant "product gaps." *PEX 58c.* Some customers were requesting a full refund, and others wanted to "debook," with the latter meaning that the customer wanted to end payments for the


2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

subscription service they were obligated to for Oracle's unusable software. *See PEX 58(c) (noting ECS and Arda Wigs).*

**D.** **Tayo Daramola refuses to participate in what he believes to be a fraud.**

226.    On the August 3, 2017 call with Texas, Defendant Douglas Riseberg led the call by repeatedly misleading the Texas Co-Op customer as to how the Texas customer was impliedly responsible for the delay, and that more time was needed as a result of the customer's requests.

227.    Defendant Riseberg also blamed delays in the customer's "kick off" date on the departure of the prior project manager, Andrea Scully.

228.    Defendant Riseberg, as well as Plaintiff Daramola, knew that Defendant Riseberg's representations were false.

229.    Defendant Riseberg misled the customer by digressing into the "NetSuite training plan," and assigning the Texas customer homework in the form of the customer now "setting up charts of accounts," creating "data conversion" slides, and making "power point slides," all for the purposes of concealing the known problem and delaying the Go Live date.

230.    This was the same NetSuite diversion and stalling tactic that had been deployed with UBS in Seattle, and of which UBS's Olinick had complained in his letter.

231.    Plaintiff Daramola knew Defendant Riseberg was misrepresenting material information to the customer, and he refused to participate.

232.    When implicitly asked by Defendant Riseberg to ratify Defendant Riseberg's representations to the Texas customer as the customer's new project manager,




2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

and to thereby falsely reassure his customer, Daramola refused, and remained silent.

**E.    Mr. Daramola suffers retaliation for his refusal to participate in fraud.**

233.    The following morning, on August 4, 2017 at 10:02 a.m., Defendants removed Mr. Daramola from his position as project manager over Campus Store Solution projects in progress.

234.    This removal was in retaliation for Mr. Daramola's overt refusal to deceive and defraud the Texas customer.

**F.    Mr. Daramola reports to Oracle's "Ethics Hotline" which is not designed to investigate internal fraud, but is instead designed to capture and contain the legal risk of that ongoing fraud, and deliver the whistleblower identity and report to Oracle's Chief Executives.**

235.    The night of the Texas call with Defendant Riseberg, Mr. Daramola sought the assistance of, and retained, a lawyer to assist him with internally reporting to Oracle what he believed was Defendants' requiring him to participate in illegal conduct.

236.    The next morning, on August 4, 2017, Plaintiff Daramola began working with his lawyer about how to phrase his internal report of fraud.

237.    While so engaged, Plaintiff Daramola received Defendant Riseberg's notice removing him from Campus Store Solution's project manager position.

238.    Continuing thereafter, from August 4, 2017 through October 13, 2017, Defendants Riseberg, Patnaik and Merell, would retaliate against Plaintiff Daramola by ensuring he had no meaningful responsibility, remained isolated, while taunting him with homework assignments regarding how he could get paid for the time he had already put in



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

on the projects to which he had been assigned, and which Oracle had already used for completing its own hourly contract with its customers.

239. On August 14, 2017, Plaintiff Daramola filed an internal ethics complaint with what Oracle's "Ethics Hotline."

240. Now, Defendants Gauvin and Harris appeared.

241. Defendant Dionis Gauvin was Oracle's Senior Corporate Counsel, Global Compliance and Ethics at this time.

242. Defendant Gauvin is a lawyer tasked by Oracle to receive internal complaints from employee whistleblowers reporting unethical or unlawful business practices and "mitigate" the legal risk to Oracle of that employee's reporting by protecting those involved.

243. Defendant Gauvin misled Mr. Daramola into believing that she was investigating his claims, while she was packaging them to be delivered upline to Oracle's C-Suite executives.

244. Defendant Gauvin provided no protection to Mr. Daramola for the management retaliation he was reporting, nor any reassignment to a functional role.

245. Defendant Gauvin did not interview any of the people identified by Tayo Daramola as Oracle NetSuite Chief Executive Suite actors involved in the Campus Store Solution fraud, nor did she investigate Daramola's claims.

246. Instead, Ms. Gauvin interviewed Mr. Daramola multiple times, making her own notes of what Mr. Daramola allegedly conveyed, and directed Mr. Daramola to produce all of the documents he believed supported the violations he believed to exist.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

247.    Defendant Doug Harris is an investigator in California, who was assigned by lawyers Gauvin and Su Kwak, to assist with the third interview of Mr. Daramola, where Mr. Harris attempted to dissuade Mr. Daramola's reporting and beliefs.

248.    Defendant Gauvin then packaged the incriminating documents provided, and delivered them with her notes to her supervising lawyer, Su Kwak, who had listened in on the third interview without announcing that she was present.

249.    Attorneys Gauvin and Kwak then packaged Mr. Daramola's claims for reporting to Attorney Kwak's legal supervisor in California, who directly reported to Oracle's General Counsel in California, Dorian Daley, who would share the complaints, and thereby the named whistleblower, to Oracle's Chief Executive Suite.

250.    In this way, Oracle C-Suite executives were made aware that Mr. Daramola believed the Campus Store Solution to be an illegal scheme, and that Oracle Legal had the documents Mr. Daramola believed would show this.

251.    Defendant Gauvin would instigate and facilitate the constructive discharge of Mr. Daramola by leaving him essentially professionally stranded, then "engage HR," which would advise Mr. Daramola in writing that all of the information of the fraud that he had submitted to Ms. Gauvin was proprietary, and that he was not to provide that information to anyone, meaning any state or federal agencies, or he would be in breach of his proprietary information contract with the Oracle NetSuite.

252.    By using internal risk mitigation lawyers to intercept and package complaints of business fraud for Oracle's executives, Oracle NetSuite ensured that whistleblowers were internally revealed, and that internal documents showing fraud were

not disseminated to federal agencies, to protect those involved and enable the unlawful financial scheme to continue.

253.    This scenario took place in particulars commencing on August 14, 2017, when Plaintiff Daramola filed his complaint with Oracle.

254.    Here, Mr. Daramola specifically reported the involvement of Oracle NetSuite executives, including Defendants Pat Merell and Mita Patnaik.

255.    Mr. Daramola reported that the activities were occurring in "C-Level Escalation Management Meetings and Internal Alignment/planning Meetings." *PEX 70*

256.    Mr. Daramola reported that:

[r]egarding the NetSuite Retail 'Campus Book Stores' Project. I have been involved in this project since on or about July 20, 2017. As you know, this project is of a delicate nature and raises serious concerns as to Oracle's ability to comply with its contractual obligation of delivering a finished product in a timely fashion to the clients. As of the last few weeks, I have been required to be more actively involved in the Project. In doing so, I am expected to provide specific information and undertake (or support) in the company's name that given actions will be performed by Oracle on given dates.

It has become my understanding that notwithstanding Oracle's will to comply with its existing contracts, certain important product components, namely the new "Campus Bookstore Solution Sets," will not be developed and completed in time to meet the clients needs and expectations. I am further concerned that I am instructed to give information and convey an impression to clients that is not reflective of the actual state of development of said products.
It appears to me that in doing so, Oracle and the individuals involved in the project could be seen as not making statements and representations to the clients that are accurate and truthful, and could be deemed by a third party as acting in violation of existing laws and regulations.

*PEX 70.*



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

257.    Mr. Daramola reported, "I am not an expert in these matters nor do I wish to explore it further. The purpose of this letter is to express the great discomfort I feel in being further involved with this aspect of the project and to ask that Oracle no longer require me to participate in misleading the clients." *PEX 70.*

**G.**    **Plaintiff Daramola reports Oracle's misconduct to the SEC, including his belief in software "revenue recognition" violations, which implicates securities fraud.**

258.    On August 16, 2017, Plaintiff Daramola filed a report with the Securities and Exchange Commission (SEC) reporting what he had internally reported to Oracle, which he reasonably believed included "revenue recognition" violations, which he would also assert to Oracle lawyer Dionis Gauvin and Douglas Harris as part of this Campus Store scheme.

259.    Mr. Daramola reported to the SEC that Oracle's executive teams were promoting the scheme:

> I have also learned that senior executive leadership has been aware from the start of the sales cycle up to the present time, that the products contractually promised, and advertised, have yet to be developed and/or completed. I am further concerned that I am instructed to give information and convey an impression to clients that is not reflective of the actual state of development of said products while executive leadership encourages and supports teams misleading the clients. It appears to me that in doing so, Oracle and the individuals involved in the project could be seen as not making statements and representations to the clients that are accurate and truthful, and could be deemed by a third party as acting in violation of existing laws and regulations. I am not an expert in these matters.

> *PEX 72.*



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

260.     Plaintiff Daramola reported that this scheme implicated revenue recognition violations;

> Further, as the clients have been invoiced and paid for undeveloped products - and if this pattern continues - there may be revenue recognition concerns, which could result in material misrepresentation and omissions about the company's revenues and earnings. The purpose of this letter is to report the potential violations to your agency, and to express the great discomfort I feel in being further involved with any aspect of the project that requires me to participate in misleading the clients. I trust you will understand my concerns.

*PEX 72.*

261.     Unlawful revenue recognition practices implicate the "employment of manipulative and deceptive devices," under 17 C.F.R. § 240.10b-5 and 15 U.S.C.A. § 78j.

262.     The overstating of revenues which can result from premature revenue recognition may state a claim for securities fraud, "as under GAAP, 'revenue must be earned before it can be recognized.'" *See, e.g., In re Daou Sys., Inc.,* 411 F.3d 1006, 1016 (9th Cir. 2005).

263.     Mr. Daramola provided the SEC his August 14 internal report, told the SEC that he had complained to Oracle internally, and told the SEC that Oracle had not acknowledged the conduct.

## H.     Defendants Gauvin and Harris attempt to derail Mr. Daramola's reporting externally to federal law enforcement entities.

264.     Commencing on August 15, 2017, Defendant Gauvin, and then Defendant Harris, became aware and understood that Mr.Daramola's reporting was reporting of perceived law and regulatory violations engaged in by Oracle executives.

265.     From August 15, 2017 through October 13, 2017, Defendants Gauvin and



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

Harris misled Mr. Daramola by implying to him that they would be investigating his complaints, when their intention was otherwise.

266.    As detailed above, Defendants Gauvin and Harris intended to instead use their executive positions to dissuade Mr. Daramola from reporting his concerns to or disclosing documents to the SEC.

267.    Defendants Harris and Gauvin performed no substantive investigation into Plaintiff Daramola's complaints, nor assessed the documents he provided them, nor obtained documents to which Daramola directed them.

268.    Defendants Gauvin submitted Plaintiff Daramola to four separate interviews by them over a course of two months, on August 22, 2017, August 24, 2017, August 25, 2017 and September 20, 2017, where she, and then Oracle's Douglas Harris on September 20 2017, asked the same questions, pretended not to understand what was being reported, engaged in obfuscation, and asked Mr. Daramola for the same information interview after interview without reviewing any of the documents provided them. *PEX 81.*

269.    On September 20, 2017, Defendant Harris attempted to obtain a recanting from Mr. Daramola of his claims by telling Mr. Daramola that he was not reporting fraud, and asking Mr. Daramola to confirm Mr. Harris's statement.

270.    Defendants Harris and Gauvin's actions were intended to prevent Mr. Daramola from asserting fraud and from communicating such assertions to the SEC or a federal enforcement agency when he left Oracle, which both Defendants intended to see happen by their actions.

271.    Defendants knew that Mr. Daramola was under significant stress and

*MARY SCHULTZ LAW, P.S.*

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

emotional hardship during this period, that he had been isolated, derogated and belittled, and they believed, and intended, that by doing nothing to assist him, and by repeatedly telling Mr. Daramola that he did not know what he was talking about—from the level of their executive positions—he would either come back into the conspiracy with new compliance, or leave, and be told he could not disseminate what he had told either Defendant.

272.    Defendant Riseberg assisted Defendants Gauvin and Harris by inviting Plaintiff Daramola to rejoin the conspiracy by assignment to a Campus Suite project at the University of Southern California (USC).

273.    When Plaintiff Daramola asked Defendant Riseberg if the same type of issues existed with the USC project, Defendant Riseberg revoked his offer of assignment.

274.    When Plaintiff Daramola later signified his separation from Oracle on September 29, 2017, Defendant Riseberg retaliated, assigning a new "evaluator manager" to downgrade Plaintiff Daramola's job performance, which was then done on October 5, 2017.

275.    The foregoing acts were continued retaliation, intimidation, and deterrence.

276.    All such actions took place over internet and phone communication, using Oracle NetSuite resources.

**I.    Defendants constructively discharge Plaintiff Daramola.**

277.    By September 29, 2017, Plaintiff Daramola had no meaningful work, and no meaningful work status.  He was isolated, ignored as to pay he believed was owed, suffering damage to his reputation and career, unable to be assigned to any substantive

project, and under significant stress from Defendants Riseberg's retaliation, and Defendants Gauvin and Harris's misleading conduct.

278.    Plaintiff Daramola's working conditions were by then such that no reasonable employee could perform meaningful work, and constituted constructive discharge.

279.    Plaintiff Daramola had no option but to resign, and did so on September 29, 2017, giving two weeks' notice that his last day of work would be October 13, 2017. *PEX 80.*

280.    Plaintiff Daramola was constructively discharged on October 13, 2017 for having uncovered, resisted, refused, and reported what he perceived to be fraud upon Oracle customers.

281.    As detailed above, Plaintiff Daramola was then marked down by his new Oracle supervisor, in an attempt to make Daramola less credible to any agency.

**J.      Defendants direct Daramola not to communicate with the SEC.**

282.    Both Defendants Gauvin and Harris were aware that it is illegal to impede an individual from communicating directly with the SEC staff about a possible securities law violation, including by enforcing, or threatening to enforce, a confidentiality agreement.

283.    Specifically, "(a) No person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement...with respect to such communications." 17 C.F.R. § 240.21F-17(a).

SECOND AMENDED COMPLAINT
CASE NO. 3:19-cv-07910 –JD
Page 54 of 75



284.    On October 3 and 4, 2017, Defendant Gauvin thus communicated with Oracle's Human Resources department, using non-lawyers to effect that result.

285.    The result of their communication was that on October 13, 2017, Oracle HR sent Mr. Daramola a document telling him that he could not use any of the Oracle confidential or proprietary information he had in his possession (which would include all documents and communications he had provided Defendants Gauvin and Harris as proof of the fraud) for any purpose, and that all information Ms. Daramola had regarding Oracle employees *was* proprietary, and fell under a nondisclosure restriction as to anyone.  *PEX 83*.

286.    Defendants' actions were taken with the continuing intent to prevent Plaintiff Daramola from communicating his fraud claims to the SEC or a federal enforcement agency.

287.    Defendants Harris and Gauvin's actions caused Plaintiff Daramola to refrain from further document delivery to the SEC for nearly a year after his initial August 2017 SEC complaint, when, in June 2018, he reported Oracle's letter directive to him to restrict his communications to the SEC.



MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

**K.**    **The Campus Store scheme went on over an extended period of time, from no later than October 2015 through at least the spring of 2019, and may be continuing.**

288.    The Campus Store sale and change order scheme went on from no earlier than James Bork's sales estimate to UBS in October 2015 through 2019. Oracle has not confirmed in discovery when, or if, the solution promised UBS, the Texas Co-Op, BYU, Cal State Fullerton, or USC went live in any fashion promised.

289.    By October 13, 2017, when Daramola was discharged, Oracle had "pushed back" UBS's go live date five times—three times by the July 20, 2017 letter from UBS to Oracle, and another two times by the time Mr. Daramola left.

290.    From April 30, 2016 forward, Oracle received revenue from the Campus Store Solution scheme, and Defendants Merell, Bork, Patnaik, and Riseberg received bonuses from such sales and services.

291.    Defendants Gauvin and Harris received salaries for mitigating the legal risk to Oracle and protecting the participants involved while this fraud continued.

### FIRST CAUSE OF ACTION.

**Retaliation under the Sarbanes-Oxley Act (18 U.S.C. § 1514A *et seq.*)**
(Against all corporate defendants)

292.    All allegations above are incorporated as if set forth herein

293.    Plaintiff Tayo Daramola is an employee, and Oracle is an employer, within the meaning of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A *et seq.*

294.    The electronic communications, contracts, conference calls, emails and phone calls involved in the foregoing Campus Store Solution detail effected a scheme or



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

artifice for obtaining money from Campus Store Solution customers by means of false or

fraudulent pretenses, representations, or promises, which were transmitted or caused to be

transmitted by means of wire communication in interstate commerce, per 18 U.S.C § 1343.

295.    Plaintiff Daramola engaged in activity that is legally protected under the

Sarbanes-Oxley Act by resisting (prior to August 3, 2017), then refusing to engage in (on

August 3, 2017), and by then internally reporting to Defendants Gauvin and Harris, who

had the authority to investigate (from August 14, 2017 – September 29, 2017), the Campus

Store misrepresentations and conduct that Daramola reasonably believed violated or would

violate the law and the Act's requirements, including by violations of 18 USC § 1343, and

by violation of revenue recognition rules.

296.    Defendant Oracle's conduct following Plaintiff Daramola's protected

activity constitutes unlawful retaliation, and caused Plaintiff Daramola's unlawful

constructive discharge, in violation of 18 U.S.C. § 1514A.

297.    As a proximate result of Oracle's conduct, Plaintiff Daramola suffered and

continues to suffer harm in the United States, including injury to his business interests,

including loss of earnings and benefits from Oracle as well as lost earnings from other

United States customers and other employers in the United States software industry, loss

of professional reputation and standing within the United States, humiliation, emotional

distress, and mental pain and anguish, all in an amount to be proven at trial, but exceeding

the minimum jurisdictional limits of this Court.

298.    Plaintiff Daramola has also incurred and continues to incur attorneys' fees

and legal expenses in an amount according to proof at trial.



MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

299.    Plaintiff Daramola requests all statutory relief available to him under 18

U.S.C. § 1514A *et seq.,* including that relief described below.

## SECOND CAUSE OF ACTION.

### Retaliation under the Dodd-Frank Wall Street Reform and Consumer Protection Act (15 U.S.C. § 78u-6 et seq.)
(Against all corporate defendants)

300.    All allegations above are incorporated as if set forth herein.

301.    Plaintiff Daramola is an employee, and Defendant Oracle is an employer,

within the meaning of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

*15 U.S.C. § 78u-6, et seq.*

302.    Plaintiff Daramola made disclosures that are protected under the Sarbanes-

Oxley Act by resisting, refusing to engage in, and actively internally reporting retaliation

and illegal conduct to Oracle, with his internal reporting initiating on August 14, 2017,

and Plaintiff Daramola then externally reported this same conduct to the Securities

Exchange Commission (SEC) on August 16, 2017.

303.    Oracle's officers and employees, acting as its agents, demoted, harassed,

and discriminated against Daramola in the terms and conditions of his employment, and

ultimately constructively discharged Daramola following his SEC reporting.

304.    Oracle's conduct constitutes unlawful retaliation and discharge under 15

U.S.C. § 78u-6(h)(1)(A)(iii).

305.    As a proximate result of Oracle conduct by and through its agents,

Plaintiff Daramola has suffered and continues to suffer harm, including but not limited

to, the damage identified at paragraph 297 above.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

306. Plaintiff Daramola should receive judgment for twice the damages sustained via 15 U.S.C. § 78u-6(h)(1)(C).

307. In doing the acts herein alleged, Oracle acted with oppression, fraud, malice, and in conscious disregard of Plaintiff Daramola's rights, as identified in the detailed actions listed above, and Plaintiff Daramola is therefore entitled to punitive damages in an amount according to proof at trial.

308. Plaintiff Daramola has also incurred and continues to incur attorneys' fees and legal expenses in an amount according to proof at trial.

309. Plaintiff Daramola requests relief as described below.

### THIRD CAUSE OF ACTION.

**Racketeer Influenced and Corrupt Organization**
18 U.S.C. § 1962(c), (d)
(Against all individually named defendants)

310. All fact allegations above are incorporated as if set forth herein, and are incorporated into this count by reference.

311. As to a violation of 18 U.S.C. Section 1962(c), all individually named defendants are employed by the enterprise.

312. This complaint involves the existence of two distinct entities: (1) the individual named defendant "persons" engaged in the pattern of racketeering, each of which is an individual capable of holding a legal or beneficial interest in property, as defined under 18 U.S.C.A. § 1961 (3); and (2) the Oracle "enterprise," which is the Oracle corporation, as defined under 18 U.S.C.A. § 1961 (4).

313. Each individually named defendant person was employed by or associated



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

with the Oracle enterprise engaged in, or the activities of which affected, interstate or foreign commerce.

314. Each named individual defendant person conducted or participated in, directly or indirectly, the conduct of such enterprise's affairs through a pattern of racketeering activity, and thereby engaged in unlawful conduct under 18 U.S.C. § 1962(c).

315. The named individual defendant persons unlawfully used the Oracle enterprise as a vehicle through which they committed unlawful activity.

316. The individual defendant violators of section 1962(c), individuals Merell, Bork, Patnaik, Riseberg, Gauvin and Harris, committed a pattern of predicate racketeering acts distinct from the enterprise whose affairs were thereby conducted.

317. The racketeering activity engaged in by the individual defendants differed from the usual and daily activities of the Oracle enterprise, and from Oracle's primary business activity, in that the usual daily activity of Oracle, and its primary business activity, was not to defraud customers by selling them non-existent software solutions and professional service implementations for non-existent software solutions, which could not be implemented.

318. All individually named defendants shared the common purpose of promoting a nonexistent SaaS and implementation services for the Campus Store Solution that did not exist for that customer as shown the customer, to derive individual economic benefit in the form of salaries, bonuses and commissions from the predicate acts.

319. Each individually named defendant person conspired to violate the provisions of 18 U.S.C. § 1962(c), which is unlawful under 18 U.S.C. § 1962(d).



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

320.    The predicate acts engaged in by each individual Defendant which formed the acts of and the pattern of racketeering activity prohibited by 18 U.S.C. § 1962 (a) consisted of violations of section 1343 (relating to wire fraud), and section 1512 (b)(3) (relating to tampering with a witness, victim, or an informant), as racketeering is defined by 18 U.S.C.A. § 1961 (1)(B).

321.    Each named racketeer committed at least two distinct but related predicate acts, constituting a "pattern of racketeering activity," with at least one of the acts alleged occurring in the year 2016 after the effective date of this chapter and continuing through 2018;

322.    The activities extended over a period of two years as a closed pattern of racketeering, and the nature of the acts amounted to or pose a threat of continued criminal activity, which may be ongoing, as an open pattern of racketeering.

323.    The  predicate acts of racketeering alleged are related to each other and presented and present the risk of continuing (open-ended), or that continued for in excess of two years between October 2015 and the spring of 2018 prior to this action being filed even if the actions have stopped by this time.

324.    All predicate acts were performed over wire transmissions, including by phone and by internet communications.

325.    The predicate acts of racketeering were horizontally related to each other, and they were vertically related to the RICO enterprise.

MARY SCHULTZ LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

326.    The predicate acts detailed are sufficiently related to each other because they had the same or similar purposes, results, participants, victims, or methods of commission, or were otherwise interrelated by distinguishing characteristics.

327.    Each actual RICO violator is not named here as an individual defendant, because the RICO enterprise consisted of numerous members of the "Campus Store Solution" line of business, including Oracle executives who promoted and schemed to fund the development of the product sold at the customers' expense. The Defendants named here, however, were the primary actors causing the damage to Plaintiff.

PREDICATE ACTS

328.    For purposes of Rule 9(b), in each instance of wire fraud alleged, the circumstances constituting the fraud are detailed below, and in each instance, the named defendant acted with knowledge that the Campus Store Solution SaaS subscription product could not be delivered in the manner in which the customer victim understood from a presentation would be delivered. In each instance, each named defendant sought to use delays, change orders and "gap" fills to extract more revenue from each victim, while knowing that the "solution" represented to the customer was not deliverable.

329.    In each instance of wire fraud alleged, the named defendant knowingly made false representations to the customers that the SaaS "Campus Store Solution" existed for that customer in the manner demonstrated, but was simply "not ready to Go Live" for that customer because the customer hadn't bought the right modules, or done their homework correctly to enable NetSuite to get them Live.

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

330. In each instance, Defendants Merell, Bork, Patnaik, and Riseberg acted with fraudulent intent in making such false statements, intending to trigger and in fact triggering, justifiable reliance by and including UBS, Texas, BYU and California customers, extracting revenue from those customers, and thereby causing damage to those customers, and thereby also causing damage to Plaintiff Daramola.

331. In each instance of wire fraud alleged, the named Defendants made the foregoing false statements intending that the customer rely on those statements, and pay additional money to Oracle, by which Defendants would benefit either by bonuses, commissions or retained salary.

332. The predicate acts of wire fraud, per 18 U.S.C § 1343, as committed by **Defendant Pat Merell,** were his overseeing and requiring sales targets, hours and revenue in Defendants' marketing and selling NetSuite "Campus Store Solution" SaaS subscription products that did not exist as represented, "discounting" what were represented as module products that would effect a pre-sales demonstration result, pricing and misrepresenting professional services that could not implement the "Campus Store Solution" *as* represented, and working with Defendant Mita Patnaik, including over the internet and in executive steering committee meetings, to deliberate and present change orders to the customer selling that customer more services, and thereby funding Oracle's actual development of the product functionality they had already sold to and including the UBS bookstore in Seattle, Washington, in April 2016, and to the University of Texas at Austin, Brigham Young University, California State Fullerton and the University of Southern California, on dates to be determined, but generally between 2015-2018.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

333.    All of the foregoing communications and directives were accomplished by wire transmissions across state lines by use of telephone calls, internet "uploads," and email.

334.    The predicate acts of wire fraud, per 18 U.S.C § 1343, committed by **Defendant James Bork** were those acts selling SaaS products that did not exist as represented, and professional services that could not implement the "solution" represented to the customer as represented, including to the UBS bookstore in Seattle, Washington, in April 2016, and to the University of Texas at Austin, Brigham Young University, California State Fullerton and the University of Southern California, on dates to be determined, but including sales between 2015-2018.[3]

---

[3]    This includes Defendant Bork's original estimate and ensuing original contract series with UBS on October 15, 2015, and April 2016;   Defendant Bork and Defendant Patnaik's number of ensuing change orders with UBS thereafter;        Defendant Bork's original estimate and ensuing original contract series with the   Texas   Co-Op on dates in 2015 and 2016 to be determined; Defendant Bork and Defendant Patnaik's number of ensuing change orders with the TexasCo-Op        thereafter,        including Defendant Patnaik's June 22, 2017 order; and Defendants Bork and Patnaik' original and ensuing change orders attendant to BYU, Cal State Fullerton, University of Southern California and others to be determined during this same time frame.

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

335.   In each instance of wire fraud alleged, Defendant Bork knowingly made false representations to the customers that the SaaS "Campus Store Solution" existed for that customer in the manner demonstrated, and would be functional for that customer through those modules. In each instance, Defendant Bork made the foregoing false statements intending that the customer rely on those statements, and pay additional money to Oracle, by which Defendant would benefit by bonuses, commissions or retained salary.

336.   All of the foregoing communications and directives in violation of 18 U.S.C. § 1512 were accomplished by wire transmissions across state lines by use of telephone calls, internet "uploads," and email.

337.   The predicate acts of wire fraud, per 18 U.S.C § 1343, as committed by **Defendant Mita Patnaik** were those acts selling "change orders" extracting more revenue from each customer to implement products that did not exist as represented, and for professional services that could not implement the "solution" represented to the customer as represented, including to the UBS bookstore in Seattle, Washington, after April 2017, and to the University of Texas at Austin, Brigham Young University, California State Fullerton and the University of Southern California, on dates to be determined, but generally from April 2017 through the spring of 2018.[4]

338.   Defendant Mita Patnaik also worked with Defendant Merell in executive sessions to determine how to get the customer(s) to pay for the functionality represented through change orders.

---

[4]   *And see* Nte. 3 *supra.*

MARY SCHULTZ LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

339.    In each instance of wire fraud alleged, Defendant Patnaik knowingly made false representations to the customers that the SaaS "Campus Store Solution" existed for that customer in the manner demonstrated, and would be functional for that customer by buying the additional modules of services that the customer had failed to acquire.

340.    In each instance, Defendant Patnaik made the foregoing false statements intending that the customer rely on those statements, and pay additional money to Oracle, by which Defendant would benefit by bonuses, commissions or retained salary.

341.    All of the foregoing communications and directives in violation of 18 U.S.C. § 1512 were also accomplished by wire transmissions across state lines by use of telephone calls, internet "uploads," and email.

342.    The predicate acts of wire fraud, per 18 U.S.C § 1343, as committed by **Defendant Douglas Riseberg** were those acts assessing alleged "gaps" represented to be the customer's fault as to their allegedly insufficient module acquisition or allegedly changing desires, and then using "pushbacks" and "change orders" in concert with Defendants Patnaik and Merell for the purpose of extracting more revenue from each customer to implement products that did not exist as represented, and professional services that could not implement the "solution" represented to the customer as represented.

343.    Defendant Riseberg's participation included those gaps assessed for change orders with the UBS bookstore in Seattle, Washington, after April 2017, and for the University of Texas at Austin, Brigham Young University, California State Fullerton and the University of Southern California, on dates to be determined, but generally from April 2017 through the spring of 2018.

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

344.    In each instance of wire fraud alleged, Defendant Riseberg knowingly made false representations to the customers that the SaaS "Campus Store Solution" existed for that customer in the manner demonstrated, that some deferral would effect that result and allow for functionality if the customer allowed for more time and bought additional modules of services that the customer had been deficient in acquiring for the alleged changes the customer now intended.

345.    In each instance, Defendant Riseberg made the foregoing false statements intending that the customer rely on those statements, and pay additional money to Oracle, by which Defendant would benefit by bonuses, commissions or retained salary.

346.    All of the foregoing communications and directives in violation of 18 U.S.C. § 1512 were also accomplished by wire transmissions across state lines by use of telephone calls, internet "uploads," and email.

347.    The predicate acts of wire fraud, per 18 U.S.C § 1343, and witness tampering per 18 U.S.C. § 1512(b)(3), were committed by **Defendants Dionis Gauvin and Douglas Harris** between August 14, 2017 and October 13, 2017, and consisted of intercepting whistleblower complaints, misleading the complainant as to the intent of the calls engaged in, requiring that Plaintiff as a whistleblower disclose all written evidence supporting his fraud observations, minimizing, "gaslighting" Plaintiff by telling him, backed by their status as a lawyer and as an upper level investigator, that what Plaintiff was reporting was not fraud and that Mr. Daramola himself was clearly not really intending to present it that way, then packaging Ms. Daramola's whistleblower identity and content for upward dissemination to Oracle's General Counsel in California, and thereon to Oracle's

MARY SCHULTZ LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

Chief Executive Suite of Officers, for the purpose of notifying executives that Mr. Daramola (and any other such whistleblowing employees) was/were whistleblowing, and then suppressing all evidence of external reporting or use of the information delivered.

348. Defendant Gauvin used Oracle Human Resources to issue warnings to Mr. Daramola, as a whistleblower, that the very documents he had compiled to show Defendants Gauvin and Harris the fraud were now confidential and could not be disclosed to anyone, including federal agencies.

349. Defendants Gauvin and Harris used deception by claiming an investigative role for the whistleblower, intending reliance, when in fact, this was knowingly false.

350. By the foregoing deception, Defendants Gauvin and Harris intended to hinder, delay, and prevent Plaintiff Daramola from communicating the allegations, information, and documents he submitted to a United States law enforcement officer, including the SEC, in violation of 18 U.S.C. § 1512(b)(3);

351. All of the foregoing were intended to protect Oracle by "mitigating the risk" of the individual Defendants' activities, and to protect the individual Defendants named, all of which generated additional revenue to Oracle, from which Defendants Gauvin and Harris benefitted financially, and by professional reputation and position.

352. All of the foregoing communications and directives in violation of 18 U.S.C. § 1512 were also accomplished by wire transmissions across state lines by use of telephone calls, internet "uploads," and email.

353. By the foregoing, and in concert with each other, the individual Defendants agreed to commit two or more of the "predicate acts" of "racketeering activity."

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

354. By the foregoing, and in concert with each other, each individual Defendant conspired to commit the referenced overt acts in furtherance of the conspiracy and to affect the objects thereof, including particularly but not limited to the acts set forth above.

355. By the foregoing, and in concert with each other, from 2015 through the spring of 2019, and continuing thereafter to a date as of yet unknown, all individual Defendants served a common purpose, which was to extract revenue from campus store customers by wire communications across state lines, from which each individual defendant would directly and indirectly profit, in violation of 18 U.S.C. §§ 1343 and 1512, as part of the ongoing racketeering scheme under §1962(c) and (d).

DAMAGE.

356. Plaintiff Daramola suffered an injury to his business in the United States by reason of the foregoing RICO violations. The violations alleged led directly to his injuries.

357. Mr. Daramola's providing a service as a software consultant or project manager to companies and clients in the United States is a commercial business endeavor and rendered and renders him "engaged in a business" in the United States for purposes of RICO standing.

358. Mr. Daramola's injuries have a direct relationship to and are attributable to the Defendants' misconduct.

359. There are no other more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; it will not be difficult to ascertain the amount of the plaintiff's damages attributable to Defendants' wrongful conduct; and this Court will not have to adopt complicated rules apportioning damages to

MARY SCHULTZ LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

obviate the risk of multiple recoveries.

360.    While Mr. Daramola resides in Canada, he was employed by Defendant Oracle to do business in the United States, with United States customers, and his injuries arise from predicate acts in the United States in violation of federal and state law.

361.    Mr. Daramola's work emanated from California as a result of the same Terms of Use commitments required by Oracle.

362.    By Terms of Use, Mr. Daramola committed to the personal jurisdiction of the state of California each time he accessed Oracle's website for his work.

363.    Defendants knew that Plaintiff had a professional reputation and customer base in the United States, and had repeatedly and systematically done business in the United States for United States customers and entities.

364.    Plaintiff's professional reputation and customer base in the United States is what caused the Oracle Defendants to hire him, and to take care of their United States customers and entities.

365.    Plaintiff's role for Oracle was to manage national level domestic customers in Washington, Texas and Utah, among other states, and his work over Oracle's internet was transferred to Oracle in California and used by Oracle in California to satisfy Oracle's obligation to its U.S. clients under its U.S. contracts.

366.    All individual Defendants specifically targeted their conduct at California with the aim of thwarting Mr. Daramola's rights in California with his California employer.

367.    Defendants' RICO conduct caused Plaintiff the loss of his employment in California with his California employer, and damage to his commercial business interests



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

in the United States, and Defendants' conduct was directly intended to cause those results to Mr. Daramola in the United States, and did so.

368.    Defendants' Merell, Patnaik, Bork, and Riseberg joined to direct Mr. Daramola to continue to deceive UBS and Texas, and to thereby engage in the conspiracy and specific predicate acts of wire fraud as defined with the foregoing to ensure the continuity of their own fraud on those customers.

369.    Defendants retaliated against Mr. Daramola by removing him from his role, in order to ensure the continuity of their own fraud on those customers.

370.    In removing Mr. Daramola from his role in support of their continuity of the wire fraud with these customers, the named individual Defendants damaged Mr. Daramola's business and property interest by causing him to lose professional status in his United States roles with U.S. customers, to lose standing in his field, to lose his ability to obtain hours of work on those United States projects and log that work into the United States server, to inflict professional isolation and disrespect upon him, all of which directly caused his constructive discharge, and ensuing loss of future United States wages, reputation, status, and desirability as an employee for a US software corporation, leading to economic loss from US sources.

371.    By failing to protect Mr. Daramola from retaliation or meaningfully assist Mr. Daramola, in their support of continuing wire fraud with these customers, the individually named Defendants all intended that Mr. Daramola resign, caused that to happen through their predicate acts, and thereby damaged Mr. Daramola's United States business interests as indicated, leading to economic loss from US sources.

SECOND AMENDED COMPLAINT
CASE NO. 3:19-cv-07910 –JD
Page 71 of 75



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

372.     For all of the foregoing reasons, the damages to Mr. Daramola's business and property interests were proximately caused by the pattern of racketeering activity, including ensuring continuity of the racketeering activity, and were therefore caused by those violations of section 1962.

373.     Daramola should receive judgment for threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, per 18 U.S.C.A. § 1964.

## FOURTH CAUSE OF ACTION.

### Retaliation (California Labor Code § 1102.5)
(Against the corporate defendant)

374.     All allegations above are incorporated as if set forth herein.

375.     Oracle is subject to the California Labor Code § 1102.5 in its actions towards its employees, regardless of the state to which they assign that employee.

376.     Defendant Oracle, and persons acting on its behalf, initiated and enforced a "confidentiality policy" upon Plaintiff Daramola, intending to prevent him from disclosing information to a government or law enforcement agency, knowing that Mr. Daramola had reasonable cause to believe that the information he possessed and shared with Defendant disclosed a violation of state or federal statute, including the Sarbanes-Oxley Act.

377.     Defendant Oracle, and persons acting on its behalf, retaliated against Mr. Daramola because they believed that Mr. Daramola disclosed or may disclose information to the SEC, and because he did disclose this information to Defendants Gauvin and Harris, who both had the authority to investigate, discover, or correct the violation or noncompliance, knowing that Mr. Daramola had reasonable cause to believe that the information he presented disclosed a violation of Sarbanes Oxley.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

378.  Defendant Oracle, and persons acting on its behalf, retaliated against Mr. Daramola because Mr. Daramola refused to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

379.  All of the foregoing activities by the Defendant Oracle violate Cal. Lab. Code § 1102.5 (a)-(c).

380.  Such violations occurred between August 4, 2017 and October 13, 2017.

381.  The latter action caused Plaintiff Daramola damage, resulted in his loss of income, and injured Plaintiff Daramola in his business by injuring his business reputation and standing in the software industry in the United States and elsewhere.

382.  In doing the acts herein alleged, Oracle acted with oppression, fraud, malice, and in conscious disregard of Daramola's rights as identified in the detailed actions listed above and Daramola is therefore entitled to punitive damages in an amount according to proof at trial.

383.  In doing each act, Daramola is entitled to a civil penalty not to exceed $10,000 for each such act, per § 1102.5 (f).

384.  Daramola requests relief as described below.

## FIFTH CAUSE OF ACTION.

### Wrongful Termination in Violation of Public Policy
(Against all corporate defendants)

385.  All allegations above are incorporated as if set forth herein.

386.  Daramola was constructively discharged on October 13, 2017, with his two weeks' notice having been given on September 29, 2017.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

387.    Oracle constructively discharged/terminated Daramola because he engaged in protected activity under the Sarbanes-Oxley Act, and refused to participate in racketeering activity and in activity that would violate *Cal. Bus. & Prof. Code § 17200,* the latter prohibiting unlawful, unfair or fraudulent business practices, including unfair, deceptive, untrue or misleading advertising.

388.    Daramola's constructive discharge was in violation of the public policy of the state of California.

389.    As a proximate result of Daramola's discharge by Oracle on October 13, 2017, Daramola has suffered and continues to suffer harm, including but not limited to, lost earnings and other employment benefits, loss of future employment benefits, including insurance and pension, loss of business and professional reputation and standing in the United States software industry, loss of medical insurance, humiliation, emotional distress, and mental pain and anguish, all to his damage in an amount to be proven at trial, but exceeding the minimum jurisdictional limits of this Court.

390.    In doing the acts herein alleged, Oracle acted with oppression, fraud, malice, and in conscious disregard of Daramola's rights as identified in the detailed actions listed above and he is therefore entitled to punitive damages in an amount according to proof at trial.

391.    Daramola requests relief as described below.

**PRAYER FOR RELIEF.**

WHEREFORE, Plaintiff Tayo Daramola seeks relief from this Court in the following respects:

SECOND AMENDED COMPLAINT
CASE NO. 3:19-cv-07910 –JD
Page 74 of 75



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

1.      For special and general damages according to proof on all causes of action;

2.      For punitive damages on those causes of action providing such damages;

3.      For front pay in lieu of reinstatement, according to proof;

4.      For double back pay on the second cause of action—(Dodd-Frank);

5.      For treble damages under the third cause of action (RICO);

6.      For a civil penalty not to exceed $10,000 for each such act in violation of § 1102.5.

7.      For costs of suit incurred herein;

8.      For attorney fees and expert fees and costs on all causes of action whereby fees and costs are available by law, as pled;

9.      For prejudgment and post-judgment interest as available by law; and,

10.     For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL.

Plaintiff demands a jury trial for each cause of action on which he is entitled to a jury trial.

DATED this 1st day of February, 2021.

MARY SCHULTZ LAW, P.S.

/s/MARY SCHULTZ
Attorney for Plaintiff, CSB 231962
2111 E. Red Barn Lane
Spangle, WA 99031
Tel: (509) 245-3522, Ext. 2
E-mail: Mary@MSchultz.com



Exhibit 2

User Friendly Interface
Click Thru Reporting on all items.

- Accounting
  - AP / AR
    - Detailed Statements any time can go and pull after month ends
    - Click Thru Reporting
  - Payroll
  - P&L & Balance Sheet
    - Click Thru Reporting
  - Inventory
  - Customer Snapshots
  - Track Customer Rebate programs
  - Customer pay invoices online (would be nice)
  - Customer can view account online (would be nice)
- Point of sale
  - Locations of inventory
  - Branches
  - EDI to venders
  - Ecommerce
- Products/ Items
  - Data entered in System
    - Mass upload
  - Item Updates and prices changes automatically from dealers.
- Purchasing & Receiving
  - Mobile inventory (tablet)
  - Purchase Orders z
  - Build Purchase Orders with variable settings
    - Seasonal codes
    - Biweekly
    - Min & Max
    - Values automatically
    - Receive Inventory
- Project Management
  - Track Projects separately
  - Track Submittals/approvals
  - Forecast Scheduling
  - Budgets
  - Reporting
- Estimating/Sales/CRM
  - Quotes
    - By Jobs or projects
  - Sales Orders
  - Customer Database
  - Follow Ups
  - Reporting
  - Invoicing
    - From quotes

- Ecommerce
  - Links to our point of sale
  - Keeps track of on hand items
  - Branches
  - Mobile friendly
  - Clients can check their prices
  - Clients can place orders and ask for Quotes
  - Clients can see delivery status
  - Clients can see their account balance
  - Orders placed online sales team is notified about online sales.
    - Once sale made online inventory adjusted
    - Once sales are made online prints off pick ticket.
- Manufacturing/Delivery
  - Bar Code Scanning Inventory
  - Receive Shipments
    - Starts at the Purchasing
  - Track Product/Project thru fabrication processes
  - Delivery Tickets/Packing Slips

Exhibit 3

User Friendly Interface
Click Thru Reporting on all items.

**NETSUITE STANDARD**
**NETSUITE ADDITIONAL MODULE**
**PARTNER SOLUTION**

- Accounting
  - AP / AR
    - Detailed Statements any time can go and pull after month ends
    - Click Thru Reporting
  - Payroll – **SuitePeople Payroll**
  - P&L & Balance Sheet
    - Click Thru Reporting
  - Inventory
  - Customer Snapshots
  - Track Customer Rebate programs
  - Customer pay invoices online (would be nice)
  - Customer can view account online (would be nice)

Point of sale – We work with a number of partners for  POS:
**Vend POS** – Very similar to LightSpeed in terms of interface and ease-of-use)  Integrated to NetSuite through In8Sync

  - Locations of inventory
  - Branches
  - EDI to venders- We work with a number of partners for EDI **(SPSCommerce)**
  - Ecommerce – **NetSuite SuiteCommerce**
- Products/ Items
  - Data entered in System
    - Mass upload
  - Item Updates and prices changes automatically from dealers. – **You can update NetSuite price changes in bulk (Mass update or CSV Import)**
- Purchasing & Receiving
  - Mobile inventory (tablet) – **You can access NetSuite via a tablet. Must be connected to the wifi or mobile hotspot**
  - Purchase Orders
  - Build Purchase Orders with variable settings
    - Seasonal codes
    - Biweekly
    - Min & Max
    - Values automatically
    - Receive Inventory
- Project Management* –  NetSuite has project management tools native to the solution. For fabricators & construction companies we work with Appficiency who has expertise in your industry and has products (modules built within NetSuite application for niche requirements for your industry (Material Job Costing and Project Task & Assignments).  https://appficiencyinc.com/material-job-costing/#
https://appficiencyinc.com/wp-content/uploads/2018/11/Appficiency-Material-Job-Costing-v2.pdf

  - Track Projects separately
  - Track Submittals/approvals
  - Forecast Scheduling
  - Budgets
  - Reporting
- Estimating/Sales/CRM
  - Quotes

- ▪ By Jobs or projects
  - o Sales Orders
  - o Customer Database
  - o Follow Ups
  - o Reporting
  - o Invoicing
    - ▪ From quotes – NetSuite invoices from a Sales Order.
    - ▪ **Flow = Quote>Sales Order>Fulfilment>Invoice**

- Ecommerce - **NetSuite SuiteCommerce**
  - o Links to our point of sale
  - o Keeps track of on hand items
  - o Branches
  - o Mobile friendly
  - o Clients can check their prices
  - o Clients can place orders and ask for Quotes
  - o Clients can see delivery status
  - o Clients can see their account balance
  - o Orders placed online sales team is notified about online sales.
    - ▪ Once sale made online inventory adjusted
    - ▪ Once sales are made online prints off pick ticket. – **Picking ticket would be generated by a user in NetSuite when they are fulfilling the customer's order**
- Manufacturing/Delivery
  - o Bar Code Scanning Inventory – **We have a robust WMS (Warehouse Management System) Module.** This includes integrated barcoding, suggested putaway, multi-order picking, mobile receiving, mobile picking, mobile cycle counting and more.
  - o https://www.netsuite.com/portal/assets/pdf/ds-netsuite-wms.pdf

  - o Receive Shipments
    - ▪ Starts at the Purchasing
  - Track Product/Project thru fabrication processes* – NetSuite has Work Orders & Assemblies to cover the manufacturing needs. Appficiency has their Material Job Costing solution which ties the NetSuite WOA/MFG and NetSuite project record together to fully manage material costs, track mfg wip, periodic budgeting, tracking against actuals, & more.
  - o Delivery Tickets/Packing Slips

Exhibit 4

DocuSign Envelope ID: B3686233-CDA8-4BDB-BF43-5EACB4C95EE7



| | | Page 1 of 6 | | Estimate |
|---|---|---|---|---|
| | | **Date** | | 1/17/2021 |
| | | **Estimate #** | | 809145 |

Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, California 94065
800 762 5524
www.netsuite.com

**Customer Name & Address**
River Supply Inc.
2555 Delta Rd
Brogue PA 17309
United States

**Provisioning Email**       Teb@riversupplyinc.com

| Item | Qty | Description | Term Mos. | Amount |
|---|---|---|---|---|
| NetSuite SuiteSuccess Manufacturing Std Cloud Service | 1 | NetSuite SuiteSuccess Manufacturing Std Cloud Service includes:<br>** ERP with G/L, Accounts Payable, Purchasing, Inventory, Order Entry, A/R, Expense Reporting, Advanced Shipping with integrated shipping depending on your location, use of Fulfillment Requests and Automatic Location Assignment for up to 5000 orders annually.<br>** NetSuite CRM Sales Force Automation with quote and order management, Marketing Automation with campaigns; Customer Service/Support<br>** Productivity tools including contacts/calendar/events<br>**NetSuite Subsidiary Management within customer's home country for a single currency. Additional countries require separate purchase of OneWorld<br>** NetSuite Work Orders and Assemblies Cloud Service<br>** NetSuite Inventory Management Cloud Service<br>** NetSuite Demand Planning Cloud Service<br>** NetSuite Advanced Electronic Bank Payments<br>** Real-time Dashboards with key business metrics, report snapshots<br>** Customer, Vendor and Partner Center logins<br>** 5 Employee Self-Service Users<br>** NetSuite Basic Customer Support. Current URL Terms for support are located at www.netsuite.com/supportterms.<br>** 30,000 integrated bulk mail merges per month<br>** 120,000 campaign emails per year with no single blast exceeding 10,000 recipients<br>** Maximum of 30 general access users<br>** Includes 1 Learning Cloud Support Pass-single user license pursuant to the Learning Cloud Support Pass terms and conditions found at https://www.netsuite.com/portal/resource/terms-of-service.shtml<br>NetSuite Standard Service Tier:<br>** Maximum of 100GB of File Cabinet Storage, which is included with Standard Service Tier.<br>** Maximum 100 Full Licensed Users Provisioned<br>** Maximum 200,000 monthly transaction lines<br>** Maximum of 1 SuiteCloud+ license | 12 | $41,988.00 |
| NetSuite General Access Cloud Service User | 20 | General access user for NetSuite. | 12 | $23,760.00 |
| NetSuite Project Management Mid-Market Cloud Service | 1 | Project Management Cloud Service includes:<br>** Estimated Costing<br>** Project Time Tracking<br>** Project Task Management<br>** Utilization & Backlog Reporting | 12 | $7,188.00 |



# Estimate

| | |
|---|---|
| **Date** | 1/17/2021 |
| **Estimate #** | 809145 |

Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, California 94065
800 762 5524
www.netsuite.com

| Item | Qty | Description | Term Mos. | Amount |
|---|---|---|---|---|
| NetSuite Financial Management Mid-Market Cloud Service | 1 | Advanced Financials:<br>** Advanced Budgeting<br>** Expense Allocations<br>** Amortization Schedules<br>** Advanced Bil<br><br>ling Schedules<br>** Milestone Billing (when used with Project Management)<br>** Statistical Accounting<br>** Dynamic Allocation | 12 | $7,188.00 |
| NetSuite WMS Cloud Service | 1 | ** Use of the automatic push based printing in WMS for some standard reports/labels, and integration with some shipping workstations functionality requires the use of the WMS Printer Driver Software, which must be procured separately<br>** Bar Code Scanning<br>** Wireless RF / Mobile Handhelds<br>** Single and Multi-Order Picking<br>** Paperless System Directed Putaway and Picking<br>** GS1 Label & Packlist Printing<br>** Shipping integration with UPS/FedEx/Endicia<br>** Requires Advanced Inventory<br><br>NetSuite WMS is provided pursuant to the NetSuite Third Party Terms of Service posted at www.netsuite.com/tos. | 12 | $11,988.00 |
| NetSuite WMS Printer Driver Cloud Service | 1 | ** One copy of the offline NetSuite WMS Printer Driver Software<br><br>NetSuite WMS Printer Driver Software is made available pursuant to the terms described in the NetSuite Third Party Terms of Service posted at www.netsuite.com/tos. | 12 | $12.00 |
| Subtotal | | | | $92,124.00 |
| Discount | | Discount | | ($59,871.39) |
| Subtotal | | | | $32,252.61 |
| | | Sandbox & Premium Support | | |
| NetSuite Sandbox Environment Cloud Service | 1 | Sandbox Environment for NetSuite Customers<br>** Replicates production environment including data and customizations<br>** Isolated environment – changes shielded from live production account<br>** One production environment replication for each month of term is included<br>** Administrators may provide sandbox access to all production users as needed<br><br>NetSuite uptime guarantee does not apply to Sandbox Environments. | 12 | $12,643.20 |
| NetSuite Premium Support | 1 | Users of NetSuite Premium Support are authorized to access the services: Users of NetSuite Premium Support are authorized to access the services: 24x7 access for critical support; Extended hours for non-critical issues (S3's); improved Response Time Goals; functional questions logged via SuiteAnswers, and additional Authorized Contacts are provided (4). Current URL Terms for support are located at www.netsuite.com/supportterms | 12 | $12,643.20 |
| Subtotal | | | | $25,286.40 |
| Discount | | Discount | | ($25,286.40) |



# Estimate

| | |
|---|---|
| **Date** | 1/17/2021 |
| **Estimate #** | 809145 |

Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, California 94065
800 762 5524
www.netsuite.com

| Item | Qty | Description | Term Mos. | Amount |
|------|-----|-------------|-----------|--------|
| Subtotal | | | | $0.00 |
| | | SuitePeople & SuiteCommerce | | |
| NetSuite SuiteCommerce Cloud Service | 1 | SuiteCommerce web store for one (1) brand/domain. Key features include: CDN caching, site search, Responsive Design application framework that support core B2B and B2C experiences, Dynamic merchandising, and Faceted navigation. This website must be used with the SuiteCommerce bundle installed, and customer cannot create or modify any Services or SSPs for this website. | 12 | $29,988.00 |
| NetSuite SuitePeople US Payroll Cloud Service | 30 | SuitePeople US Payroll, a full-service payroll offering for US-based employees only. The module includes:<br>** Employee center access<br>** Payroll Tax Calculations (US jurisdictions only)<br>** Direct Deposit<br>** Expense Reimbursement<br>** Remittances<br>** ACA Reporting and Filing<br>**Tax Filing<br>** US Compliance and Reporting<br><br>US Payroll pricing is based on 'per employee per month' basis and is calculated as number of unique employees paid through Payroll each month. (*note: for billing, refer to the Subscription Services Terms and Payment frequency below) | 12 | $4,320.00 |
| Subtotal | | | | $34,308.00 |
| Discount | | Discount | | ($22,300.20) |
| Subtotal | | | | $12,007.80 |
| | | ERP Implementation | | |
| Implementation Service - Fixed Bid | 1 | The price for the Implementation Service will be fixed as per the agreed upon Statement of Work. | 12 | $75,000.00 |
| Subtotal | | | | $75,000.00 |
| Discount | | Discount | | ($17,300.00) |
| Subtotal | | | | $57,700.00 |
| | | Website Implementation | | |
| Activation - SuiteSuccess for Commerce B2B | 1 | Activation - SuiteSuccess for Commerce B2B is further described and provided pursuant to the Activation - SuiteSuccess for Commerce B2B Service Description ("Activation SD") found at https://www.oracle.com/corporate/contracts/cloud-services/netsuite/. By signing this Estimate/Order Form, you agree to be bound by the Activation SD. | 12 | $10,000.00 |
| Subtotal | | | | $10,000.00 |
| Discount | | Discount | | ($5,000.00) |
| Subtotal | | | | $5,000.00 |
| | | Payroll Implem | | |
| | | entation | | |
| Implementation Service - Fixed Bid | 1 | The price for the Implementation Service will be fixed as per the agreed upon Statement of Work. | 12 | $7,900.00 |
| Subtotal | | | | $7,900.00 |

DocuSign Envelope ID: B3686233-CDA8-4BDB-BF43-FEACD4C95FE7



|  | **Page 4 of 6** | **Estimate** |
|---|---|---|
|  | **Date** | 1/17/2021 |
|  | **Estimate #** | 809145 |

Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, California 94065
800 762 5524
www.netsuite.com

| Item | Qty | Description | Term Mos. | Amount |
|---|---|---|---|---|
| Discount |  | Discount |  | ($1,800.00) |
| Subtotal |  |  |  | $6,100.00 |

| | |
|---|---|
| **Subtotal** | $113,060.41 |
| **Tax Total (6%)** | $2,655.62 |
| **Total** | $115,716.03 |



| | Page 5 of 6 | **Estimate** |
|---|---|---|
| | **Date** | 1/17/2021 |
| | **Estimate #** | 809145 |

Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, California 94065
800 762 5524
www.netsuite.com

## A. Terms of Your Order

### 1. Agreement

The products and/or services set forth in this Estimate/Order Form, between you and the Oracle entity referenced above, are governed by the Subscription Services Agreement v060120 found at https://www.oracle.com/corporate/contracts/cloud-services/netsuite/ (including any referenced URL Terms). This Estimate/Order Form is non-cancellable and all fees are non-refundable, unless otherwise explicitly stated in this Estimate/Order Form or in the Agreement. For clarity, the Service Start Date shall be the date this document is signed by you, unless a different date is specified as the Service Start Date.

The Oracle Data Processing Agreement covering the NetSuite services, which may be found at https://www.oracle.com/corporate/contracts/cloud-services/ ("Data Processing Agreement"), is incorporated herein by this reference and describes how Oracle will process Personal Data (as defined therein) that Customer provides to Oracle as part of Oracle's provision of the NetSuite services to Customer under this Estimate/Order Form ("order"), unless otherwise stated in the Data Processing Agreement or this order. Customer's signature on this order constitutes Customer's agreement to the Data Processing Agreement, unless stated otherwise in the Subscription Services Agreement or License Agreement that governs this order. This Data Processing Agreement only applies to NetSuite services included in this order and does not apply to the following services that may be included in this order: Mobile Push Notifications (a feature of the NetSuite for iPhone Mobile Application), any NetSuite POS Cloud Services, OrderMotion, TribeHR, Light CMS, or any other services identified by Oracle as being excluded from the applicability of this Data Processing Agreement. The Data Processing Agreement also does not apply to any (1) demonstration accounts, trials, beta releases, release preview or other similar versions of the services or (2) any features, services or products which are provided pursuant to a separate agreement or by a party other than Oracle (as defined in the Data Processing Agreement) (e.g. where Oracle is merely a billing/collection agent) including but not limited to Celigo and Pacejet,). For purposes of this order, the definition of "Services Agreement" in Section 11 is deleted and replaced in its entirety with the following definition: "Services Agreement" means (i) the applicable order for the Services you have purchased from Oracle; (ii) the applicable master agreement referenced in the applicable order; (iii) the Privacy Policy found at https://www.oracle.com/legal/privacy/ (or other location as may be updated by Oracle), and (iv) the Data Security Addendum found at https://www.oracle.com/corporate/contracts/cloud-services/netsuite/.

### 2. Start Date

2/27/2021

### 3. Subscription Services Payment Terms

Net 30 – Annual Billing

### 4. Subscription Services Payment Frequency

Annual in Advance

### 5. Professional Services Payment Terms

Net 30

### 6. Currency

USD

### 7. Offer Valid Through

2/27/2021

### 8. Customer Reference

Oracle may refer to You as an Oracle customer of the ordered Services in sales presentations, marketing materials and activities.



| | Page 6 of 6 | **Estimate** |
|---|---|---|
| | **Date** | 1/17/2021 |
| | **Estimate #** | 809145 |

Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, California 94065
800 762 5524
www.netsuite.com

I AGREE TO THE FEES AND TERMS OF THIS ESTIMATE:

Chad Rohrbach

*Chad Rohrbach*
B546F6DBD22E4BA...

February 26, 2021 | 15:08 PST

---

Print Name

Signature

Date

Upon your execution, this document is a binding order for the products and services set forth herein.

Oracle relies on the accuracy of the billing information listed above, and is unable to issue a Credit Memo or resubmit an invoice due to incorrect billing information listed. Please ensure your company name, addresses and contacts included on this document are correct.

Oracle does not accept credit card payments for invoices of more than $99,999.

Exhibit 5



|  | | **Page 1 of 2** | **Estimate** |
| --- | --- | --- | --- |
|  | | **Date** | 2/18/2021 |
|  | | **Estimate #** | 822038 |

Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, California 94065
800 762 5524
www.netsuite.com

**Customer Name & Address**
River Supply Inc.
2555 Delta Rd
Brogue PA 17309
United States

| Item | Qty | Description | Term Mos. | Amount |
| --- | --- | --- | --- | --- |
| NetSuite ACS Optimize | 1 | NetSuite ACS Optimize provides:<br>** 15 Advanced Customer Support Service hours per month that must be used in that month<br>** NetSuite ACS Optimize is further described and provided pursuant to the Advanced Customer Support Service Description - ACS Optimize ("ACS SD") found at http://www.netsuite.com/termsofservice. By signing this Estimate/Order Form, you agree to be bound by the ACS SD.<br>** Service hours may be extended at the Extended Hourly Rate of $185 USD an hour or in other currencies as calculated using then current exchange rates | 7 | $23,800.00 |
| Subtotal | | | | $23,800.00 |

|  | **Subtotal** | $23,800.00 |
| --- | --- | --- |
|  | **Total** | $23,800.00 |



| | Page 2 of 2 | **Estimate** |
|---|---|---|
| | **Date** | 2/18/2021 |
| | **Estimate #** | 822038 |

Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, California 94065
800 762 5524
www.netsuite.com

---

## A. Terms of Your Order

### 1. Agreement

Expansion or Upsell. If this Estimate/Order Form is an expansion or upsell order, the additional quantities of Cloud Services that are ordered hereunder are subject to the terms of that initial Estimate/Order Form between Customer and Oracle for such Cloud Services. For clarity, the Service Start Date shall be the date this document is signed by you, unless a different date is specified as the Service Start Date.

### 2. Start Date

8/1/2021

### 3. Subscription Services Payment Terms

Net 30 – Annual Billing

### 4. Subscription Services Payment Frequency

Annual in Advance

### 5. Professional Services Payment Terms

Net 30

### 6. Currency

USD

### 7. Offer Valid Through

3/20/2021

---

I AGREE TO THE FEES AND TERMS OF THIS ESTIMATE:

| Chad Rohrbach | *Chad Rohrbach* | February 26, 2021 \| 15:08 PST |
|---|---|---|
| Print Name | DocuSigned by: / B546FE6DBD22E4BA... / Signature | Date |

Upon your execution, this document is a binding order for the products and services set forth herein.

Oracle relies on the accuracy of the billing information listed above, and is unable to issue a Credit Memo or resubmit an invoice due to incorrect billing information listed. Please ensure your company name, addresses and contacts included on this document are correct.

Oracle does not accept credit card payments for invoices of more than $99,999.

Exhibit 6



# Fixed Price Statement of Work

**Customer Name: River Supply Inc. ("Customer" or "You")**
**Customer Address: 2555 Delta Rd Brogue PA 17309 United States**

## 1. Agreement

This Statement of Work ("SOW") describes the professional services (the "Professional Services") to be performed by Oracle America, Inc. ("Oracle") for Customer (collectively "Parties") pursuant to the applicable agreement governing Oracle's performance of Professional Services (the "PS Terms") listed below (in order of preference, as applicable):

    (i)       the Professional Services Addendum to the Subscription Services Agreement entered by and between the Parties,

    (ii)     the separate Professional Services Agreement entered by and between the Parties; or

    (iii)    if neither (i) nor (ii) are applicable, the Professional Services Agreement found at www.netsuite.com/termsofservice (or such other URL specified by Oracle).

Once executed by the Parties, this SOW shall be incorporated by reference into the PS Terms.  In the event of any inconsistency or conflict between the terms and conditions of this SOW and the PS Terms, the terms and conditions of this SOW shall govern with respect to the subject matter of this SOW only.  Capitalized terms used in this SOW shall have the meaning defined under the PS Terms.  This SOW may not be modified or amended except in a writing signed by a duly authorized representative of each party. As used in this SOW, "You" or "Your" shall refer to the Customer as defined in the Agreement.

## 2. Description of Services

Oracle will perform the following Professional Services to assist You with the implementation of SuiteSuccess Manufacturing Standard and Warehouse Management Systems in Your Oracle|NetSuite instance (the "NetSuite instance"):

A.  Project Management:

    1.  Conduct one (1) kickoff webinar session, which is up to one (1) hour in duration, to review:
        a.  Project goals and objectives
        b.  Joint team roles and responsibilities
        c.  Project scope
        d.  Project management approach
        e.  Implementation methodology
        f.  Project timeline considerations
        g.  Next steps
    2.  Create and update the project plan as required during the performance of Professional Services.
    3.  Provide status reports at a mutually agreed interval, but not more than once a week.
    4.  Provide completed cutover checklist.
    5.  Conduct one (1) post go-live transition meeting, via webinar, for up to thirty (30) minutes.

B.  General Configuration and Setup:

    1.  Conduct one (1) "Getting Started" session, via webinar, for up to one (1) hour to:
        a.  Confirm administrator access.
        b.  Provide an overview of the SuiteAnswers site.
        c.  Create Oracle|NetSuite implementation folder in the production file cabinet of the NetSuite instance.
    2.  Conduct up to one (1) personalization session, for up to two (2) hours for each of the process areas set out below.
    3.  Configure OneWorld for up to one (1) country:

      a.   United States
4.  Configure up to one (1) parent and up to two (2) subsidiaries.
5.  Setup up to one (1) country sales tax nexus(es).
6.  Perform configuration based on mutually agreed design from the personalization sessions.
7.  Configure up to one (1) User Interface ("UI") form for each NetSuite instance record type.
8.  Create up to twenty-five (25) custom fields.
9.  Configure up to one (1) printed form for each NetSuite instance printed record type.
10. Set-up time sheets for payroll processing.
11. Install and configure the Platform Solutions Group Bundles ("PSG Bundles") as defined for Your country.
12. Setup and configure up to one (1) Pre-Built Connection:
      a.   UPS
      b.   FedEx
      c.   USPS

C.  Provide process area walkthroughs for each process area in scope as follows:

1.  Lead the first process area walkthrough for up to two (2) hours per process area to demonstrate process by process use cases.
2.  Provide up to two (2) hours of assistance per process area for a second process walkthrough.
3.  Provide Warehouse Management System Standard Quick Reference guide in MS Word format and a "how to" guideline for maintaining quick reference guide.
4.  Provide train-the-trainer super user training to the Administrator and one (1) of Your team members per warehouse and functional area.

D.  Data Migration:

1.  Perform up to two (2) import iterations for the following list data records into the NetSuite instance:
      a.   Chart of accounts ("COA") – up to two hundred fifty (250)
      b.   Expense category records – up to fifty (50)
      c.   Bin records – up to five hundred (500)
      d.   Employee records – up to one hundred (100)
      e.   Customer records – up to five hundred (500)
      f.   Vendor records – up to five hundred (500)
      g.   Contact records – up to one thousand (1,000)
      h.   Item records – up to ten thousand (10,000)
2.  Perform up to two (2) import iterations for the following transactional data into the NetSuite instance:
      a.   Opening account balances – up to one (1) consolidated opening balance
      b.   Historical trial balances – up to one (1) year consolidated by quarter
      c.   Inventory balance items – up to ten thousand (10,000)
      d.   Lot/serial items – up to ten thousand (10,000)
      e.   Open transactions (accounts receivable, accounts payable, sales orders, credit memos, return authorizations and purchase orders) – up to one thousand (1,000)
3.  Perform up to two (2) (one (1) sandbox and one (1) production) data update iterations for the following list data records into the NetSuite instance:
      a.   Item records (families, groups, alias and attributes) – up to one thousand (1,000)
      b.   Store location records – up to one thousand (1,000) Store location records

E.  Setup and configure the following within the Record to Report process area based on Oracle|NetSuite standard practices:

1.  Departments segments – up to fifty (50)
2.  Classes segments – up to fifty (50)
3.  Locations segments – up to fifty (50)
4.  COAs – up to two hundred fifty (250) single COAs
5.  Accounting periods – based on twelve (12)-month calendar
6.  Journal entries (standard, recurring, reversing, import, automated)
7.  Budget – up to one (1) segmented by department and subsidiary
8.  Bank account reconciliation, transfers and deposits
9.  Print and issue checks

10. Fiscal close
11. Financial reports
12. Subsidiary Management – up to two (2) subsidiaries
13. Automated intercompany eliminations
14. Statistical Account – Up to two (2)
15. Allocations templates – Up to two (2)

F. Setup and configure the following within the Design to Build process area based on Oracle|NetSuite standard practices:

1. Item Master – up to ten thousand (10,000) items from the following item types: Inventory, Assemblies, Serialized, Lot Managed, Groups, Non-Inventory, Service, Other Charge, Item Groups, Discount/Markup, and Kits
2. Min/Max Inventory Levels per Location
3. Reorder Points with Seasonality Calculation
4. Safety Stock
5. Demand Planning and Supply Planning
6. Available to Promise
7. Inventory Tracking of Finished Build vs. Sub-components
8. Cycle Counting
9. Multiple Units of Measure
10. Tax Settings
11. Item Pricing (Pricing Levels, Pricing Groups, Quantity-Based).
12. Item Costing (First In First Out ("FIFO"), Last In First Out ("LIFO"), Average, and Standard).
13. Item Transactions (Item Receipts & Fulfillments, Multi-location Inventory, Inventory Transfers, Bin Management, and Landed Cost)
14. Advanced Bill of Materials
15. Work Orders (Build to Stock or Order)

G. Setup and configure the following within the Procure to Pay/Return to Debit process area based on Oracle|NetSuite standard practices:

1. Vendor Master
2. Employee Master
3. Purchase Orders
4. Purchase Order Item Receipts
5. Vendor Bills
6. Vendor Bill Payments (manual, ACH via file, Electronic payments for single currency via manual or file using standard templates)
7. Vendor Credits and Refunds
8. Demand & Supply Planning and Calculations
9. Three (3)-Way Matching
10. Vendor Return Authorizations
11. Vendor Return Item Fulfillments
12. Expense Reports
13. Vendor Center
14. Amortization Schedules – Up to two (2)

H. Setup and configure the following within the Order to Cash/Return to Credit process area based on Oracle|NetSuite standard practices:

1. Customer Master
2. Contact Master
3. Partner Master
4. Sales Orders
5. Drop Shipments / Special Orders
6. Sales Order Item Fulfillments (Pick, Pack and Ship)
7. Invoices
8. Customer Payments (Manual, Credit Card, Electronic Payments)
9. Customer Return Authorizations
10. Customer Return Item Receipts

11.  Customer Credit Memos
12.  Customer Center
13.  Bill of Lading

I.   Setup and configure the following within the Marketing to Return on Investment ("ROI") process area based on Oracle|NetSuite standard practices:

1.  Lead Generation (Manual, CSV Import, Online Lead Capture)
2.  Marketing Setup (Templates, Groups, Promotions, Campaigns)
3.  Campaign Execution and Management
4.  SuitePromotions
5.  Campaign Assistant

J.   Setup and configure the following within the Lead to Quote process area based on Oracle|NetSuite standard practices:

1.  Lead, Prospect and Contact Masters
2.  Sales Territories
3.  Lead Routing and Assignment
4.  Sales Rep Forecast
5.  Sales Manager Forecast
6.  Sales Quota
7.  Sales Campaigns
8.  Opportunities
9.  Estimates/Quotes

K.   Setup and configure the following within the Call to Resolution process area based on Oracle|NetSuite standard practices:

1.  Case Statuses
2.  Case Priorities
3.  Case Types
4.  Case Origin (Manual, Email, Online Case Capture)
5.  Case Profile
6.  Routing and Assignment
7.  Escalations

L.   Set up and configure the following Project to Cash process areas based on Oracle|NetSuite standard practices:

1.  Project Master
2.  Project Templates
3.  Work Breakdown Structures (Phases and Tasks)
4.  Dashboard Charts

M.   Set up and configure the following within the Warehouse Operations process area based on Oracle|NetSuite standard practices:

1.  Warehouse Configuration:
    a.  Single Bin-less Store Location
    b.  Serial Controlled Inventory
2.  Inbound Purchase Order Warehouse Operations:
    a.  Inbound Purchase Order Receiving
    b.  Inbound Inspection Quarantine/QC Inventory Status.
3.  Outbound Sales Order Warehouse Operations:
    a.  Sales Order Release
    b.  Sales Order Picking Via RF+Paper Single Order Picking
    c.  Sales Order Single-Order Pick List Report
    d.  Sales Order Picking Via RF+Paper Multi-Order Picking
    e.  Sales Order Multi-Order Pick List Report
4.  Transfer Order Warehouse Operations:

       a.   Transfer Order Release
       b.   Transfer Order Picking
       c.   Transfer Order Pick List Report
       d.   Transfer Order Pack-list Report
       e.   Transfer Order Receiving

5.   Customer Return Warehouse Operations:
       a.   Customer Return Receiving
       b.   Customer Return Inbound Inspection Quarantine

6.   Internal Warehouse Operations:
       a.   Inventory Cycle Counting
       b.   Inventory Inquiry
       c.   Standard Item Labelling
       d.   Inventory Report
       e.   Inventory Status Report
       f.   Configure one (1) Warehouse Manager Dashboard

N.   Role Setup:

   1.   Provide preconfigured roles based on Oracle|NetSuite standard practices.
   2.   Configure up to six (6) custom full access roles.
   3.   Configure up to one (1) custom employee center role.

O.   Provide assistance with the following:

   1.   Up to twenty (20) hours of third-party coordination.
   2.   Up to twenty (20) hours to build saved searches, workflows and pivot reports.
   3.   Up to twenty (20) hours of data migration guidance.
   4.   Up to ten (10) hours of technical service integration advisory/consulting.

P.   Provide the following user enablement for the process areas in scope:

   1.   Complete a remote review with Your project lead for up to one (1) hour covering how to rollout end user eLearning enablement.
   2.   Provide Manufacturing standard eLearning tutorials and basic usability for UAT eLearning tutorial for up to thirty (30) licensed users.
   3.   Provide standard quick reference guides in Microsoft ("MS") word format and a "how to" guideline for maintaining quick reference guides.
   4.   Provide up to six (6) remote sessions on process areas selected by You for up to two (2) hours per session and for up to twelve (12) end users per session.

Q.   Provide You with up to ten (10) hours of user adoption assistance to include the following:

   1.   Collaborate with You to understand Your culture and end user attitude towards change.
   2.   Create a change management strategy and road map.
   3.   Provide standard user adoption templates.

R.   User Acceptance Testing ("UAT"):

   1.   Assist with up to one (1) UAT planning session for up to one (1) hour.
   2.   Create a UAT plan.
   3.   Provide You with standard UAT test plan templates and sample test scenarios.
   4.   Provide up to twenty-eight (28) hours, which must be utilized by You within a period of ten (10) consecutive business days, to assist You with UAT issue resolution.

S.   Post Go-Live Support:

   1.   Provide up to thirty-three (33) hours of post Go-Live support, which must be utilized within a period of thirty (30) consecutive business days and must be used with in the Professional Services Period.  Post Go-Live support may include the following:

a.  Trouble shooting and addressing production issues.
b.  Instruction on the Oracle|NetSuite Support services process.
c.  Identification of further optimization requirements.
d.  End user assistance.

# 3.  Your Obligations and Project Assumptions

You acknowledge that Your timely provision of and access to office accommodations, facilities, equipment, assistance, cooperation, complete and accurate information and data from Your officers, agents, and employees (collectively, "cooperation") are essential to the performance of any Professional Services as set forth above.  Oracle will not be responsible for any deficiency in performing Professional Services if such deficiency results from Your failure to provide full cooperation.

You acknowledge that Oracle's ability to perform the Professional Services depends upon Your fulfillment of the following obligations and the following project assumptions:

## 3.1.  Your Obligations

1)  Obtain a subscription to the Service under separate contract prior to the commencement of Professional Services under this SOW and maintain such subscription for the duration of the Professional Services provided under this SOW.
2)  Provide Oracle with full access to relevant functional, technical and business resources with adequate skills and knowledge to support the performance of Professional Services.
3)  Provide, for all Oracle resources performing Professional Services at Your site, a safe and healthful workspace (e.g., a workspace that is free from recognized hazards that are causing, or likely to cause, death or serious physical harm, a workspace that has proper ventilation, sound levels acceptable for resources performing Professional Services in the workspace, and ergonomically correct work stations, etc.).
4)  Provide any notices, and obtain any consents, required for Oracle to perform Professional Services.
5)  Limit Oracle's access to any production environments or shared development environments to the extent necessary for Oracle to perform Professional Services.
6)  As required by U.S. Department of Labor regulations (20 CFR 655.734), You will allow Oracle to post a Notice regarding Oracle H-1B employee(s) at the work site prior to the employee's arrival on site.
7)  Be responsible for ensuring that common, consistent functional processes exist across Your organization; including any applicable parent and subsidiary companies (e.g. there will be one common Order to Cash process across the entire organization).
8)  Be responsible for performing a production refresh of the sandbox at the start of the project.
9)  Don't film or record Oracle's delivery of Professional Services, Oracle resources, or any Oracle materials.
10) Written communication of Your need to pause Professional Services to complete assigned tasks must be received five (5) business days in advance of any such pause, and the pause will be limited to no more than ten (10) business days.
11) If while performing Professional Services Oracle requires access to other vendor's products that are part of Your system, You will be responsible for acquiring all such products and the appropriate license rights necessary for Oracle to access such products on Your behalf.
12) Be responsible for providing Your organization structure prior to personalization.
13) Be responsible for procuring any third-party fees and/or services.
14) Be responsible for having Your designated attendee, as agreed between You and Oracle, attend pre-requisite fundamentals training no later than ten (10) consecutive business days prior to project kick off.
15) Be responsible for having Your designated attendee, as agreed between You and Oracle, attend project team administrator training.
16) Lead the second process walkthrough, for up to two (2) hours per process area, to demonstrate process-by-process use cases.
17) Reviewing the setup and testing of the Professional Services described above as part of UAT.
18) Be responsible for exporting and manipulating data from the NetSuite instance to comply with localized taxation and reporting requirements.
19) Data Migration Obligations:
a.  Provide conversion data in CSV file formats documented in the templates located in the NetSuite instance.
b.  Perform data encryption, extraction, consolidation, cleansing and mapping to the appropriate service fields for all data import activity.

20) UAT Obligations:
    a.  Validate and, if necessary, modify UAT template test scenarios.
    b.  Define additional UAT test scenarios as needed.
    c.  Be responsible for and complete UAT in line with testing scenarios.
    d.  Be responsible for removing all UAT data prior to Go-Live.
21) Perform cutover tasks assigned to You as identified in the cutover checklist.
22) Enablement Obligations:
    a.  Be responsible for deployment of the eLearning tutorials to Your end users.
    b.  Be responsible for editing, printing, shipping and copying charges for all enablement materials.
23) User Adoption Obligations:
    a.  Be responsible for distributing all communications through print, internal email servers, intranet, and/or social media channels.
    b.  Pay for printing, shipping, and distribution costs for any hard-copy communications material.
24) Be responsible for procuring PrintNode print driver to support standard label printing.
25) Be responsible for procuring Wi-Fi/RF infrastructure, infrastructure hardware, software and related services.

You acknowledge that if Oracle's cost of providing Professional Services is increased because of Your failure to meet the obligations listed in this SOW, failure to provide cooperation, or because of any other circumstance outside of Oracle's control, then You agree to pay Oracle for such increased costs.

## 3.2.  Project Assumptions

1)  All Professional Services are performed remotely.
2)  At Your request and in Oracle's discretion, Oracle may agree to conduct an onsite visit(s) to provide Professional Services during the Professional Services Period (as defined below).  You agree to be responsible for any travel and out-of-pocket expenses incurred by Oracle related to providing any Professional Services onsite.
3)  All project documentation, presentations and project communications are in English, or such other available languages the parties may agree upon in writing.
4)  You do not require Oracle consultants to work outside their standard local country workday hours.
5)  Oracle consulting resources are not dedicated to any single project and are engaged across many projects for various customers.
6)  Any Professional Services not expressly included in the above Description of Services are considered out of scope.
7)  Project timeline estimates are based on availability of Your resources and key decision makers.  Lack of access or change to project stakeholders will impact project timelines and costs if decisions cannot be made in a timely fashion.
8)  Configuration, customization or personalization will be in one (1) NetSuite instance.
9)  The parent and child subsidiaries configuration is provided for the following country designated below:
    a.  United States
10) All subsidiaries have a single defined base currency.
11) All subsidiaries have the same fiscal year end.
12) All subsidiaries will be configured with the user interface in English.
13) Each subsidiary has its own master records, which are not shared across subsidiaries.
14) Printed forms will be configured using the native PDF layout functionality, without HTML, residing in the NetSuite instance.
15) NetSuite instance dashboards will be installed without modification.
16) Data imports will be performed for up to two (2) subsidiaries.
17) You and Oracle understand and acknowledge that go-live occurs upon cut-over to Your production environment ("Go-Live") and that post Go-Live support begins at cut-over.
18) Enablement Assumptions:
    a.  All enablement is done remotely.
    b.  All enablement content is designed, developed, delivered and presented in English, or other languages that may be made available by Oracle at its sole discretion.
    c.  An eLearning Tutorial is an on-demand end user training created from a pre-defined script of the configured process areas included in the SuiteSuccess edition purchased by You.
    d.  eLearning tutorials will be delivered to You via the NetSuite instance and will be available for a period of one (1) year from the date You are granted access to eLearning.

19) All outbound warehouse operations are based on standard NetSuite Sales Orders or Transfer Orders created in a ready for fulfillment status prior to a Warehouse Management System order release and picking.

20) Train the trainer sessions will be provided or remotely in accordance with the relevant personalization and/or walkthrough session

# 4.   Pricing & Payment Terms

**Fixed Fees:** The pricing set forth in this SOW represents the fixed fees for the Professional Services set forth in this SOW. Additional discounts (if any) for these Professional Services will be reflected in Your Estimate/Order Form that references this SOW and/or these Professional Services.  In the event of a conflict between the pricing set forth in this SOW and the pricing set forth in Your Estimate/Order Form governing this SOW and/or these Professional Services, then the pricing set forth in Your Estimate/Order Form shall govern and control.  Any expenses (as described below) are not included in the fixed fees and are an additional cost to You.  The payment obligation is non-cancellable, and sum paid non-refundable except as otherwise expressly provided in Your Estimate/Order Form.

You acknowledge that the fixed price is based solely on the information provided to Oracle and the assumptions documented in this SOW.  Any requirement(s) not included herein or items not contemplated will be considered outside of the fixed price scope and will be handled through the Change Control Process defined below, and may result in additional cost. The total fees for this SOW are as follows:

| Professional Services Fees | |
|---|---|
| Professional Services | $75,000.00 USD |
| **Total Professional Services Fees (excluding expenses described below)** | **$75,000.00 USD** |

a)   **Payment Terms.**  Unless otherwise noted in Your Estimate/Order Form, fees are due Net 30 from invoice date.

b)   **Expenses:** Reasonable travel and living expenses required in connection with delivering the Professional Services will be incurred in accordance with Oracle's internal travel and expense policy and billed monthly as incurred to You as actual charges in addition to the Professional Services fees.

# 5.   Project Management

You and Oracle each agree to designate a project manager who shall be responsible for coordinating its activities under this SOW. You and Oracle each shall direct all inquiries concerning the Professional Services to the other party's project manager. Your project manager shall have the authority to approve Professional Services on Your behalf.  Oracle's project manager shall have the sole right to exercise direct control and supervision over the work assignments of Oracle resources.

# 6.   Additional Terms

6.1 Unused Services.
The Professional Services herein must be completed within **twelve (12) months** from the signature date of the Estimate/Order Form ("Professional Services Period").  Any portion of the Professional Services not used within the Professional Services Period will be automatically forfeited by You, with no further action required of either party, and You will not be entitled to a refund, or any credit toward additional or other Professional Services, for any unused portion of the fees paid for any unused portion of the Professional Services.  You may not apply any portion of unused Professional Services or fees paid, for any Professional Services other than the Professional Services stated in this SOW.  In order for Oracle to provide Professional Services to You after the Professional Services Period, You and Oracle shall mutually agree, in writing, under a separate Estimate/Order Form and SOW, to the terms and fees for such Professional Services.

6.2 Change Control Process

Any request for any change in Professional Services must be in writing; this includes requests for changes in project plans, scope, specifications, schedule, designs, requirements, service deliverables, software environment, hardware environment or any other aspect of Your order.  Oracle shall not be obligated to perform tasks related to changes in time, scope, cost, or contractual obligations until You and Oracle agree in writing to the proposed change to this SOW.

# 7.  Signatures

The Parties acknowledge that they have had previous discussions related to the performance by Oracle of professional services for You and the possible strategies which may be used by Oracle to implement the functionality described in Oracle's User Guides and in other related documentation (available at www.netsuite.com) as well as possible "workarounds," which may be implemented to achieve special requirements identified by You. This SOW and the Estimate/Order Form (including any Exhibits hereto) (and the PS Terms) shall constitute the entire understanding between You and Oracle and is intended as the final expression of the Parties' agreement regarding the Professional Services to be provided by Oracle. The Parties expressly disclaim any reliance on any and all prior agreements, understandings, RFPs, verbal and/or written communications related to the Professional Services to be provided by Oracle.  Any amendment or modification to this SOW shall not be valid, enforceable, or binding on the Parties unless such amendment or modification (i) is a written instrument duly executed by the authorized representatives of both Parties and (ii) references this SOW and identifies the specific Sections contained herein which are to be amended or modified.  This SOW may be executed in counterparts and/or by facsimile or electronic signature and if so executed shall be equally binding as an original copy of this SOW executed in ink by both Parties.

This SOW is valid through **February 28, 2021** and shall become binding upon execution by You and acceptance by Oracle.

| CUSTOMER | ORACLE AMERICA, INC. |
|---|---|
| Authorized Signature: *Chad Rohrbach* <br> B546F6DBDD22E4BA... | Authorized Signature: *Jennifer Borghesi* <br> DEBBCB4516043C... |
| Print Full Name: Chad Rohrbach | Print Full Name: Jennifer Borghesi |
| Job Title: CFO | Job Title: Sr. Manager, Business Operations |
| Signature Date: February 26, 2021 | 15:08 PST | Signature Date: February 26, 2021 | 15:42 PST |

This SOW may be signed electronically, in which case signatures may appear above or on the last page.

Exhibit 7



# Fixed Price Statement of Work

**Customer Name:  River Supply, Inc. ("Customer" or "You")**
**Customer Address: 2555 Delta Road, Brogue, PA 17309 United States**

## 1.  Agreement

This Statement of Work ("SOW") describes the professional services (the "Professional Services") to be performed by Oracle America, Inc. ("Oracle") for Customer (collectively "Parties") pursuant to the applicable agreement governing Oracle's performance of Professional Services (the "PS Terms") listed below (in order of preference, as applicable):

(i)   the Professional Services Addendum to the Subscription Services Agreement entered by and between the Parties,
(ii)  the separate Professional Services Agreement entered by and between the Parties; or
(iii) if neither (i) nor (ii) are applicable, the Professional Services Agreement found at www.netsuite.com/termsofservice (or such other URL specified by Oracle).

Once executed by the Parties, this SOW shall be incorporated by reference into the PS Terms.  In the event of any inconsistency or conflict between the terms and conditions of this SOW and the PS Terms, the terms and conditions of this SOW shall govern with respect to the subject matter of this SOW only.  Capitalized terms used in this SOW shall have the meaning defined under the PS Terms.  This SOW may not be modified or amended except in a writing signed by a duly authorized representative of each party. As used in this SOW, "You" or "Your" shall refer to the Customer as defined in the Agreement.

## 2.  Description of Services

Oracle will perform the following Professional Services related to the implementation of Your SuiteSuccess SuitePeople Standard US Payroll in Your Oracle|NetSuite instance (the "NetSuite instance"):

A.  Project Management:

   1.  Conduct one (1) kick-off webinar session, which is up to one and a half (1.5) hours in duration, to review:
      a.  Project goals and objectives.
      b.  Joint team roles and responsibilities.
      c.  Project scope.
      d.  Project management approach.
      e.  Implementation methodology.
      f.  Project timeline considerations.
      g.  Administrator access.
      h.  Next steps.
   2.  Create and update the project plan as required during the performance of Professional Services.
   3.  Provide status reports at a mutually agreed interval, but no more than once a week.
   4.  Provide completed cutover checklist.

B.  General Configuration and Setup:

   1.  Conduct up to one (1) personalization session, for up to two (2) hours.
   2.  Perform configuration based on mutually agreed design from personalization sessions.
   3.  Configure up to one (1) User Interface ("UI") form for each NetSuite instance record type.
   4.  Configure time entry record for timecard import capability.

C. Data Migration:

    1. Perform up to two (2) import iterations for the following transactional data into the NetSuite instance:
        a. Opening balance – Year to Date ("YTD") Payroll information
        b. YTD discrepancy resolution

D. Set up and configure the following within the Payroll process area based on Oracle|NetSuite standard practices:

    1. Federal Employment Identification Number ("FEIN") – one (1) within one (1) subsidiary
    2. Pay Frequencies (Weekly, Bi-weekly, Semi-monthly, Monthly) – up to two (2)
    3. Employees – up to fifty (50)
    4. Payroll Items – up to fifty (50)
    5. Direct Deposit Employees – up to fifty (50)
    6. Tax Filings – up to two (2) States
    7. Local Jurisdictions – up to forty (40)
    8. Custom Payroll Fields – up to four (4)
    9. Custom Reports – up to three (3)
    10. Paycheck Allocation

E. Role Setup:

    1. Provide preconfigured roles based on Oracle|NetSuite standard practices:
        a. Payroll Manager
        b. Payroll Processor

F. Provide assistance with the timecard import and issue resolution.

G. Provide the following user enablement for the process areas in scope:

    1. Complete a remote review with Your project lead for one (1) hour covering how to rollout end user eLearning enablement.
    2. Provide standard eLearning tutorials for up to fifty (50) licensed users.
    3. Provide standard quick reference guides in MS Word format and a "how to" guideline for maintaining quick reference guides.
    4. Provide up to one (1) remote coaching and support session for up to two (2) hours on timecard capability.

H. User Acceptance Testing ("UAT"):

    1. Assist with up to one (1) UAT planning session for up to one (1) hour.
    2. Assist with up to three (3) validation sessions; which is for up to one (1) hour in duration per session.
    3. Create a UAT plan.
    4. Provide You with standard UAT test plan templates and sample test scenarios.
    5. Provide up to seven (7) hours, which must be utilized by You within a period of five (5) consecutive business days, to assist You with UAT issue resolution.

I. Post Go-Live Support:

    1. Provide up to two (2) hours of post Go-Live support, which must be utilised within a period of thirty (30) consecutive business days and must be used within the Professional Services Period. Post Go-Live support may include the following:
        a. Trouble shooting and addressing production issues.
        b. Instruction on the NetSuite Support Services process.
        c. Identification of further optimization requirements.
        d. End user assistance.

DocuSign Envelope ID: 2D8A36DC-6D98-41D6-8GB7-90D7E88BBB73

# 3.  Your Obligations and Project Assumptions

You acknowledge that Your timely provision of and access to office accommodations, facilities, equipment, assistance, cooperation, complete and accurate information and data from Your officers, agents, and employees (collectively, "cooperation") are essential to the performance of any Professional Services as set forth above.  Oracle will not be responsible for any deficiency in performing Professional Services if such deficiency results from Your failure to provide full cooperation.

You acknowledge that Oracle's ability to perform the Professional Services depends upon Your fulfillment of the following obligations and the following project assumptions:

## 3.1.    Your Obligations

1)  Obtain a subscription to the Service under separate contract prior to the commencement of Professional Services under this SOW and maintain such subscription for the duration of the Professional Services provided under this SOW.
2)  Provide Oracle with full access to relevant functional, technical and business resources with adequate skills and knowledge to support the performance of Professional Services.
3)  Provide, for all Oracle resources performing Professional Services at Your site, a safe and healthful workspace (e.g., a workspace that is free from recognized hazards that are causing, or likely to cause, death or serious physical harm, a workspace that has proper ventilation, sound levels acceptable for resources performing Professional Services in the workspace, and ergonomically correct work stations, etc.).
4)  Provide any notices, and obtain any consents, required for Oracle to perform Professional Services.
5)  Limit Oracle's access to any production environments or shared development environments to the extent necessary for Oracle to perform Professional Services.
6)  Be responsible for ensuring that common, consistent functional processes exist across Your organization; including any applicable parent and subsidiary companies (e.g. there will be one common Order to Cash process across the entire organization).
7)  Be responsible for performing a production refresh of the sandbox at the start of the project.
8)  Don't film or record Oracle's delivery of Professional Services, Oracle resources, or any Oracle materials.
9)  Written communication of Your need to pause Professional Services to complete assigned tasks must be received five (5) business days in advance of any such pause, and the pause will be limited to no more than ten (10) business days.
10)  If while performing Professional Services Oracle requires access to other vendor's products that are part of Your system, You will be responsible for acquiring all such products and the appropriate license rights necessary for Oracle to access such products on Your behalf.
11)  Be responsible for providing Your organization structure prior to personalization.
12)  Be responsible for procuring any third-party fees and/or services.
13)  Be responsible for having Your designated attendee, as agreed between You and Oracle, attend pre-requisite fundamentals training no later than ten (10) consecutive business days prior to project kick off.
14)  Be responsible for having Your designated attendee, as agreed between You and Oracle, attend project team administrator training.
15)  Reviewing the setup and testing of the Professional Services described above as part of UAT.
16)  Be responsible for exporting and manipulating data from the NetSuite instance to comply with localized taxation and reporting requirements.
17)  Data Migration Obligations:
     a.   Provide conversion data in CSV file formats documented in the templates located in the NetSuite instance.
     b.   Perform data encryption, extraction, consolidation, cleansing and mapping to the appropriate service fields for all data import activity.
18)  UAT Obligations:
     a.   Validate and, if necessary, modify UAT template test scenarios.
     b.   Define additional UAT test scenarios as needed.
     c.   Be responsible for and complete UAT in line with testing scenarios.
     d.   If required, be responsible for removing all UAT related data except payroll batch prior to go-live.
19)  Perform cutover tasks assigned to You as identified in the cutover checklist.
20)  Enablement Obligations:
     a.   Be responsible for deployment of the eLearning tutorials to Your end users.
     b.   Be responsible for editing, printing, shipping and copying charges for all enablement material.
21)  Payroll Obligations:

    a.   Notify Oracle within two (2) business days about any inaccuracies or incomplete information in project documents provided by Oracle to You.

    b.   Provide tax registration(s), unemployment rates and deposit frequency prior to work commencement.

    c.   Responsible for assigning roles and/or adjusting permissions of existing roles.

You acknowledge that if Oracle's cost of providing Professional Services is increased because of Your failure to meet the obligations listed in this SOW, failure to provide cooperation, or because of any other circumstance outside of Oracle's control, then You agree to pay Oracle for such increased costs.

## 3.2.   Project Assumptions

1) All Professional Services are performed remotely.
2) At Your request and in Oracle's discretion, Oracle may agree to conduct an onsite visit(s) to provide Professional Services during the Professional Services Period (as defined below).  You agree to be responsible for any travel and out-of-pocket expenses incurred by Oracle related to providing any Professional Services onsite.
3) All project documentation, presentations and project communications are in English, or such other available languages the parties may agree upon in writing.
4) You do not require Oracle consultants to work outside their standard local country workday hours.
5) Oracle consulting resources are not dedicated to any single project and are engaged across many projects for various customers.
6) Any Professional Services not expressly included in the above Description of Services are considered out of scope.
7) Project timeline estimates are based on availability of Your resources and key decision makers.  Lack of access or change to project stakeholders will impact project timelines and costs if decisions cannot be made in a timely fashion.
8) Configuration, customization or personalization will be in one (1) NetSuite instance
9) Subsidiary will be configured with the user interface in English.
10) Subsidiary has its own master records, which are not shared across subsidiaries.
11) Printed forms will be configured using the native PDF layout functionality, without HTML, residing in the NetSuite instance.
12) No customization(s) of any printed forms within the NetSuite instance.
13) NetSuite instance dashboards will be installed without modification.
14) You and Oracle understand and acknowledge that go-live occurs upon cut-over to Your production environment ("Go-Live) and that post Go-Live support begins at cut-over.
15) Data imports will be performed for a single subsidiary.
16) Enablement Assumptions:
    a.   All enablement content is designed, developed, delivered and presented in English, or other languages that may be made available by Oracle at its sole discretion.
    b.   An eLearning Tutorial is an on-demand end user training created from a pre-defined script of the configured process areas included in the SuiteSuccess edition purchased by You.
    c.   eLearning tutorials will be delivered to You via the NetSuite instance and will be available for a period of up to one (1) year from the date You are granted access to eLearning.
17) Payroll Assumptions:
    a.   Only US Employees, USD currency, and US subsidiaries/tax jurisdictions are supported.
    b.   NetSuite ERP must be in production environment
    c.   US Payroll implementation start date needs to be approximately sixty (60) days in advance of planned payroll in production environment.
    d.   The following items are out of scope:
        i.   Garnishment and third-party payments.
        ii.   Setup of timesheets.
        iii.   Payment of expenses through payroll.
        iv.   Customization of time tracking form.
        v.   Employee time entry functionality.

## 4.  Pricing & Payment Terms

**Fixed Fees:** The pricing set forth in this SOW represents the fixed fees for the Professional Services set forth in this SOW. Additional discounts (if any) for these Professional Services will be reflected in Your Estimate/Order Form that references this SOW and/or these Professional Services.  In the event of a conflict between the pricing set forth in this SOW and the pricing set forth in Your Estimate/Order Form governing this SOW and/or these Professional Services, then the pricing set forth in Your Estimate/Order Form shall govern and control.  Any expenses (as described below) are not included in the fixed fees and are an additional cost to You.  The payment obligation is non-cancellable, and sum paid non-refundable except as otherwise expressly provided in Your Estimate/Order Form.

You acknowledge that the fixed price is based solely on the information provided to Oracle and the assumptions documented in this SOW.  Any requirement(s) not included herein or items not contemplated will be considered outside of the fixed price scope and will be handled through the Change Control Process defined below and may result in additional cost. The total fees for this SOW are as follows:

| Professional Services Fees | |
|---|---|
| Professional Services | $7,900.00 USD |
| **Total Professional Services Fees (excluding expenses described below)** | **$7,900.00 USD** |

a)  **Payment Terms.**  Unless otherwise noted in Your Estimate/Order Form, fees are due Net 30 from invoice date.

b)  **Expenses:** Reasonable travel and living expenses required in connection with delivering the Professional Services will be incurred in accordance with Oracle's internal travel and expense policy and billed monthly as incurred to You as actual charges in addition to the Professional Services fees.

## 5.  Project Management

You and Oracle each agree to designate a project manager who shall be responsible for coordinating its activities under this SOW. You and Oracle each shall direct all inquiries concerning the Professional Services to the other party's project manager. Your project manager shall have the authority to approve Professional Services on Your behalf.  Oracle's project manager shall have the sole right to exercise direct control and supervision over the work assignments of Oracle resources.

## 6.  Additional Terms

6.1 Unused Services.
The Professional Services herein must be completed within twelve (12) months from the signature date of the Estimate/Order Form ("Professional Services Period").  Any portion of the Professional Services not used within the Professional Services Period will be automatically forfeited by You, with no further action required of either party, and You will not be entitled to a refund, or any credit toward additional or other Professional Services, for any unused portion of the fees paid for any unused portion of the Professional Services.  You may not apply any portion of unused Professional Services or fees paid, for any Professional Services other than the Professional Services stated in this SOW.  In order for Oracle to provide Professional Services to You after the Professional Services Period, You and Oracle shall mutually agree, in writing, under a separate Estimate/Order Form and SOW, to the terms and fees for such Professional Services.

6.2 Change Control Process
Any request for any change in Professional Services must be in writing; this includes requests for changes in project plans, scope, specifications, schedule, designs, requirements, service deliverables, software environment, hardware environment or any other aspect of Your order.  Oracle shall not be obligated to perform tasks related to changes in time, scope, cost, or contractual obligations until You and Oracle agree in writing to the proposed change to this SOW.

## 7. Signatures

The Parties acknowledge that they have had previous discussions related to the performance by Oracle of professional services for You and the possible strategies which may be used by Oracle to implement the functionality described in Oracle's User Guides and in other related documentation (available at www.netsuite.com) as well as possible "workarounds," which may be implemented to achieve special requirements identified by You. This SOW and the Estimate/Order Form (including any Exhibits hereto) (and the PS Terms) shall constitute the entire understanding between You and Oracle and is intended as the final expression of the Parties' agreement regarding the Professional Services to be provided by Oracle. The Parties expressly disclaim any reliance on any and all prior agreements, understandings, RFPs, verbal and/or written communications related to the Professional Services to be provided by Oracle. Any amendment or modification to this SOW shall not be valid, enforceable, or binding on the Parties unless such amendment or modification (i) is a written instrument duly executed by the authorized representatives of both Parties and (ii) references this SOW and identifies the specific Sections contained herein which are to be amended or modified. This SOW may be executed in counterparts and/or by facsimile or electronic signature and if so executed shall be equally binding as an original copy of this SOW executed in ink by both Parties.

This SOW is valid through February 28, 2021 and shall become binding upon execution by You and acceptance by Oracle.

| **CUSTOMER** | **ORACLE AMERICA, INC.** |
|---|---|
| Authorized Signature: _Chad Rohrbach_ | Authorized Signature: _Jennifer Borghesi_ |
| Print Full Name: Chad Rohrbach | Print Full Name: Jennifer Borghesi |
| Job Title: CFO | Job Title: Sr. Manager, Business Operations |
| Signature Date: February 26, 2021 | 15:08 PST | Signature Date: February 26, 2021 | 15:42 PST |

This SOW may be signed electronically, in which case signatures may appear above or on the last page.

Exhibit 8

Case 3:23-cv-02981-LB    Document 4    Filed 06/19/23    Page 170 of 187

The Wayback Machine - https://web.archive.org/web/20210307224910/https://www.oracle.com/corporate/contracts...

About Oracle / Oracle Contracts /

# Oracle NetSuite Cloud Services Contracts

# Oracle NetSuite Cloud Services Contracts

Oracle NetSuite (NSGBU) has a consistent contract model for all programs and services globally. The standard contracts often refer to policies and other documents that may be relevant to a specific order. Links to the standard contracts, specified policies and other documentation are available here.







### NetSuite Cloud Services Contracts

The terms and conditions which govern the use of NetSuite Cloud Services including the Subscriptions Service Agreement, Program Documentation and the Data Processing Agreement are found here.

### NetSuite Cloud Service Descriptions

Each NetSuite Cloud Service on the applicable Cloud Price list has a Service Description associated with it. Within the individual Service Description are the service limitations, such as number of environments, storage limitations,

### NetSuite Other Cloud Services Contract Terms

This section includes supplemental terms which may be applicable to your order of NetSuite, OpenAir and Bronto Cloud Services.

**Learn more**

 

Case 3:23-cv-02981-LB   Document 4   Filed 06/19/23   Page 171 of 187

**Learn more**

the list of the modules Oracle will
provision for that Cloud Service.

**Learn more**



### Cloud Delivery Policies

The Hosting & Delivery Policies
describe how Oracle will deliver the
Cloud Services. Additionally,
describes how Oracle will operate
the Data Center, including how we
address security, change
management and backups.

**Learn more**

Resources for

Developers
Startups
Students and
Educators

Partners

Oracle
PartnerNetwork
Find a Partner
Log in to OPN

Solutions

Artificial Intelligence
Internet of Things
Blockchain

What's New

How we're taking on
COVID-19
Java SE Downloads
Try Oracle Cloud Free
Tier

Contact Us

US Sales:
+1.800.633.0738

How can we help?
Subscribe to emails

Country/Region

© 2021
Oracle

Site
Map

Privacy / Do
Not Sell My
Info

Ad
Choices

Careers

Exhibit 9

The Wayback Machine - https://web.archive.org/web/20210521113538/https://www.oracle.com/corporate/contracts/…

About Oracle  /  Oracle Contracts  /  NetSuite Cloud Services Contracts  /

# NetSuite Cloud Services Contracts

## NetSuite Cloud Services Contracts

In this section, you will find Oracle NetSuite's standard contracts for the NetSuite, OpenAir and Bronto Cloud Services including the Subscription Services Agreement, the Data Processing Agreement and any policies referred to in your contract with Oracle.

Subscription Services Agreement

Data Processing Agreement

Data Security Addendums

Professional Services Agreements

Professional Services Addendums

Support Terms and Response Times

Service Level Commitment (SLC)

Trial Account Agreement

Main Terms of Service

## NetSuite Cloud Services Policies

The following items are referenced in the Subscription Services Agreement and are here for easy access.

Program Documentation

Bronto Permission Marketing Policy (PDF)

 

# NetSuite Cloud Services Contracts – Subscription Services Agreements

Your Estimate/Order Form (the "order") for NetSuite, OpenAir and Bronto Cloud Services identifies the Subscription Services Agreement that governs the order. If your order is placed on or after July 1, 2020 and references the Subscription Services Agreement available at https://www.netsuite.com/portal/resource/terms-of-service.shtml or www.netsuite.com/tos, then the July 1, 2020 version of the Subscription Services Agreement applies to that order. For any "add-on order" to an original Cloud Services order, the version of the Subscription Services Agreement for Cloud Services in effect on the date of the original order will apply to the add-on order, even if the add-on order is placed after an updated version of the Subscription Services Agreement is published. An "add-on order" is an order that updates the quantity or type of previously ordered Cloud Services, such as by adding capacity, new user subscriptions, or additional SaaS service applications.

| North America | Asia Pacific | EMEA | Archive |
|---|---|---|---|
| United States (PDF) | | | Canada - English (PDF) |
| | | | Canada - French (PDF) |

---

# Data Processing Agreement

If your Estimate/Order Form ('order') for NetSuite, OpenAir or Bronto Services incorporates in the Oracle Data Processing Agreement ("DPA"), the applicable DPA can be found by going to the Oracle Cloud Contracting page found at the following URL: https://www.oracle.com/corporate/contracts/cloud-services/contracts.html.

---

# Data Security Addendums

In addition, the applicable Data Security Addendum(s) below automatically applies to your order:

NetSuite Data Security Addendum (PDF)

Bronto Data Security Addendum (PDF)

OpenAir Data Security Addendum (PDF)

---

 

# NetSuite Professional Services Agreements

The Online Professional Services Agreement governs certain professional services and training provided by Oracle to Customer.

| North America | Asia Pacific | EMEA |
|---|---|---|
| United States (PDF) | | Canada - English (PDF) |
| | | Canada - French (PDF) |

# NetSuite Professional Services Addendums

**Online Professional Services Addendum.** The Online Professional Services Addendum governs certain professional services and training provided by Oracle to Customer. The Online Professional Services Addendum is incorporated into the Subscription Services Agreement (released in June 2019; Updated in July 2019 and July 2020) and the Transactional Subscription Services Agreement (released in July 2020).

| North America | Asia Pacific | EMEA |
|---|---|---|
| United States (PDF) | | Canada - English (PDF) |
| | | Canada - French (PDF) |

**Bronto Online Professional Services Addendum.** If your order for Bronto Services was placed before July 1, 2020, this Bronto Online Professional Services Addendum governs professional services and training provided by Oracle to Customer. The Bronto Online Professional Services Addendum is incorporated into the Bronto Subscription Services Agreement (released in October 2019) and the Transactional Bronto Subscription Services Agreement found at http://content.bronto.com/terms/terms-and-conditions/.

Bronto Online Professional Services Addendum (PDF)

# Support Terms and Response Times

**NetSuite Support Services.** These NetSuite Support Service Terms are the terms under which Oracle provides support for certain online business applications pursuant to the level of support you have procured or are otherwise entitled to.

Support Terms – English (PDF)                         Support Terms – French (Canadian) (PDF)



Support Terms – Chinese (China only) (PDF)          Support Terms – English (China only) (PDF)

Support Terms – Japanese (PDF)

**Bronto Support Services**. These Bronto Support Service Terms are the terms under which Oracle provides support for certain online business applications pursuant to the level of support you have procured or are otherwise entitled to.

Support Terms – English (PDF)                        Support Terms – French (Canadian) (PDF)

Support Terms – Chinese (China only) (PDF)          Support Terms – English (China only) (PDF)

Support Terms – Japanese (PDF)

**Supplemental Support Terms for Response Services.** This addendum contains supplemental Support Service Terms for NetSuite Response Services that you may be eligible for based on specific requirements set forth in these supplemental terms.

Supplemental Support Terms (PDF)

**Oracle Terms of Use for NetSuite Support Portal**. This Terms of Use specifically covers the Customer's use of the NetSuite Support Portal website.

NetSuite Support Portal TOU (PDF)

---

# Service Level Commitment (SLC)

**Service Level Commitment (SLC) for the NetSuite and OpenAir Cloud Services.** These terms represent the Service Level Commitment for certain online business applications pursuant to the terms of your agreement with Oracle.

Service Level Commitment - April 2021 (PDF)

---

# NetSuite Trial Account Agreement

The Trial Account Agreement governs the temporary access to a limited trial, test, training or other demo account of the NetSuite Service that may be provided to you or a partner program member for such party's non-production use, the duration and scope of which may be further defined in an Estimate / Order Form.

| North America | Asia Pacific | EMEA |
|---|---|---|

United States (PDF)                                  Canada - English (PDF)

                                                     Canada - French (PDF)

# Main Terms of Service

These Main Terms of Service, in conjunction with the Subscription Services Agreement cover the Customer's usage of the NetSuite Service and OpenAir Service.

English (Last Updated March 2018) (PDF)                    Chinese (Last Updated April 2019) (PDF)

## Resources for

Developers

Startups

Students and
Educators

## Partners

Oracle
PartnerNetwork

Find a Partner

Log in to OPN

## Solutions

Artificial Intelligence

Internet of Things

Blockchain

## What's New

How we're taking on
COVID-19

Java 16 download

Try Oracle Cloud
Free Tier

## Contact Us

US Sales:
+1.800.633.0738

How can we help?

Subscribe to emails

© 2021 Oracle          Site Map          Privacy  /  Do Not Sell My Info          Ad Choices          Careers

Country/Region

Exhibit 10



**TACTICAL LAW**

4 Embarcadero Center, Suite 1400 | San Francisco, CA 94111
T 415.766.3509 | F 415.231.5272
www.tacticallawgroup.com

PAMELA K. FULMER                                          EMAIL ADDRESS
415.766.3509                                             pam@tacticallawgroup.com

**VIA EMAIL AND FEDERAL EXPRESS**

November 14, 2022

Ms. Dorian Daley, Esq.
Executive Vice President & General Counsel
Legal Department
Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, CA 94065

Re:   **Notice of Breach and 30-Day Cure Notice to Oracle|NetSuite Pursuant to
Paragraphs 6.2 and 7.3 of the Subscription Services Agreement on Behalf of River Supply
Inc.**

Dear Ms. Daley:

      This law firm represents River Supply Inc. ("RSI"), which is a SuiteSuccess customer of
Oracle America, Inc. and NetSuite, Inc. (collectively "Oracle").  Please direct all future
correspondence on this matter to my attention.  RSI writes to provide Oracle with notice of its
breaches (the "Breach Notice") and to provide Oracle with 30-days to cure (the "Cure Period")
those breaches.

      RSI has performed all of its obligations under the SSA and the Professional Services
Agreements, and notably has received no notice or communications from Oracle stating
otherwise.  RSI has paid the professional services fees and the subscription fees and yet RSI has
not been able to fully utilize the services due to Oracle's material breaches.  In the event the
Oracle services are not performed in full within thirty days of the date of this notice to RSI's
satisfaction, then RSI may terminate the contracts.

      Below we provide background regarding the dispute and a list of the breaches, which
Oracle must cure within 30-days of the date of this Breach Notice.

**The Oracle Contracts**

On or about February 26, 2021, RSI executed Estimate No. 809145 (the "SuiteSuccess Estimate")[1] and Estimate No. 822038 (the "NetSuite ACS Optimize") for cloud related software services and support and two Fixed Price Statements of Work for professional services.  Estimate No 809145 included a total discounted price for the services of $115,716.03, including a price of $57,700.00 for implementation services.  The price of Estimate No. 822038 was $23,800.00, reflecting Oracle's charge for NetSuite Advanced Customer Support (ACS).  Oracle touts on its website the benefits of its ACS support services claiming that the service goes "beyond standard support by providing prescriptive product optimization guidance and hands-on configuration assistance" and that "ACS prepares customers for new NetSuite release upgrades, helps to extend and adapt their implementation, provides advice on system architecture design and optimizes overall NetSuite system performance through testing and tuning."

Two Fixed Price Statements of Work detail the professional services that Oracle was obligated to provide to implement the SuiteSuccess ERP cloud services.  In general terms with regard to the SuiteSuccess Manufacturing Standard and Warehouse Management Systems, the professional project implementation services to be provided by Oracle included project management, general configuration and set up, process area walkthroughs, data migration, specific set up and configuration of the following: Record to Report, Design to Build, Procure to Pay/Return, and various process areas including Debit, Order to Cash/Return to Credit, Return on Investment("ROI"), Lead to Quote, Call to Resolution, Project to Cash, Warehouse Operations, Role Setup and other services.  The second statement of work covered professional services related to the implementation of RSI's SuiteSuccess SuitePeople Standard US Payroll in RSI's Oracle|NetSuite instance, and included project management, general configuration and setup, data migration, setup of the payroll process area, role setup, timecard importation, User Acceptance Testing ("UAT") and post go live support and other services.

Although the project was supposed to go live by February 28, 2022, now almost 21 months later RSI still has no working ERP solution and one "go live" date after another has come and gone due to Oracle's many failures.  Contrary to the representations made in pre and post contract discussions with Oracle, Oracle has failed to put a competent team in place to manage the project.  In addition, Oracle has made recommendations for certain third-party

---

[1] Estimate No. 809145 (the "Estimate") consisted of 4 pages and was followed by a deceptively simple 2-page "Agreement".  The Agreement purported to incorporate by reference the Subscription Services Agreement v060120 ("SSA") allegedly found at https://www.oracle.com/corporate/contracts/cloud-services/netsuite/ (including any referenced URL Terms).  Unlike other hyperlinks to be found in various agreements with which RSI is familiar, the url was not hi-lighted or set off by a different color so as to draw attention to the hyperlink.  Moreover, no one from Oracle ever pointed out the hyperlink and Oracle never provided RSI with a copy of this Subscription Services Agreement, and it is not in the files of RSI.  RSI believes that Oracle handles its NetSuite contracts in this manner in order to deceive its customers and to hide all of the self-serving and onerous provisions in the Subscription Services Agreement, which benefit Oracle to the detriment of Oracle's customers.  Given this lack of real notice, RSI is doubtful that the agreement as written is even enforceable, and should RSI end up in litigation with Oracle, RSI intends to challenge the enforceability of the SSA.

vendors, promising that these vendors had a track record of working seamlessly with Oracle customers and NetSuite.   These representations have turned out to be false and Oracle has completely failed to deliver a functioning ERP product.

**The Oracle/NetSuite Breaches**

RSI writes to provide Oracle with notice of its breaches and a 30-day opportunity to cure. Oracle's breaches and misrepresentations are many and include the following which must be cured within 30-days of the date of this letter:

- RSI was promised a functioning ERP system that would be seamless with all the parts working together.  In reality the solution has never worked.  Oracle needs to bring all parties to the table and finalize the solution so that RSI can go live.
- Oracle has failed to coordinate the third-party vendors to ensure one seamless software solution and must take ownership of the process and deliver a working solution.  Oracle has failed to effectively manage the interaction between NetSuite on the one hand and Suite Commerce, In 8 sync, WMS, Vend, SPS, Appficiency, Windcave, Shipstation , SkyVia, and Payroll, and must take control and effectively manage these relationships and deliver a system that works.
- The Oracle Cloud Services that Oracle provided under the cloud orders were not performed as warranted and/or were performed negligently.  Oracle needs to correct these issues as we outline here. Oracle needs to manage Suite Commerce, In 8 sync, WMS, Vend, SPS, Appficiency, Windcave, Shipstation , SkyVia, and Payroll and other vendors to deliver a working solution.  NetSuite failed to coordinate between the above entities and now must address these problems immediately and deliver a working solution.  RSI has given Oracle multiple notices of these breaches in correspondence between the parties, which have still not been cured.
- The third-party software recommendations Oracle provided to RSI were unsuitable and negatively impacted, and further delayed the go-live date.  Oracle must provide its third-party software recommendations, and the recommendations must be ones that will work with the entire solution, and Oracle must manage the project competently to deliver the services.
- Oracle has failed to create a solution that will integrate River Supply and its subsidiary RSI Hardware into one seamless system.  This needs to be fixed and the solution integrated and finalized.
- Oracle Professional Services incorrectly implemented the Oracle Cloud Services, including errors made in incorporating RSI's subsidiaries, which were required to be reworked and are still not functioning without error.  These problems need to be resolved.
- Oracle was slow to respond as needed, and team turnover, including the resignation of the project manager, delayed efforts to go-live.  The delay persists to this day and must be addressed, and the project brought to completion within 30-days.
- The Oracle team appeared inexperienced and over their head and never delivered the promised product. Oracle must assign a competent team to the project who will stick with it and who understands the complete system that Oracle represented and sold to RSI.

- The delay in go-live has impacted RSI's ability to realize value from the Oracle Cloud Services it has purchased under the cloud orders.  Oracle must fix these problems and deliver RSI the solution it was promised.
- The third-party software recommendations Oracle provided to RSI were unsuitable and negatively impacted, and further delayed the go-live.  Oracle must provide its third-party software recommendations, and the recommendations must be ones that will work with the entire solution.
- Oracle misrepresented the features, functionality, and/or readiness of the Oracle Cloud Services, and the effort required to implement the Oracle Cloud Services.  Oracle must deliver a functioning product as it has promised and do so within the 30-day cure period.
- The training videos on NetSuite's portal are inaccurate, making training difficult if not impossible.  Oracle must ensure that the training videos are accurate and provide the training that Oracle represented so RSI can successfully exploit the solution in its business.
- The Advanced Customer Support Services that Oracle provided for the Oracle Cloud Services were not performed as warranted and/or were performed negligently.  RSI has provided detailed notice of these failures to Oracle in various email communications, which have still not been cured.
- The Oracle Professional Services that Oracle provided under the various Statements of Work ("SOWs") were not performed as warranted and/or were performed negligently. RSI has provided detailed notice of these failures to Oracle in various email communications, which have still not been cured.
- Although Oracle represented that it was a skilled and competent implementation partner, it completely failed to deliver as represented forcing RSI to incur additional costs looking for an implementation partner to replace NetSuite.
- Oracle's incompetence in delivering the Suite Commerce component of the solution caused further delays, which have still not been corrected to this day.  Oracle must finalize these components ASAP.
- Oracle recommended third-party Point of Sale ("POS") companies Vend/Lightspeed as the third-party POS companies and they completely failed to deliver despite NetSuite's promises that they would.   This must be corrected.
- Oracle must locate and engage a POS contractor that will work with its solution.  If NetSuite, continues with Vend it must ensure that Vend regularly attends weekly meetings and closes out any open issues.  Currently Vend does not regularly attend the meetings even though requested to do so by RSI and many issues remain open.  NetSuite needs to insure that Vend participates in the weekly meetings and successfully closes out all of the open issues.
- Oracle has failed to adequately manage the project by failing to ensure that the EDI contractor communicated effectively with NetSuite.  Oracle must connect the EDI contractor with NetSuite and manage the project.
- Oracle's total failure to coordinate between SPS, Vend, and Suite Commerce exacerbated problems and caused serious delays.  Oracle must deploy a competent project manager who can manage the project and deliver the solution.
- Oracle failed to manage SPS to ensure adequate and timely testing of the EDI and assortment system.  Oracle must fix this issue and ensure that SPS or another contractor has managed the testing successfully.

- Oracle failed to competently manage the relationship with SPS, which waited until July 1 to begin outreach to House Hassen to go over the options for EDI. Oracle must supervise this to conclusion.
- Oracle failed to competently manage the relationship between SPS Commerce and Orgill. Oracle must supervise this to conclusion.
- Oracle must finalize the Assortment Timeline and deliver on this promise.
- Oracle told RSI all throughout August that WorldPay was a simple integration and would work with the Oracle solution. This was false.
- Oracle must provide one spreadsheet not three for the mass data upload.
- Connect Vend and NetSuite so RSI can upload one image to NetSuite and that image also goes to Vend without the need for a second upload.
- NetSuite represented the software would be a complete solution with no hidden costs which simply was not true.
  - $500 hidden testing fee on the EDI side must be reimbursed to RSI.
  - RSI paid all first-year fees for a service that it did not use as it never went live. Now these vendors are asking for payment for year two. RSI should not be responsible for year two payments when the solution is not working.
  - Oracle should reimburse RSI for Wincave related costs incurred when RSI had to purchase all new equipment after RSI learned that it could not use the credit card provider that was already on board.
  - Shipstation fees were never disclosed, and RSI was surprised by these new undisclosed costs.
  - Oracle needs to quantify and finalize estimates for SkyVia fees.
  - RSI paid Appficiency fees for the first year even though RSI was never able to use the solution since the project never went live. Now Appficiency has invoiced for $15,500 for a new year even though the system has never worked.
  - In 8 sync bills RSI on a time and materials basis and is well over budget due to all the work arounds required by Oracle's failure to adequately manage the work. These fees must be reimbursed to RSI.
  - RSI paid Vend for a year even though the solution never went live. Now Vend wants to be paid for year two.

**RSI Has Been Damaged by Oracle's Misrepresentations and Breaches of Contract**

RSI has been seriously damaged by Oracle's failures and other wrongful conduct. Indeed, the delay in implementation of the software that RSI contracted for has negatively impacted its business in the form of increased costs as well as delays and the inability to adequately manage the day-to-day operations of the RSI business. In addition to the damages caused by the delay, RSI has been required to dedicate significantly more internal resources than what Oracle had represented would be required in the initial meetings. Despite these increased costs, every meeting request sent to RSI was accepted and every deadline and obligation on its part has been met. Yet, over 21 months into the project the implementation is nowhere near completion. Oracle's team has demonstrated repeatedly that it is not qualified to deliver the products that were promised to RSI, and there is ample justification to terminate the applicable agreements for cause, should Oracle fail to cure. Nonetheless, it is RSI's sincere hope that Oracle will step up to the plate, cure its breaches, and deliver the solution that it promised.

In the meantime, RSI continues to reserve all rights and remedies.  Thank you.

Very truly yours,

*Pamela K. Fulmer//*

Pamela K. Fulmer

 TACTICAL LAW

Exhibit 11



## TACTICAL LAW

4 Embarcadero Center, Suite 1400 |  San Francisco, CA 94111
T  415.766.3509  |  F  415.231.5272
www.tacticallawgroup.com

PAMELA K. FULMER
415.766.3509

EMAIL ADDRESS
pam@tacticallawgroup.com

**VIA EMAIL ONLY**

January 18, 2023

Ms. EunHae Park, Esq.
Managing Counsel
Legal Department
Oracle America, Inc.
500 Oracle Parkway
Redwood Shores, CA 94065

Re:     **Notice of Termination to Oracle|NetSuite Pursuant to Sections 6.2 and 7.3 of the Subscription Services Agreement and Section 5.3 of the Professional Services Agreement on Behalf of River Supply Inc.**

Dear Ms. Park:

This firm represents River Supply Incorporated ("RSI").  On behalf of RSI, this firm sent Oracle America, Inc. and NetSuite Inc. (collectively "Oracle") through its General Counsel a notice of breach and opportunity to cure letter on November 14, 2022.  Oracle Legal subsequently assigned the dispute to you.  By my email to you dated December 16, 2022, RSI extended the cure period from December 14, 2022, to and until December 31, 2022, provided that Oracle met certain conditions.  Oracle has failed to meet those conditions and has failed to cure its material breaches.  As a result, pursuant to Sections 6.2, 7.3 and 9.3 of the SSA and Section 5.3 of the Professional Services Agreement and the Fixed Price Statement of Work, those agreements have been terminated as of December 31, 2022, and RSI is entitled to a refund of monies pre-paid to Oracle.  Likewise, RSI has no further obligation under the SSA for any further subscription payments.

RSI is currently totaling up its damages and evaluating its claims against Oracle.  I will be in touch in the near future with RSI's settlement demand.  In the interim, RSI continues to reserve all rights and remedies.  Thank you.

Very truly yours,

*Pamela K. Fulmer*

Pamela K. Fulmer

 TACTICAL LAW