1
2
3
4
5
6
7

8     UNITED STATES DISTRICT COURT

9     NORTHERN DISTRICT OF CALIFORNIA

10     San Francisco Division

11    RIVER SUPPLY, INC.,                        Case No. 3:23-cv-02981-LB

12              Plaintiff,                       **ORDER GRANTING MOTION TO DISMISS**

13        v.                                     Re: ECF No. 13

14    ORACLE AMERICA, INC., NETSUITE, INC.,
      SPS COMMERCE, INC., VEND LIMITED, and
15    LIGHTSPEED COMMERCE INC.,

16              Defendants.

17                                               **INTRODUCTION**

18        Plaintiff River Supply, Inc. sells architectural-construction materials. It bought a software

19    product from defendant Oracle to manage its business, including inventory, sales, and accounting.

20    Oracle's sales representatives allegedly made promises about the software's capabilities that they

21    knew weren't true, which induced River Supply to contract for a product that didn't work. River

22    Supply then sued Oracle (and its third-party partners that implement Oracle's products) for fraud,

23    negligent misrepresentation, breach of contract, breach of the implied covenant of good faith and

24    fair dealing, breach of warranty, theft under Cal. Penal Code § 496, and a violation of California's

25    Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200.

26        Oracle moved to dismiss on the grounds that the economic-loss doctrine precludes the tort

27    claims, the contract's integration clause does too, the contract's limitation-of-liability clause

28    precludes the claim for consequential and punitive damages, and River Supply did not plausibly

plead fraud with particularity or its other claims. River Supply counters in part that it pleaded pre-contract fraud sufficiently and certain contract provisions — such as the limitation-of-liability provisions — are unenforceable because they are hidden in a hyperlink. The contract terms are enforceable. River Supply plausibly pleaded breach of contract but did not plausibly plead its other claims. The court dismisses those claims with leave to amend within twenty-eight days.

## STATEMENT

River Supply is a "premier architectural construction material supplier," also has a hardware store, and has a sister company that provides "carrier services."[1] It subscribed to a cloud-based software product from Oracle to manage its business, including retail sales, inventory, accounting and financials, warehouse operations, and customer relationships.[2] The product is branded Oracle NetSuite. (NetSuite, which Oracle acquired, provides subscription services to the software.[3]) River Supply asserts that Oracle induced it to sign the contract by knowingly promising services that it could not deliver, charging for them later, and then hiding behind contract provisions buried in click-through hyperlinks to avoid liability for its fraudulent failure to perform.[4]

The next sections summarize the contract, Oracle's alleged breach, the alleged fraudulent misrepresentations that induced the contract, the procedural history, and jurisdiction.

### 1. The Contract

Before the parties contracted for River Supply's purchase of Oracle's system, they met fourteen times online and once in person, and conferred by email, to discuss River Supply's business needs and Oracle's solutions. River Supply's team "included Tarry and Tim Bratton, Joe

---

[1] First Am. Compl. – ECF No. 4 at 8 (¶ 14). Citations refer to the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* at 2–3 (¶ 2), 12 (¶ 30).

[3] *Id.* at 1–2 (¶ 1), 8–9 (¶ 16); *see, e.g.*, Statement of Work, Ex. 6 to *id.* – ECF No. 4 at 153 (product branded "Oracle NetSuite"); Estimate, Ex. 4 to *id.* – ECF No. 4 at 143 (same, followed by an address identifying Oracle America, Inc. at its offices in Redwood City, California).

[4] First Am. Compl. – ECF No. 4 at 1–6 (¶¶ 1–10).

United States District Court
Northern District of California

Nolan, and Chad Rohrbach," and the "Oracle team consisted primarily of Troy Landsberg[, who led most of the conversations], Chris Taverrite, Dan Damoto, and Ben Gibson."[5] River Supply described its business needs and its existing software for its three businesses: Quickbooks Desktop Enterprise (River Supply), ECI Spruce (the hardware store), and Sage 100 (the carrier-services firm).[6] The parties agreed on the price and Oracle's services, and Mr. Rohrbach signed the contract documents on February 26, 2021, via DocuSign.[7] The contract documents "included two Estimate Forms and two Fixed Price Statements of Work."[8] River Supply did not retain counsel to review the documents "as the Oracle team made it clear that the documents were standard and could not be revised at that point, and in any event included all of the features promised by Mr. Landsberg and others during pre-contract discussions."[9]

Estimate # 809145 is for the main product: a twelve-month subscription to NetSuite SuiteSuccess Manufacturing Std. Cloud Service. It lists contracted-for services and their prices (totaling $115,716) for items such as project management, financial management, a webstore, and customer support.[10] After the list of products and prices, the next page is a standalone page titled "Terms of Your Order" (in conspicuous typeface), followed by a section titled **1. Agreement**:

    **A. Terms of Your Order** [the color is white with a red background that stretches a full line]

    **1. Agreement**

        The products and/or services set forth in this Estimate/Order Form, between you and the Oracle entity referenced above, are governed by the Subscription Services Agreement v060120 found at https://www.oracle.com/corporate/contracts/cloud-services/netsuite/ (including any referenced URL Terms). This Estimate/Order Form is non-cancellable and all fees are non-refundable, unless explicitly stated in this Estimate/Order Form or in the Agreement.[11]

---

[5] *Id.* at 13 (¶ 32); *see id.* at 14–23 (¶¶ 34–50) (describing the emails and meetings).

[6] *Id.* at 13–14 (¶ 33), 15–16 (¶ 36).

[7] *Id.* at 22–23 (¶¶ 49–51).

[8] *Id.* at 23 (¶ 53).

[9] *Id.* (¶ 52); *see id.* at 50 (¶ 22).

[10] *Id.* at 23–24 (¶ 53); Estimate # 809145, Ex. 4 to *id.* – ECF No. 4 at 143–46.

[11] Estimate # 809145, Ex. 4 to *id.* – ECF No. 4 at 147.

United States District Court
Northern District of California

The next paragraph also incorporates online terms, albeit in the (different) data-processing context: "The Oracle Data Processing Agreement covering the NetSuite services [is] at https://www.oracle.com/corporate/contracts/cloud-services/ and "describes how Oracle will process Personal Data . . . that Customer provides to Oracle as part of Oracle's provision of the NetSuite services under this Estimate/Order Form."[12] The next sections have the start date and payment terms. The signature that follows accepts the estimate: it is preceded by "I AGREE TO THE FEES AND TERMS OF THIS ESTIMATE" and is followed by "Upon your execution, this document is a binding order for the products and services set forth herein."[13]

Estimate # 822038 is an estimate for customer support totaling $23,800 and states in the **Agreement** section that it is "subject to the terms of th[e] initial Estimate/Order Form." It has the same signature line to accept the work.[14]

The two Fixed Price Statements of Work begin with a section titled **1. Agreement** with a clickable hyperlink**:**

> This Statement of Work ("SOW") describes the professional services . . . to be performed by Oracle . . . for Customer (collectively, "Parties") pursuant to the applicable agreement governing Oracle's performance of Professional Services (the "PS Terms") listed . . . (in order of preference, as applicable):
>
> > (i)  the Professional Services Addendum to the Subscription Services Agreement entered by and between the parties,
> > (ii) the separate Professional Services Agreement entered by and between the Parties; or
> > (iii) if neither (i) nor (ii) are applicable, the Professional Services Agreement found at www.netsuite.com/termsofservice (or other such URL specified by Oracle).
>
> Once executed by the Parties, this SOW shall be incorporated by reference into the PS Terms. In the event of any inconsistency or conflict between the terms and conditions of this SOW and the PS Terms, the terms and conditions of the SOW shall govern with respect to the subject matter of this SOW only. Capitalized terms used in this SOW shall have the meaning defined under the PS Terms. . . .[15]

---

[12] *Id.*

[13] *Id.* at 148.

[14] Estimate # 822038, Ex. 5 to *id.* – ECF No. 4 at 150–51.

[15] Fixed Price Statement of Work, Ex. 6 to *id.* – ECF No. 4 at 153 (p. 1) (reference numbers 12146/PP02122021v1 and SS MFG Std US 122820); Fixed Price Statement of Work, Ex. 7 to *id.* at 163 (p. 1) (reference numbers 11940/KM/020121/v1 and SS PR Std US 111220).

United States District Court
Northern District of California

The statements of work then describe Oracle's professional services, including the following: (1) project management (such as hosting a kickoff webinar session, creating the project plan, providing status reports, and conducting a post-go-live meeting); (2) configuration and setup (including deliverables such as a "getting started" session); (3) walkthroughs for each process; (4) data migration; (5) setup segments for accounting, budget, inventory, marketing, sales, and warehouse management; and (6) post-go-live support.[16] Then, the statements describe River Supply's obligations, including (1) its obligation to "[o]btain a subscription to the Service under separate contract prior to the commencement of" work under the Statement of Work (meaning, the subscriptions set forth in the two estimates that River Supply accepted), and (2) its obligations about implementation of the software service, such as access to data, a safe workplace, data migration, and the like. The remaining terms are related to project implementation.[17] The next section describes project assumptions, pricing and payment, the designation of project managers, and change processes for any change in professional services.[18]

The final section is "**Signatures**:" the parties "acknowledge that they have had previous discussions related to" Oracle's performance of professional services and the "strategies" it may use to "implement the functionality described in Oracle's User Guides and in other related documentation (available at www.netsuite.com) as well as possible 'workarounds,' which may be implemented to achieve special requirements identified by You. This SOW and the Estimate/Order Forms (including any Exhibits hereto) (and the PS Terms) shall constitute the entire understanding between You and Oracle and is intended as the final expression of the Parties' agreement regarding the Professional Services to be provided by Oracle. The Parties expressly disclaim any reliance on

---

[16] Fixed Price Statement of Work, Ex. 6 to *id.* – ECF No. 4 at 153–58 (pp. 1–6); Fixed Price Statement of Work, Ex. 7 to *id.* – ECF No. 4 at 163–64 (pp. 1–2).

[17] Fixed Price Statement of Work, Ex. 6 to *id.* – ECF No. 4 at 158–59 (pp. 6–7); Fixed Price Statement of Work, Ex. 7 to *id.* – ECF No. 4 at 165–67 (pp. 3–5).

[18] Fixed Price Statement of Work, Ex. 6 to *id.* – ECF No. 4 at 159–61 (pp. 7–9); Fixed Price Statement of Work, Ex. 7 to *id.* – ECF No. 4 at 166–67 (pp. 5–6).

United States District Court
Northern District of California

any and all prior agreements, understandings, RFPs, verbal and/or written communications related to the Professional Services to be provided by Oracle." The parties' signatures follow.[19]

When River Supply signed the four documents, "it was unaware of and had never reviewed" the Subscription Services Agreement hyperlinked in Estimate # 809145 (summarized above), "which contain[ed] several one-sided provisions favoring [Oracle,] including an integration clause, a limitation of liability, an automatic renewal clause[,] and a very broad disclaimer of warranties, which essentially attempts to disclaim any obligation for providing a functioning SaaS [Software as a Service] solution."[20] The complaint describes the hyperlink as a "disguised hyperlink to a June 1, 2020 Subscription Services Agreement." "The link was not set off in bold or a different color or presented in any way that would draw attention to it or that would indicate it was a hyperlink. Only by hovering a cursor over the URL could a reader see that it was a clickable hyperlink. On information and belief, even had one clicked on the hyperlink, it would not have taken the reader to the Subscription Services Agreement. Instead, on information and belief, the reader would have been taken to a confusing page on Oracle's website entitled 'Oracle NetSuite Cloud Services Contracts.'"[21]

Exhibit 8 is a pdf of the webpage for Oracle NetSuite Cloud Services Contracts as of March 7, 2021 (downloaded from the Wayback Machine on March 22, 2023). It has four clickable options: (1) NetSuite Cloud Services Contracts, which has "terms and conditions" that govern the use of NetSuite cloud services, "including the Subscription Services Agreement, Program Documentation, and the Data Processing Agreement;" (2) Cloud Service Descriptions; (3) Other Cloud Services Contract Terms, which are supplemental terms that may be applicable to NetSuite services; and (4) Cloud Delivery Policies, which describe how Oracle delivers the cloud services.[22] The relevant link is the first: clicking it shows the webpage. Exhibit 9 shows the page as it existed on May 21, 2021

---

[19] Fixed Price Statement of Work, Ex. 6 to *id.* – ECF No. 4 at 161 (p. 9); Fixed Price Statement of Work, Ex. 7 to *id.* – ECF No. 4 at 168 (p. 6).

[20] First Am. Compl. – ECF No. 4 at 25–26 (¶ 56).

[21] *Id.* at 25 (¶ 55).

[22] Oracle NetSuite Cloud Servs. Contracts, Ex. 8 to *id.* – ECF No. 4 at 170–71.

(downloaded from the Wayback Machine on March 22, 2023). It has NetSuite's contracts: the first listed is the link to Subscription Services Agreement, which has the clauses relevant to liability and damages in this case: an integration clause, a limitation of liability, and the warranties.[23]

The integration clause is titled "Entire Agreement" and disclaims reliance on pre-contract representations:

> **14.1.1**   This Agreement incorporates by reference all URL Terms (as applicable), Exhibits and Estimate/Order Forms, and this Agreement, together with such referenced items, constitute the entire understanding between Customer and Oracle and are intended to be the final and entire expression of their agreement. The parties expressly disclaim any reliance on any and all prior discussions, emails, RFP's and/or agreements between the parties. There are no other verbal agreements, representations, warranties undertakings or other agreements between the parties.[24]

Section 9, titled "Warranties, Disclaimers, and Exclusive Remedies," limits liability and disclaims warranties:

> **9.1**   Each party represents that it has validly entered into this Agreement and that it has the power and authority to do so. Oracle warrants that during the Term, Oracle will perform (i) the Cloud Service using commercially reasonable care and skill in all material respects as described in the Oracle NetSuite Written Materials, and (ii) any Professional Services and Support Services in a professional manner consistent with industry standards (the warranties described by the foregoing clauses (i) and (ii), collectively, the "**Services Warranty**"). If the Services provided to Customer were not performed as warranted, Customer must promptly provide Oracle with a written notice that describes the deficiency in the Services (including, as applicable, the service request number notifying Oracle of the deficiency in the Services). For Professional Services, Customer must notify Oracle of any warranty deficiencies within 60 days from performance of the deficient Professional Services.
>
> **9.2**   ORACLE DOES NOT WARRANT THAT THE SERVICES WILL BE PERFORMED ERROR-FREE OR UNINTERRUPTED, THAT ORACLE WILL CORRECT ALL SERVICES ERRORS, OR THAT THE SERVICES WILL MEET CUSTOMER'S REQUIREMENTS OR EXPECTATIONS. ORACLE IS NOT RESPONSIBLE FOR ANY ISSUES RELATED TO THE PERFORMANCE, OPERATION OR SECURITY OF THE SERVICES THAT ARISE FROM CUSTOMER DATA OR THIRD-PARTY APPLICATIONS OR SERVICES PROVIDED BY THIRD PARTIES.
>
> **9.3**   FOR ANY BREACH OF THE SERVICES WARRANTY, CUSTOMER'S EXCLUSIVE REMEDY AND ORACLE'S ENTIRE LIABILITY SHALL BE THE CORRECTION OF THE DEFICIENT SERVICES THAT CAUSED THE BREACH OF WARRANTY, OR, IF ORACLE CANNOT SUBSTANTIALLY

---

[23] NetSuite Cloud Servs. Contracts, Ex. 9 to *id.* – ECF No. 4 at 173; Subscription Servs. Agreement, Ex. 1 to McClean Decl. – ECF No. 13-1 at 4–12 (pp. 1–9). The court considers Exhibit 1 and Exhibit 2, the Professional Services Agreement, ECF No. 13-1 at 14–17 (pp. 1–4), under the incorporation-by-reference doctrine. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

[24] Subscription Servs. Agreement § 14.1.1, Ex. 1 to McClean Decl. – ECF No. 13-1 at 11 (p. 8).

United States District Court
Northern District of California

CORRECT THE DEFICIENCY IN A COMMERCIALLY REASONABLE MANNER, CUSTOMER MAY END THE DEFICIENT SERVICES AND ORACLE WILL REFUND TO CUSTOMER THE FEES FOR THE TERMINATED SERVICES THAT CUSTOMER PRE-PAID TO ORACLE FOR THE PERIOD FOLLOWING THE EFFECTIVE DATE OF TERMINATION.

**9.4**   TO THE EXTENT NOT PROHIBITED BY LAW, THESE WARRANTIES ARE EXCLUSIVE AND THERE ARE NO OTHER EXPRESS OR IMPLIED WARRANTIES OR CONDITIONS INCLUDING FOR SOFTWARE, HARDWARE, SYSTEMS, NETWORKS OR ENVIRONMENTS OR FOR MERCHANTABILITY, SATISFACTORY QUALITY AND FITNESS FOR A PARTICULAR PURPOSE.[25]

In a section titled "Professional Services Warranty," the PS Terms incorporated into the statements of work (summarized above) similarly describe the warranties: (1) notice to Oracle within 60 days of any deficient performance, (2) an exclusive remedy of correction of the deficient services and a refund, and (3) the exclusivity of the warranties.[26]

In a section titled Limitations of Liability, the Subscription Services Agreement limits the type and amount of damages:

**10.1**   IN NO EVENT WILL EITHER PARTY OR ITS AFFILIATES BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES, OR ANY LOSS OF REVENUE, PROFITS (EXCLUDING FEES UNDER THIS AGREEMENT), SALES, DATA, DATA USE, GOODWILL, OR REPUTATION.

**10.2**   IN NO EVENT SHALL THE AGGREGATE LIABILITY OF ORACLE AND ITS AFFILIATES ARISING OUT OF OR RELATED TO THIS AGREEMENT OR CUSTOMER'S ESTIMATE/ORDER FORM OR STATEMENT OF WORK (SOW), WHETHER IN CONTRACT, TORT, OR OTHERWISE, EXCEED THE TOTAL AMOUNTS ACTUALLY PAID UNDER CUSTOMER'S ESTIMATE/ORDER FORM OR SOW FOR THE SERVICES GIVING RISE TO THE LIABILITY DURING THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH LIABILITY.[27]

The Subscription Services Agreement also provides that Oracle is not responsible for the work performed by its partners:

**14.2.3**   Oracle's business partners and other third parties, including any third parties with which the Services have integrations or that are retained by Customer to provide consulting services, implementation services or applications that interact with the Services, are independent of Oracle and are not Oracle's agents. Oracle is not liable for, bound by, or responsible for any problems with the Services or Customer Data arising due to any acts of any such business partner or third party, unless the business

---

[25] *Id.* § 9 at 9–10 (pp. 6–7).

[26] First Am. Compl. – ECF No. 4 at 27 (¶ 57) (quoting the Statements of Work, excerpted above); Prof. Servs. Agreement § 5, Prof. Servs. Warranty, Ex. 2 to McClean Decl. – ECF No. 13-1 at 15 (p. 2).

[27] Subscription Servs. Agreement § 10, Ex. 1 to McClean Decl. – ECF No. 13-1 at 10 (p. 7).

partner or third party is providing Services as Oracle's subcontractor on an engagement ordered under this Agreement and, if so, then only to the same extent as Oracle would be responsible for our resources under this Agreement.[28]

The PS Terms incorporated into the statements of work (summarized above) similarly say that Oracle is not responsible for its partners' work.[29]

### 2. Oracle's Alleged Breach of the Contract

Oracle allegedly breached the contract by, among other issues, (1) not implementing a workable ERP [enterprise-resource-planning software], which is what businesses use to manage day-to-day business activities, such as accounting, finance, procurement, project management, supply chain, and manufacturing, (2) missing "go-live" dates (August 2021, June 1, 2022, November 1, 2022, and January 1, 2023), and (3) not managing the work of its partners (the other defendants, who failed to implement point-of-sale functionality, payment-processing solutions, EDI [electronic-data exchange], and other functions).[30] On November 14, 2022, after twenty months of delays and performance failures, River Supply sent a notice of breach to Oracle and an opportunity to cure.[31] Oracle blamed River Supply for the failures and tried to "exact an expensive change order to get the functionality that Oracle had promised as far back as February of 2021."[32] River Supply terminated the contract on January 18, 2023, based on Oracle's failure to cure its breaches.[33]

### 3. The Alleged Pre-Contract Fraudulent Misrepresentations

River Supply identifies the following representations by Oracle that it alleges are fraudulent.[34]

---

[28] *Id.* § 14.2.3 at 11 (p. 8).

[29] Prof. Servs. Warranty § 5.2, Ex. 2 to McClean Decl. – ECF No. 13-1 at 15 (p. 2).

[30] First Am. Compl. – ECF No. 4 at 29–38 (¶¶ 58–78); Notice of Breach, Ex. 10 to *id.* – ECF No. 4 at 179–84.

[31] First Am. Compl. – ECF No. 4 at 6 (¶ 10); Notice of Breach, Ex. 10 to *id.* – ECF No. 4 at 179–84.

[32] First Am. Compl. – ECF No. 4 at 6 (¶ 10).

[33] Notice of Termination, Ex. 11 to *id.* – ECF No. 4 at 186–87.

[34] Opp'n – ECF No. 26 at 10–13 (citing First Am. Compl. – ECF No. 4).

First, Oracle said during Zoom meetings with River Supply employees on October 2, 2020, January 8, 2021, and February 17 and 24, 2021, that it could provide the functionality that River Supply wanted (meaning, the functionality that it was using for its businesses already with Quickbooks Desktop Enterprise, ECI Spruce, and Sage 100) "right out of the box" or through Oracle partners.[35] "On information and belief, at the time that Mr. Landsberg made those representations he knew were not true and made the representations solely to induce" River Supply to enter into the contracts.[36]

Second, during Zoom meetings on January 8, 12, and 20, 2021, Mr. Landsberg told the River Supply team (Tarry, Bratton, Nolan, Bell, and Rohrbach) that the NetSuite solution would provide the one-stop solution that River Supply wanted.[37] No solution was delivered.[38]

Third, during the January 8 and 12, 2021, meetings, Mr. Landsberg promised River Supply employees (Tarry, Bratton, Nolan, Bell, and Rohrbach) that it could track inventory through NetSuite WMS "through multiple companies, including with locators to a specific point in" River Supply's facilities.[39] After two years, it could not track inventory.[40]

Fourth, also during the January 8 and 12, 2021, meetings, Mr. Landsberg told the same River Supply employees that the software would "grow with the company to incorporate additional locations" and could handle data from River Supply Hardware's wholesaler to the NetSuite software and into River Supply's inventory. The software did not go live or track data.[41]

---

[35] First Am. Compl. – ECF No. 4 at 13–14 (¶¶ 31, 33), 15–16 (¶ 36).

[36] *Id.* at 22 (¶ 49).

[37] *Id.* at 15–18 (¶¶ 36, 38).

[38] *Id.* at 2 (¶ 2) (Oracle knew that at the time of contracting that it had solutions that it could not deliver for the price that it promised).

[39] *Id.* at 15–16 (¶ 36).

[40] *Id.* at 2 (¶ 2) (Oracle knew that at the time of contracting that it had solutions that it could not deliver for the price that it promised), 34–35 (¶ 69) (on July 1, 2022, SPS (an Oracle partner) gave a timeline of sixteen weeks to install the system; one month after the deadline, it was "not even close to producing a working product, stalling out" River Supply's "inventory tracking, inventory replenishment[,] and product flow with its vendors and customers;" on December 1, 2022, River Supply gave Oracle and SPS a final chance to perform, and they failed).

[41] *Id.* at 13–14 (¶ 33), 15–16 (¶ 36), 34–35 (¶ 69).

Fifth, similarly, Oracle promised that its system could update inventory automatically but it never delivered this functionality.[42]

Sixth, Mr. Landsberg promised during Zoom meetings on October 2, 2020, January 8 and 12, 2021, and February 24, 2021, that Oracle had experience with companies like River Supply Hardware and could implement similar SaaS solutions.[43] It could not implement the solution.[44]

Seventh, Mr. Landsberg and Mr. D'Amato said that the price would be "all in" without any price increases.[45] This was not the case: Oracle proposed change orders that increased the price for contracted functionalities.[46]

Eighth, Oracle promised that the platform would go "live" quickly (within four to six months), and it never went live.[47]

Ninth, Oracle never disclosed during pre-contract meetings that River Supply would need to use (and negotiate with) third-party Oracle Partners and instead said that Oracle would manage the project and any third-party managers.[48] Oracle did not manage the project, which never went live.[49]

Tenth, Oracle demonstrated what looked like a successful product on February 18, 2021, but after two years, Oracle could not get the system to work.[50]

Eleventh, Mr. Landsberg said that Solupay was an Oracle payment-solution partner with technology that worked with the NetSuite solution, but the technology did not work.[51]

---

[42] *Id.* at 2–3 (¶¶ 2–3), 13–14 (¶ 33), 16–17 (¶ 37), 36 (¶ 72), 37 (¶ 75).

[43] *Id.* at 12–13 (¶ 31), 15–16 (¶ 36), 48 (¶ 114).

[44] *Id.* at 2 (¶ 2) (same statement that Oracle knew that at the time of contracting that it could not deliver what it promised).

[45] *Id.* at 22 (¶ 49).

[46] *Id.* at 38–39 (¶¶ 79, 81).

[47] *Id.* at 30–31 (¶¶ 59–61), 33 (¶ 65), 38–39 (¶¶ 78, 81).

[48] *Id.* at 16–17 (¶ 37) (Mr. Landsberg introduced the idea of third-party Oracle Partners to handle some of the job-costing tasks), 21 (¶ 47) (Oracle would coordinate work of Oracle Partners).

[49] *Id.* at 2 (¶ 2) (same statement that Oracle knew that it could not deliver what it promised), 35–36 (¶¶ 70–73) (dropped the ball on coordination).

[50] *Id.* at 2 (¶ 2) (same statement that Oracle could not deliver), 20–21 (¶ 46), 31–32 (¶ 63).

[51] *Id.* at 20–21 (¶ 46), 33–34 (¶ 66).

United States District Court
Northern District of California

Twelfth, Oracle recommended Worldpay as a payment processor that would work with the solution, but it did not work.[52]

Thirteenth, Oracle recommended Vend as the POS (point of service) provider and said that it integrated "tightly" into NetSuite. It did not provide the promised functionality.[53]

Fourteenth, Oracle recommended SPS Commerce for the EDI (electronic-data exchange) part of the implementation, saying that it had worked successfully with SPS with similar clients.[54] The project never went live, and SPS did not seem familiar with similar projects.[55]

### 4. Procedural History

The defendants are Oracle and NetSuite and three Oracle vendors that implemented the software product: SPS Commerce (which helps retail partners with data collaboration), Vend Limited (which provides point-of-sale and retail-management systems), and Lightspeed Commerce (which acquired Vend).[56] The claims are (1) fraud in the inducement and promissory fraud for making promises that could not be delivered to induce River Supply to enter into the contract with Oracle (against Oracle), (2) fraud in the inducement and promissory fraud on the same theory to induce River Supply to enter into contracts with Oracle and Vend/Lightspeed (against Oracle), (3) negligent misrepresentation (against Oracle), (4) negligent misrepresentation (against Oracle, Vend, and Lightspeed), (5) breach of contract (against Oracle), (6) breach of warranty (against Oracle), (7) breach of warranty (against SPS); (8) breach of the implied covenant of good faith and fair dealing (against Oracle), (9) theft in violation of California Penal Code § 496 (against Oracle), (10) a violation of California's Unfair Competition Law (UCL) (against Oracle, NetSuite, Vend/Lightspeed, and SPS), and (11) declaratory relief (against Oracle).[57] The court held a hearing on October 5, 2023.

---

[52] *Id.* at 33–34 (¶ 66).

[53] *Id.* at 2 (¶ 2) (same cursory language), 11 (¶ 26), 33 (¶ 65), 48 (¶ 114).

[54] *Id.* at 34–45 (¶¶ 68, 70).

[55] *Id.* at 37 (¶¶ 74–75), 39 (¶ 81).

[56] *Id.* at 9 (¶¶ 17–19). The plaintiff dismissed defendant Appficiency. Notice of Voluntary Dismissal – ECF No. 10.

[57] *Id.* at 42–57 (¶¶ 90–159).

United States District Court
Northern District of California

1

2

**5.  Jurisdiction**

There is complete diversity of citizenship between the opposing parties, the amount in controversy exceeds $75,000, and the parties thus do not dispute the court's diversity jurisdiction. 28 U.S.C. § 1332(a)(1); *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996). All parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636.[58]

**STANDARDS OF REVIEW**

**1.  Rule 12(b)(6)**

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of (1) what the claims are and (2) the grounds upon which they rest. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, "[a] complaint may fail to show a right to relief either by lacking a cognizable legal theory or by lacking sufficient facts alleged under a cognizable legal theory." *Woods v. U.S. Bank N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016).

A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (cleaned up). A complaint must contain factual allegations that, when accepted as true, are sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 838 F. App'x 231, 234 (9th Cir. 2020). "[O]nly the *claim* needs to be plausible, and not the facts themselves. . . ." *NorthBay*, 838 F. App'x at 234 (citing *Iqbal*, 556 U.S. at 696); *see Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 886–87 (9th Cir. 2018) (the court must accept the factual allegations in the

United States District Court
Northern District of California

---

[58] Consents – ECF Nos. 8, 19, 24, 31, 33.

1    complaint "as true and construe them in the light most favorable to the plaintiff") (cleaned up).

2        Put another way, "[a] claim has facial plausibility when the plaintiff pleads factual content that

3    allows the court to draw the reasonable inference that the defendant is liable for the misconduct

4    alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability

5    requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

6    *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops

7    short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (cleaned up).

8

9    **2.  Rule 9(b)**

10        Fraud allegations elicit a more demanding standard. "In alleging fraud . . . , a party must state

11    with particularity the circumstances constituting fraud. . . . Malice, intent, knowledge, and other

12    conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This means that

13    "[a]verments of fraud must be accompanied by the 'who, what, when, where, and how' of the

14    misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). "The

15    plaintiff must [also] set forth what is false or misleading about a statement, and why it is false." *Id.*

16    (cleaned up). Like the basic "notice pleading" demands of Rule 8, a driving concern behind Rule

17    9(b) is that defendants be given fair notice of the charges against them. *In re Lui*, 646 F. App'x

18    571, 573 (9th Cir. 2016) ("Rule 9(b) demands that allegations of fraud be specific enough to give

19    defendants notice of the particular misconduct . . . so that they can defend against the charge and

20    not just deny that they have done anything wrong.") (cleaned up); *Odom v. Microsoft Corp.*, 486

21    F.3d 541, 553 (9th Cir. 2007) (Rule 9(b) requires particularity "so that the defendant can prepare

22    an adequate answer").

23

24    **3.  Leave to Amend**

25        If a court dismisses a complaint because of insufficient factual allegations, it should give leave

26    to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Cook,*

27    *Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). If a court

28    dismisses a complaint because its legal theory is not cognizable, the court should not give leave to

United States District Court
Northern District of California

1    amend. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016); *see*

2    *Steele-Klein v. Int'l Bhd. of Teamsters, Loc. 117*, 696 F. App'x 200, 202 (9th Cir. 2017) (leave to

3    amend may be appropriate if the plaintiff "identifie[s] how she would articulate a cognizable legal

4    theory if given the opportunity").

5                                              **ANALYSIS**

6         The issues are whether the parties' contract incorporated the Subscription Services Agreement

7    hyperlinked in Estimate # 809145 and whether River Supply otherwise plausibly pleaded its claims.

8    The contract incorporates the Subscription Services Agreement: the link to it is conspicuous, and

9    River Supply had the opportunity to review the contract when it signed it. This means that the terms

10   in the Subscription Services Agreement — including its limitations on liability and its integration

11   clause — apply. This conclusion does not preclude fraud claims that induced the contract. But River

12   Supply did not adequately plead fraud. It did adequately plead breach of contract.

13        The next sections address (1) the contract's incorporation of the hyperlinked agreement (with

14   the integration clause and limitation of liability), (2) whether the fraud claims are precluded under

15   the parol-evidence rule and the economic-loss rule and whether River Supply pleaded fraud with

16   specificity, (3) the contract claims, (4) the breach-of-warranty claim, (5) the claim of theft under

17   Cal. Penal Code § 496(a), and (6) the other claims.

18

19   **1.   The Contract's Hyperlinked Provisions**

20        River Supply contends that it is not bound by the Subscription Services Agreement because it is

21   available only by a hidden hyperlink, which renders incorporation of the Agreement procedurally

22   and substantively unconscionable.[59] The link to the agreement is not unconscionable, and the

23   agreement — including its integration clause and limitations of liability — apply.

24        California law provides that a contract is unconscionable only if it is both "procedurally and

25   substantively unconscionable." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 996 (9th Cir. 2010);

26   *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000). "[T]he former

27

28   ───────────────
     [59] Opp'n – ECF No. 26 at 20–24.

United States District Court
Northern District of California

focus[es] on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results." *Armendariz*, 24 Cal. 4th at 114 (cleaned up). "Procedural and substantive unconscionability 'need not be present in the same degree.'" *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1260 (9th Cir. 2017) (quoting *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 910 (2015). "Rather, there is a sliding scale: 'the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.'" *Id.* (quoting *Sanchez*, 61 Cal. 4th at 910). River Supply — as the party opposing the contract provision — "must demonstrate that the contract as a whole or a specific clause in the contract is both procedurally and substantively unconscionable." *Id.* (citing *Sanchez*, 61 Cal. 4th at 910).

It is not procedurally unconscionable under California law to incorporate documents by reference: "A contract may incorporate documents and terms by reference." *In re Holl*, 925 F.3d 1076, 1084 (9th Cir. 2019) (citing *Shaw v. Regents of Univ. of Cal.*, 58 Cal. App. 4th 44, 54 (1997). River Supply does not dispute this and instead asserts procedural unconscionability on the ground that the link is hidden: "[i]t is not the 'mere' fact of a hyperlink that results in procedural unconscionability. . . . Rather, the FAC alleges that the hyperlink was 'hidden' in a manner that purposefully obfuscated the terms" for River Supply, "which clearly had unequal bargaining power compared to a software behemoth such as Oracle." And "even if [River Supply] could 'locate and click' the hyperlink, it would still have had to 'hunt' for the TOS [terms of service] upon which Oracle now relies."[60] River Supply's argument about procedural unconscionability thus turns on whether the hyperlink was hidden and whether the underlying terms were in any event not easily available through the hyperlink.

"Where it is clear that a party is assenting to a contract that incorporates other documents by reference, the incorporation is valid — and the terms of the incorporated document are binding — so long as the incorporation is clear and unequivocal, the reference is called to the attention of the other party and he consents thereto, and the terms of the incorporated document are known or

---

[60] Opp'n – ECF No. 26 at 23.

1    easily available to the contracting parties." *In re Holl*, 925 F.3d at 1084 (cleaned up). "Yet, an

2    offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous

3    contractual provisions of which he was unaware, contained in a document whose contractual

4    nature is not obvious." *Id.* (cleaned up).

5        The contracts are reproduced in the Statement. The Estimate and the Statements of Work

6    conspicuously — in sections titled (in bold) Agreement — identify the underlying agreements and

7    provide hyperlinks to them. Again as set forth in the Statement (and reflected in the exhibits that it

8    cites), the hyperlink in the Estimate links to a page that conspicuously identifies and links to the

9    Agreement. The pages are not confusing, they are not hidden, and the Agreement is easily available.

10    River Supply's agent may not have read the contract terms, but River Supply is bound by them.

11    *Employee Painters' Tr. v. J & B Finishes*, 77 F.3d 1188, 1192 (9th Cir. 1996) ("A party who signs a

12    written agreement is bound by its terms, even though the party neither reads the agreement nor

13    considers the legal consequences of signing it."). Also, River Supply was free to use other vendors,

14    which suggests only slight procedural unconscionability. *Chou v. Charles Schwab & Co.*, No. 21-

15    cv-06189-LB, 2022 WL 1127384, at *6 (N.D. Cal. Mar. 22, 2022), *aff'd*, No. 22-15549, 2023 WL

16    2674367 (9th Cir. Mar. 29, 2023).

17        River Supply — as the party that must demonstrate unconscionability — advances arguments to

18    support procedural unconscionability, but they do not change the result.

19        First, it says that even if the link is conspicuous, clicking it requires a "hunt" for the Subscription

20    Services Agreement. It cites *Tompkins v. 23andMe, Inc.*, where the district court held that an

21    arbitration clause was procedurally unconscionable because the customer had to hunt for the

22    arbitration clause in the terms of service.[61] No. 5:13-CV-05682-LHK, 2014 WL 2903752, at *14–15

23    (N.D. Cal. June 25, 2014) (nonetheless compelled arbitration), *aff'd*, 840 F.3d 1016, 1024 n.2 (2016)

24    (because the parties did not dispute the finding of procedural unconscionability, the Ninth Circuit did

25    not address the issue). In the very different context of a consumer contract, the terms of service

26    involved an arbitration clause in the last section of 23andMe's terms. *Id.* at *2. Just getting to the

27    ───────────────

28    [61] *Id.* at 22–23.

terms involved scrolling through a significant amount of information. *Id.* That showed procedural unconscionability. *Id.* at *14–15.

This is not a consumer contract involving buried terms: it is a business contract for services costing nearly $170,000.[62] The section titled **1. Agreement** specifies that the contract incorporates the Subscription Services Agreement, and the hyperlink that follows links to a webpage with four conspicuous options. Option one (Cloud Services Contracts) is the Subscription Services Agreement, which is easily accessible, not hidden. Even if one were to apply the consumer cases, this identifies the relevant agreement more specifically than the clickwrap cases (where courts uphold terms of service in clickthrough agreements where consumers must click on "I agree" after being presented with the hyperlink to the terms of service). *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014); *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023) (courts routinely enforce clickwrap agreements but are reluctant to enforce browsewrap agreements, where conditions of use are posted on the website, generally on a link at the bottom of the screen).

Second, relatedly, in the complaint, River Supply alleges that the hyperlinks were not bolded or in a different color.[63] It cites only consumer-contract cases. No case requires a different color or bolding for a hyperlink in a business contract. In any event, a link to terms of service that is bolded or in color and that appears right above an agreement to the terms is notice that courts deem sufficient to show a reasonable consumer's notice of the terms. *Oberstein*, 60 F.4th at 513, 515–16. That is because the color makes the link to terms of service — perhaps not otherwise on a consumer's radar — conspicuous. The issue for any contract that incorporates terms is whether the incorporated terms are obvious and easily available and the party consents to them. *In re Holl*, 925 F.3d at 1084. Here, the section titled **Agreement** specifies that it incorporates two agreements (the Subscription Services Agreement and the Data Processing Agreement) and links immediately to a page that allows easy access to those agreements. This is at least as conspicuous notice of the terms and easy access to them as the consumer cases with a hyperlink in bold or color.

---

[62] First Am. Compl. – ECF No. 3 at 2 (¶ 2).

[63] *Id.* at 4 (¶ 6).

The remaining issue is substantive unconscionability. As Oracle points out, contracts are about allocation of risk.[64] The contract here allocates risk between two business partners contracting for a SaaS business solution. In one paragraph, River Supply counters only that the contract's provisions limiting liability are "one-sided provisions." It cites *In re Yahoo! Customer Data Sec. Breach Litig.*, but in that consumer case, which involved data security, the defendant disclaimed liability for almost all damages. 313 F. Supp. 3d 1113, 1136–38 (N.D. Cal. 2018).[65] By contrast, the business contract here between parties contracting for a software business solution defines recoverable damages and provides a remedy in the form of correcting the deficient performance or a refund.

River Supply also cites *A & M Produce Co. v. FMC Corp.* (without discussing it), for the same proposition that one-sided limitations of liability are substantively unconscionable.[66] 135 Cal. App. 3d 473, 491–92 (1982). Oracle collects cases that have criticized the decision for having a too-broad standard for substantive unconscionability.[67] In any event, *A & M* involved a complete disclaimer of liability by an equipment company for any liability about the product, a disclaimer that was commercially unreasonable. *Id.* By contrast, the warranties in section 9 — set forth in the Statement — are about service errors, interruptions, and issues related to customer data or third parties. And again, there is a remedy that matches the sale of the product: correct the service errors or refund the fees. This after all is a software license for business functionality. There is no substantive unconscionability with a limitation of liability that provides the remedies allowed here.

## 2. The Fraud Claims and the Economic-Loss Rule

The parties' contract has an integration clause that disclaims the parties' reliance on statements made during negotiations and says that that the contract reflects the parties' entire agreement.[68] But

---

[64] Reply – ECF No. 28 at 14 (citing *Affiliated FM Ins. Co. v. LTK Consulting Servs. Inc.*, 556 F.3d 920, 921 (9th Cir. 2009).

[65] Opp'n – ECF No. 26 at 24.

[66] *Id.*

[67] Reply – ECF No. 28 at 15 (collecting cases).

[68] *See supra* Statement.

River Supply claims fraud in the inducement. "An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal. 4th 1169, 1173 n.3 (2013). Oracle counters that the economic-loss rule forecloses the fraud claims.[69] The economic-loss rule does not bar claims of fraud that induce the contract. That said, River Supply did not adequately plead fraud.

    The next two sections address (1) the conclusion that the economic-loss rule does not bar claims of fraud in the inducement, and (2) River Supply's failure to plead fraud with particularity.

### 2.1   The Economic-Loss Rule Does Not Bar Claims for Fraud in the Inducement

    "The economic-loss rule bars tort claims arising out of a contract, where a failed product has caused only economic loss, but has not injured anyone or damaged other property." *Grouse River Outfitters Ltd. v. NetSuite, Inc.*, No. 16-cv-02954-LB, 2016 WL 5930273, at *11 (N.D. Cal. Oct. 12, 2016) (collecting and analyzing cases). "The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Id.* (quoting *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004)); *accord Rattagan v. Uber Techs., Inc.*, 19 F. 4th 1188, 1191 (9th Cir. 2021) ("Stated differently, a party to a contract generally cannot recover for pure economic loss — i.e., damages that are solely monetary — that resulted from a breach of contract unless he can show a violation of some independent duty arising in tort."). The purpose of the rule is to prevent "the law of contract and the law of tort from dissolving one into the other." *Robinson Helicopter*, 34 Cal. 4th at 988.

    Excepted from this rule are (among other things) claims that a "contract was fraudulently induced." *Id.* at 989–90; *Frye v. Wine Libr., Inc.*, No. 06-5399 SC, 2006 WL 3500605, at *2 (N.D. Cal. Dec. 4, 2006) (citing *Erlich v. Menezes*, 21 Cal. 4th 543, 552 (1999)); *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal. App. 3d 1220, 1238–39 (1991); *Krzyzanowsky v. Orkin Exterminating Co.*, No. C 07-05362 SBA, 2009 WL 481267, at *11–12 (N.D. Cal. Feb. 24, 2009); *see Grouse River*, 2016 WL 5930273, at *11 (conducting this analysis). This includes inducement-

---

[69] Mot. – ECF No. 13 at 17 (asserting that the doctrine bars these claims).

of-the-contract claims predicated on fraud and negligent misrepresentation. *Grouse River*, 2016 WL 5930273, at *11 (citing *Frye*, 2006 WL 3500605, at *3 ("As Plaintiff's negligent misrepresentation claim can be characterized as relating to Defendant's inducement of Plaintiff to contract, there is also no question of it being barred by the economic loss rule.") (citing *Robinson Helicopter*, 34 Cal. 4th at 989).

Oracle contends in its reply brief that courts are reluctant to apply the fraud exception to the economic-loss rule to cases that are not product-liability cases.[70] *Robinson* involved (1) a contract for helicopter parts with a failure rate that did not comport to contract specifications and (2) lies by the supplier that the parts conformed to contract specifications. *Robinson*, 34 Cal. 4th at 985.

Oracle emphasized this point at the hearing. First, it pointed to paragraphs 52 and 122 of the FAC: (1) in paragraph 52, River Supply alleged that Oracle made it clear that the contracts "included all of the features promised by" Oracle in the precontract discussions, and (2) in paragraph 122, River Supply alleged that Oracle "represented that all the requested functionality was included at a fixed price."[71] Oracle's point is that the contract — by River Supply's own allegations — covered all promised functionalities. As a result, Oracle contends, the economic-loss doctrine precludes the tort claims that lie in fraud. Second, Oracle reiterated its argument that the fraud exception to the economic-loss doctrine should apply only in the products-liability context: in cases where the fraud exception applies, there is an additional injury (such as personal injury in a products-liability case), not just the economic losses that arise from the breach of contract.[72]

The argument makes some sense. Products-liability cases are the classic illustration of the rule that fraudulent inducement of the contract allows recovery for extra-contractual injury (often personal injury). The product suppliers making the misrepresentations are able to perceive the risks of extra-contractual injury and thus are responsible for it. By contrast, a breach of contract attending a pure business transaction generally involves only economic losses. But it does not follow

---

[70] Reply – ECF No. 28 at 9 (collecting cases expressing skepticism).

[71] First Am. Compl. – ECF No. 4 at 23 (¶ 52), 50 (¶ 122).

[72] Reply – ECF No. 28 at 8–9 (citing cases for this principle, sometimes without analyzing their facts).

United States District Court
Northern District of California

conceptually that a material lie that induces a contract is insulated from liability whenever the case is not a products-liability case. To hold otherwise would mean that a party could knowingly lie about a product's capabilities to induce a contract and then shield itself from liability through an integration clause and limitation of liability.

The fraudulent-inducement exception to the parol-evidence rule supports this conclusion: the rule permits evidence to prove that the contract is void or voidable for fraud in the inducement. *Grouse River*, 2016 WL 5930273, at *6–7 (collecting and analyzing cases). And courts in this district have recognized that the economic-loss rule does not preclude claims of fraudulent inducement of a contract and have allowed cases to proceed at the pleadings stage. *Id.* at *11 (collecting cases); *White v. FCA US LLC*, No. 22-cv-00954-BLF, 2022 WL 3370791, at *5 (N.D. Cal. Aug. 16, 2022) (misrepresentations inducing sale of a Jeep Cherokee); *R Power Biofuels, LLC v. Chemex LLC*, No. 16-CV-00716-LHK, 2017 WL 1164296, at *1, *5–7, *12 (N.D. Cal. Mar. 29, 2017) (in case claiming a failure to adequately build a biodiesel plant, the court held that (1) "fraudulent inducement is a well-recognized exception to the economic loss rule" and (2) promises that fraudulently induced the contract — specifically, promises that refurbished components would meet the required specification of the original contract — were actionable and not precluded by the economic-loss doctrine) (collecting and closely analyzing cases); *cf. Synology Inc. v. Via Licensing Corp.*, No. 22-cv-01405-TLT, 2023 WL 3149250, at *1, *3–4 (N.D. Cal. Mar. 1, 2023) (in case by a patent licensee claiming that a patent-pool administrator failed to pay license fees, the administrator countersued for breach of contract, breach of warranty, and fraud; the court applied the economic-loss rule because the administrator did not allege that the licensee induced the administrator to enter into the contract; the claim as pled was only a claim for failure to perform the terms of the contract).

The court recognizes that *R Power Biofuels* is conceptually reconcilable with *Robinson Helicopter*: it involved a physical biodiesel plant, while the software product here is more a service that — if inadequate — involves only economic losses. But there is additional injury here: the limitation-of-liability clause in the contract means that full contract remedies are not available. Also, holding that fraud is out of bounds is hard to square with the Ninth Circuit's decision in *Grouse River*, which involved a similar software product, a similar contract with a limitation-of-

liability provision, similar allegations of fraud, and similar issues about the economic-loss rule. *Grouse River Outfitters, Ltd. v. Oracle Corp.*, 848 F. App'x 238, 243–44 (9th Cir. 2021).

More pragmatically, as discussed in the next section, the court is dismissing the fraud claims with leave to amend, which moots the issue, at least temporarily. Assuming that there will be a round-two motion, the parties can address the issue again in light of this analysis and the additional authorities submitted by the plaintiff after oral argument.[73]

### 2.2 Fraud

The elements of fraud are (1) a material misrepresentation (or omission), (2) knowledge of falsity, (3) an intent to defraud, (4) justifiable reliance, and (5) resulting damages. *Lazar v. Super. Ct.*, 12 Cal. 4th 631, 638 (1996). "Unlike fraud, a claim for negligent misrepresentation 'does not require knowledge of falsity, but instead requires a misrepresentation of fact by a person who has no reasonable grounds for believing it to be true.'" *Beard v. Int'l Bus. Machs. Corp.*, No. 18-cv-06783-WHA, 2019 WL 1516592, at *2 (N.D. Cal. Apr. 7, 2019) (quoting *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 230–31 (2013)).

Oracle moved to dismiss on the ground that most of Oracle's alleged statements were general statements — such as that the products and services are a complete solution — that courts have dismissed as puffery.[74] *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 973 (N.D. Cal. 2008) (generalized and vague statements of product superiority such as "superb, uncompromising quality" and "faster, more powerful, and more innovative than competing machines" are non-actionable puffery) (collecting cases holding that "high performance," "top of the line," reliable mobile-computing solution, and "do more on the move" are non-actionable puffery). River Supply countered with the specific examples set forth in the Statement.[75] Oracle dismisses these as unactionable statements of future intent (i.e., the product would go live on a specific time frame) or

---

[73] Statement of Additional Authorities – ECF No. 49.

[74] Mot. – ECF No. 13 at 24–25.

[75] Opp'n – ECF No. 26 at 10–13.

United States District Court
Northern District of California

non-actionable puffery (the product integrated "seamlessly").[76] Most of these are non-actionable puffery or future promises.

Statements constituting mere "puffery" cannot support liability for fraud or negligent misrepresentation. *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 100 F. Supp. 2d 1086, 1093 (C.D. Cal. 1999). "Puffery" has been described "as making generalized or exaggerated statements such that a reasonable consumer would not interpret the statement as a factual claim upon which he or she could rely." *In re All Terrain Vehicle Litig.*, 771 F. Supp. 1057, 1061 (C.D. Cal. 1991) (citing *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv.*, 911 F.2d 242, 246 (9th Cir. 1990)). "[U]ltimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008). "[A]dvertising which merely states in general terms that one product is superior is not actionable." *Cook, Perkiss & Liehe*, 911 F.2d at 246 (quoting *Smith-Victor Corp. v. Sylvania Elec. Prods., Inc.*, 242 F. Supp. 302, 308 (N.D. Ill. 1965)). "However, misdescriptions of specific or absolute characteristics of a product are actionable." *Id.* (quoting *Stiffel Co. v. Westwood Lighting Grp.*, 658 F. Supp. 1103, 1115 (D.N.J. 1987)).

"[P]redictions as to future events, or statements as to future action by some third party, are deemed opinions, and not actionable fraud." *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 158 (1991). "Certain broken promises of future conduct may, however, be actionable." *Id.* "A false promise is actionable on the theory that a promise implies an intention to perform, that *intention to perform or not to perform* is a state of mind, and that misrepresentation of such a state of mind is a misrepresentation of *fact.* The allegation of a *promise* (which implies a representation of intention to perform) is the equivalent of the ordinary allegation of a representation of fact." *Id.* at 158–59 (quoting 5 B. Witkin, Cal. Procedure at 120 (3d ed. 1985)). "To maintain an action for deceit based on a false promise, one must specifically allege and prove, among other things, that the promisor did not intend to perform at the time he or she made the promise and that it was intended to deceive or induce the promisee to do or not do a particular thing." *Id.*; *see Randell v.*

---

[76] Reply – ECF No. 28 at 12.

*Levi Strauss & Co.*, No. C 05-1047 CW, 2006 WL 1310464, at *6 (N.D. Cal. May 12, 2006) ("Levi Strauss was a good company to work with, it was fair, [and] it was a place that [the plaintiff could] retire from" was a non-actionable opinion and statement about a future event).

Whether an alleged misrepresentation is a non-actionable statement of puffery is a question of law. *Cook, Perkiss & Liehe*, 911 F.2d at 246.

Here, some of the statements set forth in the Statement are either promises about future deliverables (such as vague statements about the timeline to go live) or puffery ("go live quickly"). But rendered more concrete, they might be actionable. *See Grouse River*, 848 F. App'x at 243–44 (speed of deployment can be actionable fraud, not puffery). And Oracle represented that it could deliver a software system that met River Supply's needs. That might sound in fraud too. River Supply said that it provided Oracle with its requirements, and NetSuite said that it could meet them.[77] But the statements here are too generic. River Supply presumably can specify what it asked for, what Oracle promised (and who promised it), River Supply's justifiable reliance on the promises, and Oracle's failure to deliver what it promised. *Grouse River*, 2016 WL 5930273, at *10. The court dismisses the fraud and misrepresentation claims with leave to amend. In any amended complaint, the court asks the plaintiff to do what it did in its opposition: identify specifically the representations that allegedly are fraudulent.

### 3. Contract Claims

There are two contract-based claims: breach of contract and breach of the implied covenant of good faith and fair dealing.

The elements of a breach-of-contract claim are "(1) the existence of the contract, (2) [the] plaintiff's performance or excuse for nonperformance, (3) [the] defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) (cleaned up). River Supply pleaded the claim sufficiently. It alleged that Oracle did not provide the promised functionality, and it pleaded its own performance. It could have been more specific,

---

[77] *See supra* Statement.

but that deficiency will be remedied on amendment. In any event, the allegations are enough to get by Rules 8(a) and 12(b)(6). *Grouse River*, 2016 WL 5930273, at *12–13.

The covenant of good faith and fair dealing is implied in every contract and prevents one party from "unfairly frustrating the other party's right to receive the benefits" of the contract. *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 349 (2000). To allege a claim for the breach of the implied covenant of good faith and fair dealing, a plaintiff must allege the following: (1) the plaintiff and the defendant entered into a contract; (2) the plaintiff did all or substantially all of the things that the contract required him to do or that he was excused from having to do; (3) all conditions required for the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's right to receive the benefits of the contract; and (5) the defendant's conduct hurt the plaintiff. *Oculus Innovative Scis., Inc. v. Nofil Corp.*, No. C 06-01686 SI, 2007 WL 2600746, at *4 (N.D. Cal. Sept. 10, 2007). The implied covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Guz*, 24 Cal. 4th at 349–50. "To the extent the implied covenant claim seeks simply to invoke terms to which the parties *did* agree, it is superfluous." *Id.* at 352.

Here, River Supply alleges breach of the contract in the form of Oracle's failure to perform, but it does not specify which representations were something "beyond those incorporated into the specific terms" of the agreement. The court dismisses the claim with leave to amend.

### 4. Breach of Warranty

Oracle also moved to dismiss the breach-of-warranty claim.[78]

Under California law, an express warranty is created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Cal. Com. Code § 2313(1)(a). "[T]o prevail on a breach of express warranty claim, the plaintiff must prove [that] (1) the seller's statements constitute an affirmation or promise, or a description of the goods; (2) the statement was part of the basis of the bargain; and (3) the

---

[78] Mot. – ECF No. 13 at 28.

United States District Court
Northern District of California

United States District Court
Northern District of California

warranty was breached." *Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213, 1227 (2010) (cleaned up). "To establish the existence of an express warranty, a plaintiff must point to a specific and unequivocal statement." *Watkins v MGA Ent., Inc.*, 574 F. Supp. 3d 747, 756 (N.D. Cal. 2021) (cleaned up).

The warranty required Oracle to perform (1) the Cloud Service using reasonable care and (2) the Professional Services and Support Services in a professional manner consistent with industry standards.[79] Oracle contends that River Supply did not allege how it failed to use reasonable care or perform consistent with industry standards.[80] River Supply counters that it was enough to allege Oracle's failure to provide the services using commercially reasonable care and skill.[81] River Supply did not identify specific written statements of warranty that were breached, at least regarding the Cloud Service (the main part of the contract). Instead, it alleges only a breach of contract. The court dismisses the claim with leave to amend.

### 5. California Penal Code § 496

California Penal Code § 496(a) provides in relevant part:

> Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained . . . shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170.

Section 496(c) has a treble damages provision for civil actions:

---

[79] *See supra* Statement.

[80] Reply – ECF No. 28 at 16–17 (the sum of the argument on reply).

[81] Opp'n – ECF No. 26 at 26 (citing — without discussing — First Am. Compl. – ECF No. at 52 (¶ 132) ("failed to perform the services in a professional manner consistent with industry standards"), (¶ 133) ("breached the warranties by failing to correct the services while keeping monies paid by RSI, without delivering a workable ERP solution"), 50 (¶ 124) (failed to perform services it was required to perform under the Estimate Forms and Statements of Work and failing to provide a workable ERP with the required features at the agreed-upon price and during the agreed-upon timeframe, thereby breaching the contract; failed to provide services consistent with industry standards and instead skipped meetings, ignored emails and questions, failed to import data, and generally dropped the ball), 29–39 (¶¶ 58–81) (summarizing the interactions during the project, including breaches (blowing deadlines and not delivering a functioning product), not managing the project adequately, recommending payment processors that did not work, and other project issues).

> Any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees.

California courts have held that "[s]ection 496(a) extends to property 'that has been obtained in any manner constituting theft.'" *Grouse River*, 848 F. App'x at 242 (cleaned up) (quoting *Bell v. Feibush*, 212 Cal. App. 4th 1041, 1048 (2013)). California Penal Code § 484(a) defines theft: "Every person . . . who shall knowingly and designedly, by any false or fraudulent representation or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property . . . is guilty of theft." The elements of theft under § 484(a) are "(i) property was stolen or obtained in a manner constituting theft, (ii) the defendant knew the property was so stolen or obtained, and (iii) the defendant received or had possession of the stolen property." *Grouse River*, 848 F. App'x at 242 (quoting *Switzer v. Wood*, 35 Cal. App. 5th 116, 126 (2019)). If a plaintiff adequately pleads fraud in a case like this, "it follows that [it] adequately pleaded theft by false pretense (which satisfies the first element of a § 496 violation) because the elements of a civil fraud claim closely track those of theft by false pretense." *Id.* (applying rule in a case against Oracle involving similar contract for a SaaS software solution).

Because River Supply did not plead fraud with the requisite specificity under Rule 9(b), it did not plead a § 496(a) claim either.

### 6. Remaining Claims

The remaining claims are the UCL claim and the claim for declaratory relief.

Oracle moved to dismiss River Supply's UCL claim, which is predicated on unlawful, unfair, and fraudulent business practices, on the ground that River Supply has an adequate remedy at law.[82] River Supply counters that the issue is better addressed at summary judgment and it in any event asks for an injunction and restitution.[83] The UCL claim is predicated on claims that the court has dismissed. The court thus dismisses it with leave to amend. That said, this is a case that

---

[82] Mot. – ECF No. 13 at 31–33; *see* First Am. Comp. – ECF No. 1 at 55–56 (¶¶ 149–53).

[83] Opp'n – ECF No. 26 at 28–29.

seemingly has an adequate remedy at law. *Rodriguez v. FCA US LLC*, No. 8:22-cv-01445-FWS-JDE, 2023 WL 3150075, at * 3–5 (C.D. Cal. Mar. 21, 2023) (dismissing UCL claim because the plaintiff did not plead that money damages were an inadequate remedy at law).

The claim for declaratory relief is predicated on Oracle's alleged fraud.[84] Because River Supply did not adequately plead fraud, this claim fails. Also, as Oracle contends, the claim duplicates other claims.[85] A declaratory-relief claim "is unnecessary where an adequate remedy exists under some other cause of action." *Shin v. ICON Found.*, No. 20-cv-07363-WHO, 2021 WL 1893117, at *12 (N.D. Cal. May 11, 2021). The dismissal is with leave to amend.

The court defers considering whether the allegation of a one-time discount is an impermissible settlement negotiation that the court must strike.[86] The context may be illuminated better in an amended complaint.

### CONCLUSION

The court dismisses the claims against Oracle and NetSuite except for the breach-of-contract claim. Any amended complaint must be filed within twenty-eight days and must attach a blackline compare of the amended complaint against the current complaint. This disposes of ECF No. 13.

**IT IS SO ORDERED.**

Dated: November 6, 2023

_____

LAUREL BEELER
United States Magistrate Judge

---

[84] First Am. Compl. – ECF No. 1 at 57 (¶¶ 154–59).

[85] Reply – ECF No. 28 at 20.

[86] *Id.* at 21.

United States District Court
Northern District of California